Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 1 of 122 PageID #: 10

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF RICHMOND**

| | | |
|---|---|---|
| GGP STATEN ISLAND MALL, LLC; ACE AMERICAN INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO. BOWPN1800272/091/270/274 a/s/o GGP STATEN ISLAND MALL; ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; WESTPORT INSURANCE CORPORATION a/s/o GGP STATEN ISLAND MALL; LIBERTY MUTUAL FIRE INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; AMERICAN INTERNATIONAL GROUP UK LIMITED F/K/A LEXINGTON LONDON, A DIVISION OF AIG EUROPE, LTD. a/s/o GGP STATEN ISLAND MALL; CHUBB CUSTOM INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; ALLIANZ GLOBAL CORPORATION & SPECIALTY SE a/s/o GGP STATEN ISLAND MALL | : : : : : : : : : : : : : : : : : : : : : : : | Index No.:  **SUMMONS** |
| Plaintiffs, | : | |
| v. | : : | |
| AURORA CONTRACTORS, INC., BARNETTE CONSULTING SERVICES, LLC; INDUSTRIAL CONNECTIONS & SOLUTIONS, LLC; ABB, INC; REXEL, USA, INC. d/b/a GEXPRO; | : : : : : | |
| Defendants. | : : | |

**TO THE ABOVE NAMED DEFENDANTS:**

 **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your Answer, or if the Complaint is not served with a Summons, to serve a Notice of Appearance on the plaintiff's attorney(s), **within twenty (20) days** after service of this summons, exclusive of the date of service, **or within thirty (30) days after completion of service** where service is made in any other manner than by personal delivery within the State. In case of your failure to appear or answer, judgment may be taken against you by default for the relief demanded in the Complaint.

{S2716944; 1}

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 2 of 122 PageID #: 11

Richmond County is designated as the place of trial because the facts and circumstances giving rise to this action occurred in Richmond County.

**Dated: New York, New York**
       **January 25, 2021**

                              **SULLIVAN & WORCESTER LLP**


                              By:/s/George O. Richardson, III
                              George O. Richardson, III
                              1633 Broadway
                              New York, New York 10019
                              (212) 660-3000
                              grichardson@sullivanlaw.com
                              Attorneys for Plaintiff
                              GGP Staten Island Mall, LLC


                              **FLEISCHNER POTASH LLP**

                              By:
                              Ronald P. Berman
                              Counsel
                              14 Wall Street
                              Suite 5C
                              New York, New York 10005
                              (646)520-4200
                              rberman@fp.law

                              **Attorneys for Plaintiffs** ACE AMERICAN
                              INSURANCE COMPANY a/s/o GGP STATEN
                              ISLAND MALL; CERTAIN UNDERWRITERS
                              AT LLOYD'S LONDON SUBSCRIBING TO
                              POLICY NO. BOWPN1800272/091/270/274
                              a/s/o   GGP   STATEN   ISLAND   MALL;
                              ENDURANCE   AMERICAN   SPECIALTY
                              INSURANCE COMPANY a/s/o GGP STATEN
                              ISLAND MALL; WESTPORT INSURANCE
                              CORPORATION a/s/o GGP STATEN ISLAND
                              MALL; LIBERTY MUTUAL FIRE INSURANCE

Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 3 of 122 PageID #: 12

COMPANY a/s/o GGP STATEN ISLAND MALL; AMERICAN INTERNATIONAL GROUP UK LIMITED F/K/A LEXINGTON LONDON, A DIVISION OF AIG EUROPE, LTD. a/s/o GGP STATEN ISLAND MALL; CHUBB CUSTOM INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; ALLIANZ GLOBAL CORPORATION & SPECIALTY SE a/s/o GGP STATEN ISLAND MALL

**To Defendants:**

**AURORA CONTRACTORS, INC.**
**100 Raynor Avenue**
**Ronkonkoma, New York 11779**

**ABB, INC.**
**305 Gregson Drive**
**Cary, North Carolina 27511**

**BARNETTE CONSULTING SERVICES, LLC**
**C/O United States Corporation Agents, Inc.**
**9900 Spectrum Drive**
**Austin, Texas 78717**

**INDUSTRIAL CONNECTIONS & SOLUTIONS, LLC**
**C/O The Corporation Trust Company**
**Corporation Trust Center**
**1209 Orange Street**
**Wilmington, DE 19801**

**REXEL, USA INC. d/b/a GEXPRO**
**C/O Corporation Service Company**
**251 Little Falls Drive**
**Wilmington, Delaware 19808**
**And**
**700 Broadhollow Road**
**Farmingdale New York 11735**

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 4 of 122 PageID #: 13

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF RICHMOND**

| | |
|---|---|
| GGP STATEN ISLAND MALL, LLC; ACE AMERICAN INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO. BOWPN1800272/091/270/274 a/s/o GGP STATEN ISLAND MALL; ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; WESTPORT INSURANCE CORPORATION a/s/o GGP STATEN ISLAND MALL; LIBERTY MUTUAL FIRE INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; AMERICAN INTERNATIONAL GROUP UK LIMITED F/K/A LEXINGTON LONDON, A DIVISION OF AIG EUROPE, LTD. a/s/o GGP STATEN ISLAND MALL; CHUBB CUSTOM INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; ALLIANZ GLOBAL CORPORATION & SPECIALTY SE a/s/o GGP STATEN ISLAND MALL | : Index No.: : : : : : **COMPLAINT** : : : : : : : : : : : : : : : : : |
| Plaintiffs, | : |
| v. | : |
| | : |
| AURORA CONTRACTORS, INC., BARNETTE CONSULTING SERVICES, LLC; INDUSTRIAL CONNECTIONS & SOLUTIONS, LLC; ABB, Inc.; REXEL, USA, INC. d/b/a GEXPRO; | : : : : : |
| Defendants. | : : |

Plaintiffs GGP Staten Island Mall, LLC ("GGP"), by its attorneys, Sullivan & Worcester LLP, Ace American Insurance Company as subrogee of GGP ("ACE"), Certain Underwriters at Lloyd's London subscribing to Policy No. BOWPN1800272/091/270/274 as subrogee of GGP ("Lloyds"), Endurance American Specialty Insurance Company as subrogee of GGP ("Endurance"), Westport Insurance Corporation as subrogee of GGP ('Westport"), Liberty Mutual Fire Insurance Company as subrogee of GGP ("Liberty"), American International Group UK Limited formerly

{S2716944; 1}

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 5 of 122 PageID #: 14

known as Lexington London, a division of AIG Europe as subrogee of GGP ("Lex London"), Chubb Custom Insurance Company as subrogee of GGP ("Chubb"), and Allianz Global Corporation & Specialty SE as subrogee of GGP ("Allianz"), by their attorneys, Fleischner Potash LLP , for their complaint against defendants, Aurora Contractors, Inc. ("Aurora"), Barnette Consulting Services LLC ("Barnette"). Industrial Connections & Solutions, LLC formerly known as GE Industrial Solutions ("Industrial Connections"), ABB, Inc. ("ABB"), and Rexel, USA, Inc. d/b/a Gexpro ("Gexpro"), state as follows:

1.      Plaintiff GGP is a Delaware limited liability company with a principal place of business at 110 N. Wacker Drive, Chicago, Illinois.  GGP brings this action in its own name to enforce its rights and claims with respect to losses incurred and sustained that currently are not subject to any insurance commitment or payment.

2.      Plaintiff ACE is a Pennsylvania corporation with a principal place of business in Philadelphia, Pennsylvania.  At all times relevant hereto, ACE provided all risk property insurance to GGP under Policy No.CX D37417919 005 and is subrogated to certain rights and claims of GGP against third parties responsible for an insured loss to the extent of ACE's payments.

3.      Plaintiff Lloyds is a group of insurance underwriters with a principal place of business outside the United States.  At all times relevant hereto, Lloyds provided all risk property insurance to GGP under Policy No. BOWPN1800272/270/274 and is subrogated to certain rights and claims of GGP against third parties responsible for an insured loss to the extent of Lloyds' payments.

4.      Plaintiff Endurance is a Delaware corporation with a principal place of business in Purchase, New York.  At all times relevant hereto, Endurance provided all risk property insurance to GGP under Policy No. GPR10010887801 and is subrogated to certain rights and claims of GGP against third parties responsible for an insured loss to the extent of Endurance's payments.

5.      Plaintiff Westport is a Missouri corporation with a principal place of business in Kansas City, Missouri. At all times relevant hereto, Westport provided all risk property insurance to GGP under Policy No. NAP 0451276 05 and is subrogated to

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 6 of 122 PageID #: 15

certain rights and claims of GGP against third parties responsible for an insured loss to the extent of Westport's payments.

6.      Plaintiff Liberty is a Wisconsin corporation with a principal place of business in Boston, Massachusetts.  At all times relevant hereto, Liberty provided all risk property insurance to GGP under Policy No.   YS2-L9L-430466-068 and is subrogated to certain rights and claims of GGP against third parties responsible for an insured loss to the extent of Liberty's payments.

7.      Plaintiff American International Group UK Limited f/k/a Lexington London is a division of AIG Europe, LTD. with a principal place of business outside the United States.  At all times relevant hereto, Lex London provided all risk property insurance to GGP under Policy No. BOWPN1800085 and is subrogated to certain rights and claims of GGP against third parties responsible for an insured loss to the extent of Lex London's payments.

8.      Plaintiff Chubb is a Delaware corporation with a principal place of business in Philadelphia, Pennsylvania. At all times relevant hereto, Chubb provided all risk property insurance to GGP under Policy No. 44734993-01 and is subrogated to certain rights and claims of GGP against third parties responsible for an insured loss to the extent of Chubb's payments.

9.      Plaintiff Allianz is an insurance company with a principal place of business outside the United States.  At all times relevant hereto, Allianz provided all risk property insurance to GGP under Policy No. BOWPN18000275 and is subrogated to certain rights and claims of GGP against third parties responsible for an insured loss to the extent of Allianz's payments.

10.     On information and belief, defendant Aurora is a New York corporation with a principal place of business at 100 Raynor Avenue, Ronkonkoma, New York.

11.     On information and belief, defendant Barnette is a Texas corporation with a principal place of business at 7835 Atlantic Breeze Lane, Richmond, Texas.  At all times relevant hereto, Barnette was the agent or authorized representative of defendant Industrial Connections or defendant Gexpro.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 7 of 122 PageID #: 16

12.     On information and belief, defendant Industrial Connections is a Delaware limited liability company with a principal place of business at 305 Gregson Drive, Cary, North Carolina.

13.     On information and belief, defendant ABB is a Delaware limited liability company with a principal place of business at 305 Gregson Drive, Cary, North Carolina.

14.     On information and belief, Gexpro is a Delaware corporation with a principal place of business at 14951 Dallas Parkway, Dallas, Texas.

<u>JURISDICTION AND VENUE</u>

15.     This Court has personal jurisdiction over defendants pursuant to CPLR section 301 or 302 because defendants are found in the State or, as more fully described below, directly, or through an intermediary or agent, transacted business in New York or contracted to supply goods or services in New York or committed a tortious act without New York which caused injury within New York and the defendants, and each of them, regularly does or solicits business, or engage in a persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered, in New York or expect or should reasonably expect the act to have consequences in New York and derive substantial revenue from interstate or international commerce.

16.     Venue is proper in Richmond County because the facts and circumstances giving rise to this action occurred in Richmond County.

<u>STATEMENT OF FACTS</u>

17.     GGP owns and operates the Staten Island Mall located at 2655 Richmond Avenue on Staten Island.

18.     In 2016, the Mall began an expansion project ("the Project").

19.     GGP hired Aurora as the general contractor of the Project.  A copy of the contract between GGP and Aurora is attached as Exhibit 1 ("the Contract").

20.     Part of the Project required the procurement and installation of three new electrical feeders, or "cores," on the roof of one of the buildings at the Mall.  Each core is made up of a system of electrical parts collectively called a "busway."

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 8 of 122 PageID #: 17

21.     Prior to the start of the Project, there was a single core on the roof that supplied electrical power to a significant portion of the Mall, including a number of plaintiff GGP's tenants.

22.     As part of its work as general contractor, Aurora, either itself or through one of the subcontractors it hired, procured three new busways ("the Busways").  In the course of the Project and the events described below, the three new Busways came to be referred to as Cores 1, 3, and 4.  The busway existent prior to the commencement of the Project is referred to as Core 2.

23.     On information and belief, the Busways were procured from defendant Gexpro.

24.     Upon information and belief, Industrial Connections, ABB, and/or Gexpro designed, manufactured, assembled, tested, inspected, sold and/or distributed the Busways.

25.     Core 1 was installed by defendant Aurora or its subcontractor in the late Summer or Fall of 2017.

26.     Almost immediately, problems arose with Core 1.

27.     In response to inquiries about these problems, on or about November 21, 2017, defendant Industrial Connections, ABB, Inc., and/or Gexpro sent one of its employees to the Mall to inspect and test Core 1.  The employee discovered water within it.

28.     The employee determined that the water condition was a result of a "manufacturing defect."

29.     Despite this manufacturing defect, Industrial Connections, ABB and/or Gexpro certified Core 1 as fit to operate.

30.     In response to continuing concerns with Core 1, on or about March 31, 2018, Industrial Connections, ABB and/or Gexpro, sent Jerrith Barnette, a principal of defendant Barnette, to the Mall to inspect and test Core 1.

31.     Barnette discovered certain characteristics, including characteristics consistent with the depletion of Core 1's electrical insulation.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 9 of 122 PageID #: 18

32.     Despite the results of his inspection and tests, Barnette, on behalf of defendant Industrial Connections, ABB and/or Gexpro, determined that Core 1 was fit to operate.

33.     In reliance on Barnette's determination, Core 1 was energized.

34.     On or about July 17, 2018, Core 1 failed catastrophically causing its destruction.

35.     Not only was Core 1 destroyed, but its failure also destroyed Core 2 and other property of plaintiff GGP at the Mall.

36.     The loss of Cores 1 and 2 immediately rendered a significant portion of the Mall without electricity.  In order to mitigate this disaster, emergency generators were obtained at considerable cost in time, labor, and material to supply electrical power to the Mall and its tenants throughout the prolonged period of remediation.

37.     In investigating the cause of the failure of Core 1, GGP learned that Core 1 was either designed or manufactured defectively or was not fit for the particular use to which it was put.

38.     Cores 1 and 2 were removed and replaced with new busways manufactured by Square D at considerable cost in time, labor, and material.

39.     Based on the investigation referred to above, it was determined not to install the busways procured from defendants Industrial Connections, ABB and/or Gexpro for use in Cores 3 and 4.  Instead, at considerable additional cost in time, labor, and material, busways manufactured by Square D were obtained and installed in Cores 3 and 4.

40.     Subject to adjustment, supplementation, amendment and/or modification, Plaintiffs incurred or expect to incur no less than $2,500,000 million in repair costs, plus and not including lost profits.

41.     Plaintiffs Ace, Lloyds, Endurance, Westport, Liberty, Lex London, Chubb, Allianz made insurance payments to GGP for a portion of the damages and are therefore, to the extent of their payments and any future payments, are subrogated to GGP's rights and claims against the defendants.

{S2716944; 1}                                6

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 10 of 122 PageID #: 19

### FIRST CAUSE OF ACTION – BREACH OF CONTRACT (AURORA)

42.     The Plaintiffs repeat, reiterate and reallege each and every allegation as contained in paragraphs 1 through 41 with the same force and effect as though each were more fully set forth at length herein.

43.     The Contract provided that defendant Aurora "warrants to [GGP] that: (i) all materials and equipment uses in connection with the Work and the Project will be of good equality and new free from faults and defects unless the Contract Documents require or permit otherwise; (ii) the Work will comply with all applicable laws, rules, regulations, ordinances and permits and all of the requirements of the Contract Documents; and the Work will be free from defects and any Work, materials or equipment not conforming to these requirements, including substitutions not properly approved by [GGP], may be considered defective."  Contract § 3.2.

44.     The Contract provided that Aurora "shall be responsible to [GGP] for the acts and omissions of [Aurora's] employees, Vendors, Subcontractors and any of their agents and employees, and any other persons performing or supplying any of the labor, materials or services constituting the Work including but not limited to Subcontractors, suppliers, and/or materialmen."  Contract § 3.11.

45.     The Contract provided that Aurora "shall be responsible for the performance of Subcontractors and Vendors of every tier to the same extent as if performed by [Aurora] on a direct basis, including coordination of those portions of the Work performed by Subcontractors and Vendors."  Contract § 9.1.

46.     Aurora breached its duties owed to GGP under the Contract.

47.     Aurora's breach of its contractual obligations was a direct and proximate cause of plaintiffs' damages.

WHEREFORE,  plaintiffs demand judgment against Aurora for damages exceeding $2,500,000 together with costs, interest, attorney's fees, and such other and further relief as to the Court appears just and proper.

### SECOND CAUSE OF ACTION – NEGLIGENCE (BARNETTE)

48.     The Plaintiffs repeat, reiterate and reallege each and every allegation as contained in paragraphs 1 through 47 with the same force and effect as though each were more fully set forth at length herein

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 11 of 122 PageID #: 20

49.     Barnette owed a duty to GGP and plaintiffs to exercise due and reasonable care in the inspection, testing and/or certification of the Busway.

50.     Barnette owed a duty imposed by common law, applicable industry customs, regulations, standards of practice codes and/or ordinances to exercise due care in the performance of its work and/or obligations at the subject location.

51.     Barnette knew or should have known that its failure to exercise due and reasonable care would result in unreasonable risk of damage and/or harm to the subject property.

52.     Barnette breached the duty of care in one or more of the following ways:

   a. Failing to adequately supervise its agents, employees, workmen, representatives, contractors, subcontractors, servants and/or officers to ensure that the work did not harm or otherwise damage the property of GGP;

   b. Failing to properly inspect and test the Busway in accordance with manufacturer guidelines, and applicable standards and codes.

   c. Failing to take adequate remedial action upon discovery of deficiencies in the Busway system;

   d. Failing to warn of the dangerous and defective condition of the Busway;

   e. Failing to ensure the Busway was fit for operation before certifying the system fit for use;

   f. Otherwise failing to use reasonable care and act reasonably under the circumstances.

   g. Plaintiffs will also rely on the doctrine of res ipsa loquitor.

53.     Barnette's breach of duty was a direct and proximate cause of plaintiffs' damages.

WHEREFORE, plaintiffs demand judgment against defendant Barnette for damages no less than $2,500,000 together with costs, interest, attorney's fees, and such other and further relief as to the Court appears just and proper.

### THIRD CAUSE OF ACTION – NEGLIGENCE (INDUSTRIAL CONNECTIONS)

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 12 of 122 PageID #: 21

54.     The Plaintiffs repeat, reiterate and reallege each and every allegation as contained in paragraphs 1 through 53 with the same force and effect as though each were more fully set forth at length herein.

55.     Industrial Connections owed a duty to GGP and plaintiffs to exercise due and reasonable care in the design, manufacture, inspection, testing and/or certification of the Busways.

56.     Industrial Connections owed a duty imposed by common law, applicable industry customs, regulations, standards of practice codes and/or ordinances to exercise due care in the performance of its work and/or obligations at the subject location.

57.     Industrial Connections knew or should have known that its failure to exercise due and reasonable care would result in unreasonable risk of damage and/or harm to the subject property.

58.     Industrial Connections breached the duty of care in one or more of the following ways:

   a.  Negligently designing and manufacturing the Busways;

   b.  Failing to ensure the design and manufacture of the Busways complied with applicable standards and codes;

   c.  Failing to warn of the dangerous and defective condition of the Busways;

   d.  Failing to adequately supervise its agents, employees, workmen, representatives, contractors, subcontractors, servants and/or officers to ensure that the work did not harm or otherwise damage the property of GGP;

   e.  Failing to properly inspect and test the Busways in accordance with manufacturer guidelines, and applicable standards and codes;

   f.  Failing to take adequate remedial action upon discovery of deficiencies in the Busways system;

   g.  Failing to ensure the Busways were fit for operation before certifying the system fit for use;

Case 1:24-cv-04939-VMS Document 1-1 Filed 07/16/24 Page 13 of 122 PageID #: 22

     h.  Otherwise failing to use reasonable care and act reasonably under the circumstances.

     i.  Plaintiffs will also rely on the doctrine of res ipsa loquitor.

59.    Industrial Connections' breach of duty was a direct and proximate cause of plaintiffs' damages.

WHEREFORE, plaintiffs demand judgment against defendant Industrial Connections for damages no less than $2,500,000 together with costs, interest, attorney's fees, and such other and further relief as to the Court appears just and proper.

## FOURTH CAUSE OF ACTION – STRICT LIABILITY (INDUSTRIAL CONNECTIONS)

60.    The Plaintiffs repeat, reiterate and reallege each and every allegation as contained in paragraphs 1 through 59 with the same force and effect as though each were more fully set forth at length herein

61.    Industrial Connections was engaged in the business of the design, manufacture, marketing, sale, and/or distribution of Busways.

62.    Upon info and belief Industrial Connections manufactured, sold, marketed, distributed, monitored, inspected , tested and/or placed into the stream of commerce an unreasonably dangerous and/or defective product which was unsafe at the time it left its control.

63.    Industrial Connections designed, manufactured, and sold the Busways in a dangerous and defective condition.

64.    The Busways and their component parts were defective as to design, manufacturer, and warnings, causing the Busways and its component parts to be in a dangerous and defective condition that made them unsafe for its intended use.

65.    The dangerous and defective condition of the Busways existed upon delivery of the Busways to the Mall.

66.    The dangerous and defective condition of the Busways was a direct and proximate cause of plaintiffs' damages.

67.    Industrial Connections is strictly liable for plaintiffs' damages for designing, manufacturing, and selling the Busways in a dangerous and defective condition.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 14 of 122 PageID #: 23

WHEREFORE, plaintiffs demand judgment against defendant Industrial Connections for damages no less than $2,500,000 together with costs, interest, attorney's fees, and such other and further relief as to the Court appears just and proper.

## FIFTH CAUSE OF ACTION – NEGLIGENCE (ABB, INC.)

68.    The Plaintiffs repeat, reiterate and reallege each and every allegation as contained in paragraphs 1 through 67 with the same force and effect as though each were more fully set forth at length herein.

69.    ABB owed a duty to GGP and plaintiffs to exercise due and reasonable care in the design, manufacture, inspection, testing and/or certification of the Busways.

70.    ABB owed a duty imposed by common law, applicable industry customs, regulations, standards of practice codes and/or ordinances to exercise due care in the performance of its work and/or obligations at the subject location.

71.    ABB knew or should have known that its failure to exercise due and reasonable care would result in unreasonable risk of damage and/or harm to the subject property.

72.    ABB breached the duty of care in one or more of the following ways:

a.  Negligently designing and manufacturing the Busways;

b.  Failing to ensure the design and manufacture of the Busways complied with applicable standards and codes;

c.  Failing to warn of the dangerous and defective condition of the Busways;

d.  Failing to adequately supervise its agents, employees, workmen, representatives, contractors, subcontractors, servants and/or officers to ensure that the work did not harm or otherwise damage the property of GGP;

e.  Failing to properly inspect and test the Busways in accordance with manufacturer guidelines, and applicable standards and codes.

f.  Failing to take adequate remedial action upon discovery of deficiencies in the Busways system;

Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 15 of 122 PageID #: 24

      g. Failing to ensure the Busways were fit for operation before certifying the system fit for use;

      h. Otherwise failing to use reasonable care and act reasonably under the circumstances;

      i. Plaintiffs will also rely on the doctrine of res ipsa loquitor.

73.    ABB's breach of duty was a direct and proximate cause of plaintiffs' damages.

WHEREFORE, plaintiffs demand judgment against defendant ABB for damages no less than $2,500,000 together with costs, interest, attorney's fees, and such other and further relief as to the Court appears just and proper.

## SIXTH CAUSE OF ACTION – STRICT LIABILITY (ABB, INC.)

74.    The Plaintiffs repeat, reiterate and reallege each and every allegation as contained in paragraphs 1 through 73 with the same force and effect as though each were more fully set forth at length herein.

75.    ABB was engaged in the business of the design, manufacture, marketing, sale, and/or distribution of the Busways.

76.    Upon info and belief, ABB manufactured, sold, marketed, distributed, monitored, inspected, tested and/or placed into the stream of commerce an unreasonably dangerous and/or defective product which was unsafe at the time it left its control.

77.    ABB designed, manufactured, and sold the Busways in a dangerous and defective condition.

78.    The Busways and their component parts were defective as to design, manufacturer, and warnings, causing the Busways and its component parts to be in a dangerous and defective condition that made them unsafe for its intended use.

79.    The dangerous and defective condition of the Busways existed upon delivery of the Busways to the Mall.

80.    The dangerous and defective condition of the Busways was a direct and proximate cause of plaintiffs' damages.

81.    ABB is strictly liable for plaintiffs' damages for designing, manufacturing, and selling the Busways in a dangerous and defective condition.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 16 of 122 PageID #: 25

WHEREFORE, plaintiffs demand judgment against defendant ABB for damages no less than $2,500,000 together with costs, interest, attorney's fees, and such other and further relief as to the Court appears just and proper.

## SEVENTH CAUSE OF ACTION – NEGLIGENCE (GEXPRO)

82.    The Plaintiffs repeat, reiterate and reallege each and every allegation as contained in paragraphs 1 through 81 with the same force and effect as though each were more fully set forth at length herein.

83.    GEXPRO owed a duty to GGP and plaintiffs to exercise due and reasonable care in the sale, design, manufacture, inspection, testing and/or certification of the Busways.

84.    GEXPRO owed a duty imposed by common law, applicable industry customs, regulations, standards of practice codes and/or ordinances to exercise due care in the performance of its work and/or obligations at the subject location.

85.    GEXPRO knew or should have known that its failure to exercise due and reasonable care would result in unreasonable risk of damage and/or harm to the subject property.

86.    GEXPRO breached the duty of care in one or more of the following ways:

a.  Negligently designing and manufacturing the Busways;

b.  Failing to ensure the design and manufacture of the Busways complied with applicable standards and codes;

c.  Failing to warn of the dangerous and defective condition of the Busways;

d.  Failing to adequately supervise its agents, employees, workmen, representatives, contractors, subcontractors, servants and/or officers to ensure that the work did not harm or otherwise damage the property of GGP;

e.  Failing to properly inspect and test the Busways in accordance with manufacturer guidelines, and applicable standards and codes.

f.  Failing to take adequate remedial action upon discovery of deficiencies in the Busways system;

     g.  Failing to ensure the Busways were fit for operation before certifying the system fit for use;

     h.  Otherwise failing to use reasonable care and act reasonably under the circumstances;

     i.  Plaintiffs will also rely on the doctrine of res ipsa loquitor.

87.    GEXPRO's breach of duty was a direct and proximate cause of plaintiffs' damages.

WHEREFORE, plaintiffs demand judgment against defendant GEXPRO for damages no less than $2,500,000 together with costs, interest, attorney's fees, and such other and further relief as to the Court appears just and proper.

## **EIGHTH CAUSE OF ACTION – STRICT LIABILITY (GEXPRO)**

88.    The Plaintiffs repeat, reiterate and reallege each and every allegation as contained in paragraphs 1 through 87 with the same force and effect as though each were more fully set forth at length herein.

89.    Gexpro sold the Busways in a dangerous and defective condition.

90.    Gexpro was engaged in the business of the design, manufacture, marketing, sale, and/or distribution of the Busways.

91.    Upon info and belief, Gexpro manufactured, sold, marketed, distributed, monitored, inspected, tested and/or placed into the stream of commerce an unreasonably dangerous and/or defective product which was unsafe at the time it left its control.

92.    The Busways and their component parts were defective as to design, manufacturer, and warnings, causing the Busways and their component parts to be in a dangerous and defective condition that made them unsafe for its intended use.

93.    The dangerous and defective condition of the Busways existed upon delivery of the Busways to the Mall.

94.    The dangerous and defective condition of the Busways was a direct and proximate cause of plaintiffs' damages.

95.    Gexpro is strictly liable for plaintiffs' damages for selling the Busways in a dangerous and defective condition.

WHEREFORE, plaintiffs demand judgment against defendant Gexpro for damages exceeding $2,500,000 together with costs, interest, attorney's fees, and any other relief the Court deems appropriate.

Dated: New York, New York
      January 25, 2021

                                Respectfully submitted,

                                **SULLIVAN & WORCESTER LLP**

                                By: /s/ George O. Richardson, III
                                George O. Richardson, III
                                1633 Broadway
                                New York, New York 10019
                                (212) 660-3000
                                grichardson@sullivanlaw.com
                                Attorneys for Plaintiff
                                GGP Staten Island Mall, LLC

                                **FLEISCHNER POTASH LLP**

                                By:
                                Ronald P. Berman
                                Counsel
                                14 Wall Street
                                Suite 5C
                                New York, New York 10005
                                (646)520-4200
                                rberman@fp.law

                                **Attorneys for Plaintiffs** ACE AMERICAN INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO. BOWPN1800272/091/270/274 a/s/o GGP STATEN ISLAND MALL; ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY a/s/o GGP STATEN ISLAND MALL; WESTPORT INSURANCE CORPORATION a/s/o GGP STATEN ISLAND MALL; LIBERTY MUTUAL FIRE INSURANCE COMPANY a/s/o GGP STATEN ISLAND

FILED: RICHMOND COUNTY CLERK 01/25/2021 06:19 PM
NYSCEF DOC. NO. 1
INDEX NO. 150180/2021
RECEIVED NYSCEF: 01/25/2021

MALL; AMERICAN INTERNATIONAL GROUP
UK LIMITED F/K/A LEXINGTON LONDON, A
DIVISION OF AIG EUROPE, LTD. a/s/o GGP
STATEN ISLAND MALL; CHUBB CUSTOM
INSURANCE COMPANY a/s/o GGP STATEN
ISLAND MALL; ALLIANZ GLOBAL
CORPORATION & SPECIALTY SE a/s/o GGP
STATEN ISLAND MALL

{S2716944; 1}

16

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 20 of 122 PageID #: 29

# EXHIBIT 1

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 21 of 122 PageID #: 30

| | |
|---|---|
| Project Name: | Staten Island Mall - Seed Money Macys |
| Located in: | Staten Island, New York |
| Project #: | 418098878 |
| Contractor: | Aurora Contractors, Inc. |
| FEIN#: | 112638171 |
| Amount: | $93,341,302.00 |
| Contract #: | 019 |

# CONSTRUCTION AGREEMENT
# (GMP)

THIS CONSTRUCTION AGREEMENT (the "Agreement"), effective as of the date electronically uploaded and approved in Proliance®, is made by and between GGP Staten Island Mall, LLC, a Delaware limited liability company (the "Owner") and Aurora Contractors, Inc. (the "Contractor") for the construction of Staten Island Mall - Seed Money Macys in Staten Island, New York (the "Project"), as more fully described in the Scope of Work set forth in the attached Exhibit A.

## AGREEMENT:

For and in consideration of the mutual covenants and conditions contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, do hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ATTACHMENTS

**Section 1.1 Certain Defined Terms.** As used herein, the term:

1.1.1 "**Agreement**" means this Agreement between Owner and Contractor, including all schedules, exhibits, attachments and other documents annexed hereto and made part hereof or incorporated herein by reference, as well as any addenda hereto or modifications made and entered into as provided herein. No other documents are part of this Agreement.

1.1.2 "**Allowance Amounts**" has the meaning ascribed to it in Section 5.6.

1.1.3 "**Allowance Items**" has the meaning ascribed to it in Section 5.6.

1.1.4 "**Application for Payment**" means a written or electronically request submitted via Proliance® for compensation by Contractor to the Owner for the Project for the Work performed, goods delivered or services rendered in accordance with the guidelines set forth in Section 10.1.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 22 of 122 PageID #: 31

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

1.1.5 "<u>Architect</u>" means that certain person lawfully licensed to practice architecture or an entity lawfully practicing architecture and having a direct agreement with the Owner to perform all of the necessary architectural and engineering services, including but not limited to architectural, structural (including foundation design), electrical, mechanical, plumbing, lighting and fire protection design required for all or a portion of the design of the Project.

1.1.6 "<u>Change</u>" has the meaning ascribed to it in <u>Section 6.1</u>.

1.1.7 "<u>Change Order</u>" has the meaning ascribed to in in <u>Section 6.3</u>.

1.1.8 "<u>Contract Amendment</u>" has the meaning ascribed to it in <u>Section 6.2</u>.

1.1.9 "<u>Contract Documents</u>" means this Agreement all exhibits, schedules, attachments and documents attached hereto; the Project Schedule (as defined in <u>Section 4.1</u> herein); the General Conditions of the Agreement attached hereto as <u>Exhibit B</u>, and any special conditions; the Drawings; the Specifications; all contracts and purchase orders with Subcontractors and Vendors; the Schedule of Values; all documents incorporated by reference into any of the foregoing documents; and all other documents, if any, set forth in the Scope of Work attached hereto as <u>Exhibit A</u>.

1.1.10 "<u>Contractor's Fee</u>" has the meaning ascribed to it in <u>Section 5.1</u>.

1.1.11 "<u>Contractor's Representative</u>" means the person designated from time to time by the Contractor as its representative in a written notice delivered to the Owner as provided in this Agreement.

1.1.12 "<u>Contract Time</u>" means, unless otherwise set forth in this Agreement or any Contract Document, the period of time between the Date of Commencement and the Final Completion, during which Contractor shall achieve Substantial Completion of the Work in its entirety in accordance with <u>Section 4.3</u>.

1.1.13 "<u>Cost of the Work</u>" has the meaning ascribed to it in <u>Section 7.1</u>.

1.1.14 "<u>Date of Commencement</u>" means the date upon which Owner requests Contractor to begin the Work on the Project.

1.1.15 "<u>Drawings</u>" mean, collectively, (i) the drawings listed in <u>Exhibit A</u>, (ii) such additional plats, drawings, profiles, typical cross-sections, general cross-sections, working drawings and supplemental drawings concerning the Work as may hereafter be issued and approved by the Owner's Representative, and (iii) such amendments to any of the foregoing documents as may be issued and approved by the Owner's Representative.

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

1.1.16 "**Final Completion**" means the Work as described in **Exhibit A** (Scope of Work) has been completed in accordance with the Contract Documents and in accordance with Section 8.6 of the General Conditions, that punch list items are satisfied and completed and close out documentation has been provided to the Owner.

1.1.17 "**Final Payment**" has the meaning ascribed to it in Section 11.1.

1.1.18 "**General Conditions**" means the General Conditions of the Agreement for Construction of the Project, attached hereto as **Exhibit B**.

1.1.19 "**Guaranteed Date of Substantial Completion**" has the meaning ascribed to it in Section 4.3.

1.1.20 "**Guaranteed Maximum Price**" has the meaning ascribed to it in Section 5.2.

1.1.21 "**Hazardous Materials**" means any hazardous, radioactive or toxic substance, material or waste, including, but not limited to, those substances, materials and wastes (whether or not mixed, commingled or otherwise combined with other substances, materials or wastes) listed in the United States Department of Transportation Hazardous Materials Table (49 C.F.R. Section 172.101, as may be amended from time to time) or by the Environmental Protection Agency as hazardous substances (40 C.F.R. Part 302, as may be amended from time to time), or substances, materials and wastes which are or become regulated under any applicable local, state, or federal law, rule or regulation, including, without limitation, any material, waste or substance which is (i) a petroleum product, crude oil or any faction thereof, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, or listed pursuant to Section 307 of the Clean Water Act,, (v) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, or (vi) as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act. Hazardous Material does not include any materials used in compliance with any environmental law, rule or regulation in the ordinary course of business or in the development or construction of the Project.

1.1.22 "**Jobsite**" means the area designated by the Owner as the area on which the Work is to be performed hereunder and such other areas as may be designated by the Owner's Representative, from time to time, for access to the Project and for the storage of the Contractor's materials and equipment.

1.1.23 "**Non-allowable Cost of the Work**" has the meaning ascribed to it in Section 5.10.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 24 of 122 PageID #: 33

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

1.1.24 "**Notice to Proceed**" means a written notice given by the Owner to the Contractor in which the Contractor is provided a "Date of Commencement" on which Contractor is instructed to proceed with the Work or a specific portion hereof.

1.1.25 "**Owner's Representative**" means the person designated from time to time by the Owner as its representative in a written notice delivered to the Contractor as provided in this Agreement.

1.1.26 "**Project**" has the meaning ascribed to it in the preamble and in **Exhibit A**.

1.1.27 "**Project Schedule**" has the meaning ascribed to it in Section 4.1.

1.1.28 "**Project Schedule Update**" has the meaning ascribed to it in Section 4.2.

1.1.29 "**Proliance®**" means the Owner's computer based project management system that is required to be used by the Contractor, and Subcontractors when deemed appropriate by the Owner, to manage the documentation and communication for the Project, including without limitation, Change Orders, Change Amendments, Applications for Payment and other information Owner requires to be uploaded into the project management system in order to manage the Project. Additional information regarding the project management system is set forth in **Exhibit G** attached hereto, entitled "Project Management System".

1.1.30 "**Recovery Plan**" means a detailed narrative explanation clearly stating the scope and extent of any and all resource loading, activity re-sequencing and other acceleration activities required for all affected elements of the Work to enable Contractor to either: (a) complete the respective interim milestones by the respective interim milestone dates; or (b) obtain Substantial Completion of the Work in its entirety within the Contract Time.

1.1.31 "**Schedule of Values**" means a schedule, prepared by the Contractor and approved by the Owner's Representative, allocating values among all categories or portions of the Work, including the Contractor's Fee as a separate line item. The initial Schedule of Values shall be set forth on **Exhibit A** attached hereto; and shall be in a format specified or approved by Owner, with any subsequent schedules prepared in such form and supported by such data to substantiate its accuracy as the Owner's Representative or Owner's lender(s) may require, and shall be used as a basis for reviewing the Contractor's Applications for Payment.

1.1.32 "**Scope of Work**" shall mean the description of the Project and Work to be performed to produce the building(s), structure(s), improvements and related facilities as described on **Exhibit A** and in the Contract Documents.

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

1.1.33 "**Specifications**" means the specifications listed in **Exhibit A** and all additions thereto hereafter issued by the Architect and approved by the Owner.

1.1.34 "**Subcontractors**" means those persons or other entities, which contract directly with Contractor to furnish any portion of the Work. The term "Subcontractors" does not include any person or other entity solely furnishing materials for the Project.

1.1.35 "**Substantial Completion**" or "Substantially Complete" means that the "Work" referred to in **Exhibit A** has been sufficiently completed in accordance with the Contract Documents so that the Owner may occupy or utilize the Work, Jobsite and/or Project for its intended purpose and use, and a temporary or permanent Certificate of Occupancy has been issued by the applicable issuing government agency and as set forth in Section 8.4 of the General Conditions.

1.1.36 "**Unavoidable Delay**" means delays due to strike, lockout, or other labor or industrial disturbance (whether or not on the part of employees or Subcontractors or Vendors); civil disturbance; order of any government, court or regulatory body claiming jurisdiction; terrorism; war; act of the public enemy; riot; sabotage; blockade; embargo; lightning; earthquake; fire; storm; hurricane; flood; explosion; act of God; or any cause similar to any of the causes hereinabove stated.

1.1.37 "**Value Engineering**" means a process in which the Contractor, utilizing its professional skills, knowledge and expertise, reviews the Drawings and Specifications for the Work and construction methods to be utilized in the performance of the Work and recommends to the Owner: (i) changes that will improve the quality of the workmanship or materials incorporated into the Work without increasing the Cost of the Work, or (ii) upon request of Owner, changes that will reduce to Cost of the Work without decreasing the quality of workmanship or materials.

1.1.38 "**Vendor**" means any person or entity (including employees, agents and representatives thereof) which has a purchase order or other agreement to provide materials, supplies, equipment and/or related services for the Project and/or provide installation services at the Jobsite for the Work, through a contract, purchase order or other arrangement with Contractor or any Subcontractor at any level.

1.1.39 "**Warranty Period**" means the later of one (1) year after the date of Substantial Completion of the Work or designated portion thereof solely with respect to the repair and correction warranty or the date such item is removed from the punch list.

1.1.40 "**Work**" means the totality of the obligations imposed upon Contractor by the Contract Documents, including, without limitation, the supply and

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

performance by Contractor, directly and through Subcontractors and Vendors, of all things necessary and/or reasonably inferable from the Contract Documents as being required or necessary to fully complete the tasks and improvements described in **Exhibit A** (Scope of Work) for the full completion of the Project and in accordance with the requirements of the Contract Documents, including, but not limited to, all labor, services, supervision, materials, equipment, tools, machinery and fabrication. The term "Work" may constitute the whole or a portion of the Project.

**Section 1.2 Additional Defined Terms.** Terms used in this Agreement not otherwise defined herein and which are defined in the General Conditions shall have the meanings ascribed to them in the General Conditions.

**Section 1.3 Attachments.** Attached hereto and forming a part of this Agreement are the following Exhibits, which, for the purpose of identification, have been signed or initialed by the parties hereto or their attorneys:

> 1.3.1 **Exhibit A** – Scope of Work, List of Contract Documents and Schedule of Values
> 1.3.2 **Exhibit B** – General Conditions of the Construction Agreement
> 1.3.3 **Exhibit C** – Guaranteed Maximum Price Premises & Assumptions
> 1.3.4 **Exhibit D** – General Condition Costs
> 1.3.5 **Exhibit E** – Insurance Requirements
> 1.3.6 **Exhibit** F - Proliance®

## ARTICLE 2
## THE WORK

**Section 2.1 Performance of the Work.** The Contractor shall perform and supply the Work, including, without limitation (i) all necessary scheduling, procurement, supervision, construction and construction management services; (ii) all necessary labor, materials, equipment, scaffolding, supervision, tools, supplies, insurance and related work and services; and (iii) all things reasonably inferable from the Contract Documents as being necessary to fully complete the Work, produce the buildings, structures, improvements and obtain the intended results described in **Exhibit A** attached hereto, including, but not limited to the requirements of the Project Schedule and the Guaranteed Maximum Price requirements set forth in **Articles 4** and **5** below. The enumeration of particular items in the Specifications or Drawings or other Contract Documents shall not be construed to exclude other items; provided however, that excluded items shall be specifically set forth in **Exhibit A**. The Contract Documents are complementary, and what is required by or reasonably inferable from any one of the Contract Documents (including either a Drawing or Specification) as being necessary to produce the intended results shall be binding and required as a part of the Work as if required by all Contract Documents.

GMP_10082015

Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 27 of 122 PageID #: 36

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**Section 2.2    Order of Precedence.** In the event of any conflicts or inconsistencies which cannot be resolved by reading the Contract Documents as a whole, the provisions of the Contract Documents shall be controlling in accordance with the following order of precedence: (i) this Agreement; (ii) the Drawings; (iii) the Specifications; and (iv) other Contract Documents incorporated by reference.

**Section 2.3  Inspections by Public Authority.** If any of the Work is required to be inspected or approved by any public authority, the Contractor shall cause such inspection or approval to be performed.   No inspection performed (or not performed) by the Owner hereunder, shall be considered a waiver of any of the Contractor's obligations hereunder or be construed as an approval or acceptance of the Work or any part thereof.

**Section 2.4 Materials Off-Site.** All materials which are or shall be the subject of an Application for Payment shall be stored at all times at the Jobsite, in a bonded warehouse or such other secured facility satisfactory to Owner, or, at the premises of the manufacturer or fabricator (in which event the materials shall be appropriately marked and identified with the applicable purchase contract and physically segregated in an area with access to a public street), until the materials are incorporated into the Project; provided that if the materials are stored with the manufacturer or fabricator, Owner must receive evidence satisfactory to Owner of the creditworthiness of the manufacturer or fabricator.  Furthermore, Contractor shall and shall cause its Subcontractors to (if applicable):

2.4.1 use the materials only for construction of the Project, and not make any transfer thereof or permit any claim or lien to attach thereto which could materially impair the ability of Owner to use the materials for such purpose;

2.4.2  take or cause to be taken all actions necessary to maintain, preserve and protect the materials and keep them in good condition and repair, and to comply with all laws, rules, regulations and ordinances relating to the ownership, storage or use of the materials;

2.4.3 cause to be delivered to Owner the original warehouse receipt (and any bailee waivers where bailee rights exist) covering any stored materials, and ensure that such stored materials have been stored in such a way as to eliminate the possibility that they will be commingled with  other materials or projects; and

2.4.4 ensure that Owner may enter upon any property on within which the materials may be stored to inspect them at any reasonable time.

If Contractor shall fail to perform any of its obligations under this Section 2.4 after Owner has made payment to Contractor for the materials, Owner may, but shall

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 28 of 122 PageID #: 37

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

not be obligated to, after written notice **and after reasonable opportunity to cure** to Contractor, take such actions and expend such sums as may be necessary in its judgment to protect and preserve Owner's title in such materials, and all such expenditures so incurred (including, without limitation, attorneys' fees and disbursements) shall be repayable by Contractor promptly on demand with interest thereon per annum at the prime rate (as then published daily by the Wall Street Journal) plus two percent (2%) from the date of demand until paid.

**Section 2.5 Materials On-Site**. Within fifteen (15) days after the execution of this Agreement, the Contractor will prepare for the Owner's review and the Contractor's use, a plan for efficient and effective use of the Project site and for secure storage of materials and equipment by the Contractor and all Subcontractors. Once approved by the Owner this plan must be approved by the authority having jurisdiction (if required). In addition, it will be the Contractor's responsibility to assist the Owner in obtaining agreements from adjacent landowners where necessary for the construction of the Project (including but not limited to approvals necessary for operation of project related equipment if required).

**Section 2.6 Contractor Signs**. The Contractor and Subcontractors shall not erect any sign on the Project site without the prior written consent of the Owner. Any such sign must comply with the Construction Documents and with all applicable laws, rules, codes and regulations, at the sole cost of the Contractor and shall not be larger than 4' x 8'.

**Section 2.7 Utility Service**. **Except as set forth in Exhibit A** the Contractor shall not interrupt utility service to the Jobsite or to adjacent buildings. If the Contractor is required to interrupt utility services to perform its Work, Contractor shall **provide Owner with seven (7) days prior notice and** coordinate such interruption with the Owner and any affected adjacent owners or tenants so as to avoid any business interruption to tenants of the Project, adjacent owners and damage or liability to the Owner. **Except as otherwise noted in this Agreement** ~~Notwithstanding anything to the contrary contained in the Contract Documents,~~ Contractor shall not interrupt utility service during business hours for any reason and Contractor shall pay any outage fee and/or premium or overtime charges in connection with any such interruption in utility service.

## ARTICLE 3
## THE CONTRACTOR'S OBLIGATIONS

**Section 3.1 Covenants of Performance.** Contractor covenants and agrees that all Work performed by any Subcontractor or Vendor, and all Work performed and supervised by Contractor, shall be carried out: (a) with a proper supply of labor, materials and equipment; (b) in full compliance with the requirements contained in, indicated on and reasonably inferable from the Contract Documents given Contractor's experience with construction projects similar in size, scope and

Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 29 of 122 PageID #: 38

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

complexity to the Work being performed for the Project; and (c) diligently and in a manner designed to assure completion on or before the Guaranteed Date of Substantial Completion.

## Section 3.2  General Warranty.

3.2.1  Contractor warrants to Owner that: (i) all materials and equipment used in connection with the Work and the Project will be of good quality and new, free from faults and defects unless the Contract Documents require or permit otherwise; (ii) the Work will comply with all applicable laws, rules, regulations ordinances and permits and all of the requirements of the Contract Documents; and the Work will be free from defects and any Work, materials or equipment not conforming to these requirements, including substitutions not properly approved by Owner, may be considered defective.  This warranty obligation is cumulative and shall not serve to exclude other remedies of the Owner under the Agreement or applicable law, or change applicable statutes of limitations.  At the option of the Owner, the Owner may elect to accept defective Work and take a credit against the Guaranteed Maximum Price in an amount that reasonably compensates the Owner for the diminution of value and utility of the Project but said amount not to **exceed the reasonable cost to repair the defective work**. The Contractor's warranty excludes any remedy for damage or defects caused by abuse, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage; provided, however, that modifications, extensions, attachments to, completion of or repair to systems in the Work by others (including the Owner or tenants performing tenant improvement work), including, without limiting the generality of the foregoing, the electrical, HVAC, plumbing, security and sprinkler systems, shall not void the Contractor's warranty so long as the same are done in accordance with the original design and installation standards of the building and **Manufacturer's**.  If required by the Owner or the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment to be used in connection with the performance of the Work.  All warranties shall be delivered to the Owner with copies to the Architect upon completion of the Work. At the time of Final Completion of the Work, the Contractor agrees to transfer and assign to the Owner (whether specified or not) any and all manufacturers' warranties relating to materials and labor used in the Work and further agrees to perform the Work in such manner so as to preserve any and all such manufacturers' warranties.  The Owner reserves the right, in its sole discretion, to assign all and any of its rights to any warranties given under the Contract Documents.

3.2.2  **Repair Warranty**.  If, within the Warranty Period, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition.  To the extent any repair or correction work performed by the Contractor is not accepted by the Owner, the Contractor shall

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 30 of 122 PageID #: 39

continue to repair the Work until such Work is finally accepted by Owner, regardless of whether the Warranty Period has run.

Nothing contained in this Section 3.2.2 shall be construed to establish a period of limitation with respect to the General Warranty referenced in Section 3.2.1 or other obligations which the Contractor might have under the Contract Documents. Establishment of the Warranty Period relates only to the specific obligation of the Contractor to correct the Work under this Section 3.2.2, and has no relationship to the time within which the obligation to comply with the Contract Documents as set forth in 3.2.1 hereof may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's other than specifically to correct the Work.

~~Section 3.3 Preconstruction Services. Contractor shall as a Cost of the Work furnish, coordinate, manage and pay for all services, personnel, labor, material, equipment, machinery and tools for the Work, and shall:~~

~~3.3.1 Search for and timely recommend to Owner various Value Engineering and other cost savings measures during the entire progress of the Work to reduce the Cost of the Work to the fullest extent possible while maintaining the quality required by the Contract Documents. Owner will then elect, in its sole discretion, whether or not to implement such measures in connection with the Work.~~

~~3.3.2 Timely review designs with Owner and Architect, including, but not limited to, to the extent applicable, architectural designs, structural, HVAC, plumbing, fire protection, power and lighting, security systems and communications, interior designs, and vertical transportation to assure compliance with the Guaranteed Maximum Price, Guaranteed Maximum Price Premises and Assumptions, and Project requirements; advise on the Jobsite use and improvements, selection of materials, Project and Jobsite systems and equipment, improvements to the Project and Jobsite, call and security systems, and methods of Project delivery; provide recommendations on relative feasibility of construction methods, availability of materials and labor, time requirements for procurement, installation and construction, integration into existing Project phasing and/or schedule and Jobsite systems, and factors related to cost including, but not limited to, costs of alternative designs or materials, preliminary budgets and possible economics.~~

~~3.3.3 Advise Owner in writing promptly upon discovery if, in the judgment of Contractor, the issuance of architectural or engineering documents does not meet schedule requirements or if the information provided on such documents is inadequate for the current purposes intended or if requirements of such documents conflict with other documents issued or with existing conditions on the Jobsite. In any such event, Contractor will issue a request for information ("RFI") to the Architect (with a copy to Owner).~~

FILED: RICHMOND COUNTY CLERK 01/25/2021 06:19 PM INDEX NO. 150180/2021

NYSCEF DOC. NO. 2    Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 31 of 122 PageID #: 40    RECEIVED NYSCEF: 01/25/2021

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

3.3.4  Review the Contract Documents, as the same are being prepared and check the same for (a) obvious conflicts, discrepancies and omissions, and (b) variations from customary construction practices and methods which, in the opinion of Contractor, may cause difficulties or occasion delay in the performance of the Work and timely advise Owner and the Architect promptly, in writing, of any such observed issues. Coordinate Contract Documents by consulting with Owner and the Architect regarding Drawings and Specifications as they are being prepared, and recommending alternative solutions whenever design details affect construction feasibility, cost or schedule. Timely advise Owner, using Contractor's professional skill and judgment, of any missing or incomplete aspects of the Project scope.

3.3.5  Assist Owner and/or Architect as they may request in the bidding preparation process and solicitation and requests for bids and review of bids received.

**Section 3.4  Experience and Evaluation of Jobsite.** Contractor represents and warrants to the Owner that Contractor (a) is experienced and skilled in the construction of buildings, structures and improvements of the type described in the Contract Documents, and (b) has, by careful examination and evaluation, satisfied itself as to (i) the nature, location, layout and character of the Project and Jobsite, including, without limitation, the surface and subsurface (by review of available reports and information) **provided to it by Owner** condition of the land and all structures and obstructions thereon, both natural and man-made, and all surface and subsurface (by review of available reports and information) **provided to it by Owner** water conditions of the Jobsite and the surrounding area, as more specifically provided in Section 4.1.2 of the General Conditions; (ii) the nature, location and character of the general area in which the Project and Jobsite are located, including, without limitation, its climatic conditions; (iii) the quality, quantity, availability and cost of all materials, supplies, tools, equipment, labor and professional services necessary to complete the Work in the manner required by the Contract Documents; and (iv) all other matters or things which, in the reasonable judgment of the Contractor, could in any manner affect the performance of the Work.

**Section 3.5  Insurance.** The Contractor shall furnish and pay for the insurance required in **Exhibit E** attached hereto.  The Contractor shall, prior to the commencement of Work, furnish to the Owner a Certificate of Insurance as evidence of the existence of such coverage, and upon Owner's request, shall furnish a copy of the insurance policy or policies.  The policies shall provide for written notice of cancellation, lapse or material change to the Owner at least thirty (30) days in advance, and the Certificate shall indicate that this provision has been included.  Contractor's insurance shall be primary as to any insurance maintained by Owner.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 32 of 122 PageID #: 41

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**Section 3.6  Contractor's Covenant.**  The Contractor recognizes and accepts the relationship of trust and confidence established between it and the Owner by this Agreement.   Contractor covenants with the Owner to furnish its best professional skill and judgment and to cooperate with the Owner's Representative and the Architect in promoting and protecting the interests of the Owner. Contractor further agrees to furnish efficient business administration and supervision services and to keep an adequate supply of personnel and materials at the Jobsite at all times, and to execute the Work in the best and most efficient way, and in the most expeditious and economical manner consistent with the interests of the Owner.

**Section 3.7  Contractor's Representative.**   The Contractor's Representative shall be authorized to represent the Contractor in all matters regarding this Agreement and the Project and shall be a person acceptable to Owner.  If, at any time, Owner shall advise the Contractor that the Contractor's Representative is not acceptable to Owner, Contractor shall promptly designate a new Contractor's Representative acceptable to Owner.

~~**Section 3.8  Value Engineering Services.**  If the Owner requests that the Contractor furnish Value Engineering services, the Contractor shall be responsible for reviewing the architectural, civil, mechanical, electrical, structural, landscaping, lighting and signage, Drawings and Specifications, for advising and making recommendations with respect to such factors as constructability, feasibility, possible economies, Project costs, availability of material and labor, and time requirements for procurement and construction, installation methods and design criteria.  The Contractor shall not be responsible for the accuracy, completeness, adequacy or coordination of the Drawings and Specifications, or the quality of the engineering and design represented therein.   Contractor shall be entitled to reimbursement of certain labor and personnel costs during value engineering, as provided in Section 7.1.1.5, but otherwise shall not be entitled to compensation or reimbursement of costs in connection with the furnishing of Value Engineering services.~~

**Section 3.9  Hazardous Materials.**  The Contractor is responsible for compliance with the requirements of the Contract Documents regarding the handling of Hazardous Materials.  If the Contractor encounters a Hazardous Material or substance not addressed in the Contract Documents, and if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a Hazardous Material or substance, including but not limited to asbestos of polychlorinated biphenyl ("PCB"), encountered on the Jobsite by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing.  When the Hazardous Material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor.  If applicable, the Contract Time shall be extended by Change Order

GMP_10082015

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

and the Guaranteed Maximum Price shall be adjusted accordingly in the amount of the actual reasonable costs incurred due to the shutdown, delay and start-up of the Work.

**Section 3.10 Contractor's Compliance with Contract Documents.** Contractor hereby agrees and acknowledges that Contractor has a duty to refer all questions with respect to any doubts or concerns over the intent or appropriate interpretation of the Contract Documents to Owner for Owner's consideration and decision. Contractor agrees, acknowledges and assumes that Owner's decision will require implementation of the most stringent requirements among any conflicting provisions of the Contract Documents as being part of the Work. Contractor agrees to be bound by all decisions by Owner to implement the most stringent of any conflicting requirements within the Contract Documents. Any failure by Contractor to seek such clarifications shall in no way limit Owner's ability to require implementation, including replacement of installed Work at a later date at Contractor's sole expense, to achieve compliance with the more stringent requirements.

The failure of Owner to insist in any one or more instances upon a strict compliance with any provision of this Agreement, or to exercise any option herein conferred, shall not be construed as a waiver or relinquishment of Owner's right thereafter to require compliance with such provision of this Agreement, or as being a waiver of Owner's right thereafter to exercise such option, and such provision or option will remain in full force and effect.

If there is any inconsistency in the Drawings or any conflict between the Drawings and Specifications, Contractor shall provide the better quality or greater quantity of Work or materials, as applicable, unless Owner directs otherwise in writing.

**Section 3.11 Contractor Responsible for Acts of Others.** The Contractor shall be responsible to the Owner for the acts and omissions of the Contractor's employees, Vendors, Subcontractors and any of their agents and employees, and any other persons performing or supplying any of the labor, materials or services constituting the Work including, but not limited to architectural, engineering, Subcontractors, suppliers and/or materialmen.

**Section 3.12 Contractor Responsible for Inspection of Work.** The Contractor shall be responsible for visual inspection of portions of Work already performed whether performed by Contractor, or by prior contractors of Owner, to determine that such portions are in proper condition to receive subsequent Work.

**Section 3.13 Establishment of Reference Data.** At the earliest possible time after the commencement of the Work on the Jobsite, the Contractor shall (i) have all property corners and benchmarks verified by a surveyor approved by the Owner; (ii) establish necessary reference marks from which the Work accurately

GMP_10082015

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 34 of 122 PageID #: 43

can progress; (iii) furnish the Owner evidence of such verification; and (iv) report at once any errors discovered during the process of such verification. The Contractor shall preserve all reference points, benchmarks, and other survey points established by the Owner and, in case of the destruction of these points, shall replace them.

~~Section 3.14          Separate Contracts at Jobsite. Contractor agrees that it will not prohibit or otherwise hinder or prevent any Subcontractor or materialman engaged in any aspect of the performance of the Work from entering into separate subcontracts with another general contractor engaged by any tenant of the Owner except by reason of genuine, good faith concerns (including conflicting man-hour and capacity requirements), and if such conflict is believed to exist, Contractor shall advise Owner in writing as soon as possible, to allow for practical resolution of such conflict. Owner cannot and will not be accountable for any actions by tenants or their agents outside of Owner's reasonable control. Contractor acknowledges full responsibility and accountability for performance under this the Contract Documents, and the terms contained in this Agreement.~~

**Section 3.15 Enforcement of Discipline**. The Contractor shall at all times enforce strict discipline and good order among its employees and its Subcontractors and Vendors and their respective employees, subcontractors and agents, and shall not employ or permit its Subcontractors or Vendors to employ any unfit person or anyone not skilled in the performance of their respective assigned tasks in connection with the performance of the Work. Contractor shall enforce an appropriate dress code for all contractors and Subcontractors on this Project. The Contractor acknowledges that it is the Contractor's responsibility to hire all personnel for the proper and diligent performance of the Work and the Contractor shall use its best efforts to maintain labor peace for the duration of the Project. In the event of a labor dispute, the Contractor shall not be entitled to any increase in the Guaranteed Maximum Price or an extension of contract completion dates, unless the labor action is general in nature and not directed specifically at the Contractor's operations.

## ARTICLE 4
## PROJECT SCHEDULE, COMMENCEMENT AND COMPLETION

**Section 4.1 Project Schedule.** Contractor has furnished a detailed Project Schedule for the Work, or has acknowledged and agreed to the Project Schedule prepared by Owner, which Project Schedule describes the required activities and their corresponding dependency relationships and is incorporated by reference herein. The Project Schedule includes an agreed upon construction schedule setting forth interim milestone dates for Contractor to achieve certain construction completion milestones. Contractor's performance will be measured against the Project Schedule. The Contractor shall maintain copies of such Project Schedule at the Jobsite to reflect current conditions. The Project Schedule (and any revisions thereto) shall be updated and revised at appropriate intervals in writing by Change

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 35 of 122 PageID #: 44

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

Order or Contract Amendment as required by Owner or the current and projected conditions of the Work, shall designate those items on the critical path of the Work, shall be related to the entire Project to the extent required by the Contract Documents and shall provide for expeditious and practicable execution of the Work. Notwithstanding the Project Schedule, Owner has the right to modify or otherwise change the sequence of the Work, and Contractor shall comply with such changes and adjust schedules accordingly. If Contractor believes such modification or change causes a delay or acceleration in the completion of the Work, Contractor shall provide written notice to Owner of such delay or acceleration and shall be entitled to seek reimbursement (if such modification or change impacts the cost or Contract Time) its additional costs of the Work and an extension of Contract Time in accordance with the terms of this Agreement. Any such modifications or changes in sequence apply only to scheduling and shall not be construed to mean a change in the method or means employed by Contractor for the execution of the Work.

**Section 4.2  Project Schedule Updates.** Contractor shall submit a Project Schedule Update along with each monthly Application for Payment for comparison to the Project Schedule via Proliance®. The first Project Schedule Update shall be dated and identified as "Project Schedule Update No. 1" and shall identify the then current status of all major Work activities identified in the Project Schedule. All Project Schedule Updates shall include a comprehensive narrative setting forth: (i) the actual activity completion dates; (ii) the effect on the Project Schedule of any delays in any activities in progress and/or the impact of known or suspected delays which are expected to affect future Work; (iii) the effect of Contract Amendments or Change Orders on the Project Schedule; (iv) all actual and potential variances between the latest Project Schedule Update and probable actual completion dates; (v) all Work activities not commenced or completed in accordance with the Project Schedule; and (vi) recommendations of specific Recovery Plans which may be necessary to achieve the Contract Time and/or relevant milestone dates. All subsequent revisions shall be dated and numbered sequentially. In addition, each Project Schedule Update shall be clearly labeled to state the effective date of the current status information contained therein. Contractor's failure to provide Project Schedule Updates as required in this <u>Section 4.2</u>, or as otherwise mutually agreed in writing, shall be a material breach of this Agreement.

**Section 4.3 Commencement and Completion of the Work.** The Work shall commence upon <u>**August 26,2016**</u> or Owner's issuance of a Notice to Proceed, which shall direct the Contractor to commence with the construction of the Work or any portion thereof as specified in such Notice to Proceed, each of which shall be subject to receiving a work permit from the issuing government agency. The Work shall be commenced in accordance with the Project Schedule. In addition to any interim or milestone dates included in the Project Schedule, and subject to any extensions of the Contract Time pursuant to the terms of the Contract Documents, Contractor shall achieve Substantial Completion of the Work in accordance with <u>**Exhibit A**</u> ("Guaranteed Date of Substantial Completion") as

GMP_10082015

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 36 of 122 PageID #: 45

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

evidenced by a Certificate of Substantial Completion issued by the Architect. Final Completion shall be achieved within sixty (60) days after Substantial Completion of the Work, subject to any extensions of time pursuant to the terms of the Contract Documents. The Project Schedule may not be changed except in accordance with Article 6 herein and Section 4.8.1 of the General Conditions. Contractor hereby accepts and confirms that, subject to the terms of this Agreement, the Contract Time is reasonable for completing the Work and hereby agrees to dedicate all such personnel and other resources as are necessary to assure that the Work is continuously managed and performed in a diligent, skilled and workmanlike manner in accordance with the Project Schedule.

Section 4.4  Time of the Essence.  Time is of the essence in the performance of this Agreement.  By executing this Agreement, Contractor confirms that the Contract Time is a reasonable period within which to perform the Work.  The Contractor shall take all necessary actions required to remedy any delay due to the fault of the Contractor or anyone working under Contractor, including, without limitation, providing additional forces to perform the Work, or working overtime at the Contractor's expense.  Contractor's failure to achieve Substantial Completion by the Guaranteed Date of Substantial Completion, ~~except pursuant to mutually agreed schedule extensions which are determined and finalized by Contract Amendment or Change Order in accordance with Section 6.1,~~ **except pursuant to schedule extensions to which Contractor is entitled and approved in accordance with this Agreement** shall be a material breach of this Agreement and Contractor shall and hereby agrees to indemnify Owner from and against any and all costs, damages, expenses, losses, liabilities and obligations relating to and/or arising out of any such delay(s).

~~Section 4.5  Liquidated Damages.  If Substantial Completion of the Work is not achieved by the Guaranteed Date of Substantial Completion, Owner and Contractor agree that it would be impractical or impossible to fix actual damages for Contractor's default of its obligation to achieve Substantial Completion within the Contract Time; therefore, the parties agree to stipulate that Owner's loss in the case of any such default will be deemed to equal Owner's actual damages in such event.~~

Section 4.6  Supplemental Personnel.  Owner shall have the **right after providing Contractor with a five (5) day written notice and providing Contractor seven (7) days to cure after receipt of such notice** to supplement Contractor's personnel, without termination of this Agreement, in the event Contractor fails to take the measures set forth above for curing Contractor's delay in performing the Work, the cost of which shall be deducted from any amounts otherwise due Contractor hereunder.

Section 4.7 Protection Against the Elements.  Contractor shall **tame commercially reasonable steps to** keep the Work, Jobsite, materials and apparatus free from injury or damage from rain, wind, storms, frost or heat.  Contractor shall include in the Project Schedule an adequate number of days to compensate for customary

adverse weather conditions in order to ensure completion of the Project by the Substantial Completion Date, and no extensions of time will be granted due to days lost to adverse weather conditions except as permitted by Section 7.3.3 of the General Conditions.

**Section 4.8 Information, Decisions and Approvals.** The Owner or Architect shall furnish the Contractor with all information reasonably requested or necessary for the Contractor to efficiently and expeditiously perform the Work. Decisions and approvals required of the Owner shall be provided in a timely manner so as not to delay the orderly progression of the Work, and Contractor shall allow a reasonable amount of time for review of submittals by the Owner.

**Section 4.9 Completion of Work Within Contract Time.** Contractor has examined and will continue to examine all Contract Documents provided by Owner pertaining to the Work, Project and the Jobsite. Contractor represents that the Guaranteed Maximum Price Premises and Assumptions were sufficiently detailed and comprehensive to enable Contractor to have reliably estimated and established the Cost of the Work and the Guaranteed Maximum Price set forth in Article 5 of this Agreement. Subject to the provisions of this Agreement, Contractor further agrees that all Work shall be performed within the Guaranteed Maximum Price and within the Contract Time.

~~Section 4.10 Design Process. Contractor expressly acknowledges that construction of this Project and the Work will commence without final Drawings and Specifications in place. More specifically, while Drawings and Specifications are complete for certain portions of Work, the design process will continue for other portions during construction based on the Guaranteed Maximum Price Premises and Assumptions. Contractor represents that it is familiar with the scope and quality of those aspects of the Project which have not yet been fully designed, and has taken such scope and quality matters into consideration in preparing each component of the Guaranteed Maximum Price based on the Guaranteed Maximum Price Premises and Assumptions. Contractor agrees to work with Owner and Architect and their respective consultants in the completion of the design process and will provide prompt written notice to Owner in accordance with the time periods contained in the Project Schedule if (i) any proposed Drawings, Specifications or designs being prepared by Owner or Architect are not in substantial compliance with the Guaranteed Maximum Price Premises and Assumptions; or (ii) if any redesign or Value Engineering is necessary or advisable for certain aspects of the Project at any stage of the design process in order to bring the Cost of such Work within or below, but not in excess of, the respective Allowance Amounts for the Allowance Items or the budgeted or allocated amounts for other items contained in the Guaranteed Maximum Price. Once the Drawings and Specifications are complete, it is acknowledged and agreed by both parties that the scope of the Guaranteed Maximum Price may include Work not expressly indicated on the Contract Documents, but which is reasonably inferable from the Contract Documents, and such Work shall be performed without any increase in the~~

Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 38 of 122 PageID #: 47

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

~~Guaranteed Maximum Price or extension of Contract Time, except if and to the
extent otherwise expressly provided in this Agreement.~~

**Section 4.11 Recovery Plan.** The Guaranteed Maximum Price is based on
Contractor working as many hours as necessary to properly perform the Work and
comply with the Project Schedule requirements. In the event the Work has not
progressed according to the Project Schedule due to the Contractor's fault,
and it becomes necessary for Contractor or any Subcontractor to work additional
overtime in order to comply with the Project Schedule, Contractor shall be
responsible for all costs relating to such overtime.

**4.11.1** If Owner determines at any time based on reasonable
evidence that Contractor is behind schedule or is otherwise in jeopardy of failing
to complete (i) any milestone by the applicable milestone date, or (ii) the Work
within the Contract Time, Owner shall issue a written notice to Contractor
identifying the areas of concern and requiring that Contractor provide a Recovery
Plan to Owner.

**4.11.2** Upon receipt of Owner's notice, Contractor shall
immediately undertake all available steps to overcome or mitigate the adverse
effects of all delays identified by Owner. Contractor's failure to undertake all
available steps to mitigate the effects of such delays shall constitute a waiver of
Contractor's right to claim relief for any schedule extensions and/or additional
compensation to the extent that Contractor's failure to act timely contributed to any
such delays.

**4.11.3** Contractor shall, within seven (7) calendar days after receipt
of Owner's notice, provide its Recovery Plan to Owner regardless of whether
Contractor disputes responsibility for the cause(s) of any such delays or not.

**4.11.4** After submission of the Recovery Plan by Contractor, Owner
shall advise Contractor in writing whether to proceed with the Recovery Plan as
submitted, or as revised by Owner. Any such Notice to Proceed with such
Recovery Plan shall be evidenced by a Contract Amendment or Change Order.
Owner shall have the right to require Contractor to utilize its own construction
crews and Subcontractors and other personnel overtime, and to direct Contractor
to take all other necessary action, including, without limitation, increasing the
number of personnel and implementing double shifts. Such overtime work and
other actions shall continue until such time as the Work has progressed so that it
complies with the stage of completion required by the then most recently Owner
approved Project Schedule. Any additional costs incurred necessitated by such
overtime work and other actions shall not result in any adjustment to the
Guaranteed Maximum Price **only to the extent the delay was caused by
Contractor.**

FILED: RICHMOND COUNTY CLERK 01/25/2021 06:19 PM    INDEX NO. 150180/2021

NYSCEF DOC. NO. 2    Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 39 of 122 PageID #: 48    RECEIVED NYSCEF: 01/25/2021

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**4.11.5** Contractor's failure to provide a Recovery Plan after written notice within the time requirements and to the extent required in this Section 4.11, or to immediately implement a Recovery Plan upon receipt of a Contract Amendment or Change Order to do so, shall be considered material breaches of this Agreement.

**Section 4.12 Acceleration for Owner's Convenience.** In the event Owner desires to accelerate the Project Schedule for reasons other than delays caused by or attributable to the Contractor, Owner shall notify Contractor in writing. Upon receipt of such written notice, Contractor shall require its personnel and its Subcontractors and Vendors to work such overtime hours and/or to increase their respective work forces as reasonably necessary in order to meet Owner's accelerated Project Schedule. In the event such acceleration is directed by Owner which results in additional costs, Contractor will be entitled to an adjustment in the Guaranteed Maximum Price as determined in accordance with <u>Article 6</u> of this Agreement.

## ARTICLE 5
## CONTRACTOR FEE & GUARANTEED MAXIMUM PRICE

**Section 5.1  Contractor Fee.**  For Contractor's performance of the Work, the Owner shall pay the Contractor a fee ("**Contractor Fee**") equal to **Ten percent (10%)** of the Cost of the Work. The Contractor's Fee shall be the Contractor's sole and exclusive compensation for all costs described as Non-Allowable Costs of the Work in <u>Section 5.2</u> hereof and is inclusive of all overhead and profit arising out of or relating to the Contractor's Work.

**Section 5.2  Guaranteed Maximum Price**. Subject to additions and deductions which may be made only in accordance with <u>Section 6.4</u> herein, Contractor represents, warrants and guarantees to Owner that the total maximum cost to be paid by Owner for Contractor's complete performance of the Work under the Contract Documents, including, without limitation, Final Completion of all Work **as described in Exhibit B** and all fees, compensation and reimbursements to Contractor, shall not exceed the total amount of **Ninety Three Million Three Hundred Forty One Thousand Three Hundred Two and 00/100 Dollars ($93,341,302.00)** ("Guaranteed Maximum Price"). Contractor will determine and notify the Owner of the Guaranteed Maximum Price within fifteen (15) days of its receipt of the Drawings and Specifications, which are at least eighty percent (80%) complete and adequate to delineate quantities and quality of building systems, equipment, structures and material required for the Work. The Guaranteed Maximum Price is broken down into the line items and categories set forth on **Exhibit A** attached hereto and is based upon the description of the Work as of the date hereof and the Guaranteed Maximum Price Premises and Assumptions attached hereto as **Exhibit A**. No contingency to the Guaranteed Maximum Price shall be utilized by the Contractor at any time without the prior written consent of

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 40 of 122 PageID #: 49

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

the Owner. Such Contractor's Contingency shall be identified in a separate line item to the Guaranteed Maximum Price estimate delivered to the Owner. The Contractor's Contingency will be reviewed six months after the acceptance of the Guaranteed Maximum Price. At that time, the Contractor's Contingency may be reduced based on the mutual agreement of the Owner and Contractor. Periodically after the initial review of the Contractor's Contingency, the Contractor's Contingency can be reviewed and reduced based upon the mutual agreement of the Owner and Contractor. Such contingency established by the Contractor shall be identified in a separate line item to the Guaranteed Maximum Price estimate delivered to the Owner.

5.3 **Guaranteed Maximum Price Components**. The Guaranteed Maximum Price is comprised of the maximum amount payable by Owner for: (i) the Cost of the Work listed in Section 5.2 hereof for full and complete performance of the Work in strict accordance with Contract Documents; and (ii) the Contractor's Fee. **The Cost of the Work shall include the lump sum amount identified in Exhibit D for Contractor's costs and expenses associated with the specific general conditions items set forth in Exhibit D ("Contractor's General Conditions") to be incurred during the contemplated Contract Time of 26 9 months pursuant to this Agreement. Notwithstanding anything to the contrary in this Agreement, the Owner shall pay the Contractor the lump sum amount for Contractor's General Conditions in 26 9 equal and consecutive monthly installments, without any deduction for retainage.**

5.4 **Cost Overruns**. Subject to approved additions or deductions which may be made pursuant to Section 6.4 herein, Contractor shall be solely liable and responsible for and shall pay any and all costs, fees and other expenditures in excess of the Guaranteed Maximum Price for and/or relating to the Work, without reimbursement from Owner. Contractor is not entitled to any fee, payment, compensation or reimbursement under this Agreement or relating to the Work or Project other than as expressly provided in this Article 5.

5.5 **Inferable Work**. Contractor agrees that the scope of the Guaranteed Maximum Price includes Work not expressly indicated on the Contract Documents, but that is reasonably inferable from or consistent with the Contract Documents, and such Work shall be performed by Contractor without any increase in the Guaranteed Maximum Price.

5.6 **Allowances.** The Guaranteed Maximum Price includes specific "Allowance Amounts" for certain items as shown on the Schedule of Values and budgeted in the Guaranteed Maximum Price ("**Allowance Items**"). The only Allowance Items shall be those specifically identified as such in the Schedule of Values and in the Guaranteed Maximum Price **subject to Section 5.7** the Allowance Amounts represent all Cost of the Work of the Allowance Items, including, without limitation, costs of materials, labor, handling, transportation, loading and unloading and installation. Allowance Items shall be supplied for such amounts and by such

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 41 of 122 PageID #: 50

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

persons as the Owner may direct. Unless otherwise provided in the Contract Documents, materials and equipment under an allowance shall be selected by the Owner so as to avoid unreasonable delay in the Work. An allowance shall cover the cost to the Contractor of materials and equipment delivered at the Jobsite and all required taxes, less applicable trade discounts and Contractor's costs for unloading and handling at the Jobsite.

**5.7    Portions of the Work; Phases of Construction.** ~~As described in Section 4.10 of this Agreement, the Drawings and Specifications for the Work and Project may not be one hundred percent (100%) complete as of the execution of this Agreement.~~ As Drawings and Specifications are completed for a particular portion of the Work, Contractor shall, in accordance with Article 9 hereof, propose and obtain ~~sealed~~ bids from a minimum of three Subcontractors and/or Vendors for that portion of the Work and assist Owner in selecting one of the Subcontractor or Vendor bids for that Work.

**5.7.1** If the amount of the bid selected by Owner exceeds the amount budgeted in the Guaranteed Maximum Price for that item or portion of the Work, including the Allowance Amount as to an Allowance Item, ~~and the increase in cost is due to the failure of the Drawings and Specifications to substantially conform to the "Guaranteed Maximum Price Premises and Assumptions" as set forth on Exhibit C~~ attached hereto, Owner shall, subject to Section 5.7.3 below, either: (a) rework, or have reworked, the Drawings and Specifications to cause the Work depicted therein to fall within the budgeted amount allocated in the Guaranteed Maximum Price (or within the Allowance Amount as to an Allowance Item), or (b) increase the Guaranteed Maximum Price by an amount equal to that portion of the difference between the amount of the selected bid over the amount budgeted for such item or portion of the Work in the Guaranteed Maximum Price (or over the Allowance Amount as to an Allowance Item) that is attributable to the failure of the Drawings and Specifications to substantially conform to the Guaranteed Maximum Price Premises and Assumptions.

**5.7.2** If the amount of the bid recommended by Contractor exceeds the amount allocated or budgeted in the Guaranteed Maximum Price for that item or portion of the Work, and the Drawings and Specifications substantially conform to the Guaranteed Maximum Price Premises and Assumptions, then Contractor may proceed with such bid, provided that such increase in costs shall be solely Contractor's responsibility **(but subject to Contractor's use of the Contractor's contingency** and Contractor shall not be entitled to, and will not seek, any increase in the Guaranteed Maximum Price.

**5.7.3** Notwithstanding the provisions of Sections 5.7.1 and 5.7.2 above, if Contractor fails to comply with its obligations under Section 3.2 of this Agreement, including to timely notify Owner in writing in accordance with

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 42 of 122 PageID #: 51

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

~~Section 5.7.3 of this Agreement that the Drawings, Specifications or designs for such item or portion of the Work (including any Allowance Item), fail to substantially conform to the Guaranteed Maximum Price Premises and Assumptions, or that redesign or Value Engineering is necessary to bring the cost within or below the amounts allocated in the Guaranteed Maximum Price for such item or portion of the Work, Owner shall not be required to make any election under clause (a), or (b) of Section 5.7.1 above and Contractor shall perform and be responsible for the increased cost of such Work and be precluded from seeking, and Contractor agrees not to seek and shall not be entitled to, any increase in the Guaranteed Maximum Price with regard thereto.~~

**5.7.4** If the amount of the bid selected by Owner is less than the amount allocated or budgeted in the Guaranteed Maximum Price for that item or portion of the Work and the portion of the Work is an Allowance Item, then such savings and difference shall be a credit against and reduce the Guaranteed Maximum Price.

**5.7.4.1 If the amount of the bid selected by Owner is less than the amount allocated or budgeted in the Guaranteed Maximum Price for that item or portion of the Work and the portion of the Work is not an Allowance Item, then such savings and difference shall be added to and increase the Contractor's contingency.**

**5.7.5** Notwithstanding the provisions of this Section 5.7, if Owner elects to have a party other than Contractor, or one of Contractor's Subcontractors, perform the Work related to an Allowance Item or other portion of the Work, or otherwise eliminates or reduces the scope of an Allowance Item or other portion of the Work, the Guaranteed Maximum Price shall be reduced by both (i) the Allowance Amount for any such Allowance Item or the budgeted amount in the Guaranteed Maximum Price for such item, and (ii) a portion of the Contractor's Fee in an amount equal to 2.25 percent (2.25%) of the amount of reductions specified in the preceding clause (i), and there shall not be any corresponding increase in the Guaranteed Maximum Price for the cost of such Allowance Item or other portion of the Work not performed by Contractor.

**Section 5.8** Intentionally Omitted.

**Section 5.9 Cost of the Work.** "Cost of the Work" includes those elements of costs set forth in Article 7 up to the Guaranteed Maximum Price (subject to change only as provided in this Agreement) which are chargeable to Owner and payable to Contractor when reasonably, actually and necessarily incurred and properly documented by the Contractor for the acceptable performance of the Work, without mark-up or add-on of any kind. Such costs shall be actual costs paid by Contractor less all discounts, rebates and salvages taken by Contractor. All amounts paid or

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 43 of 122 PageID #: 52

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

payable as Cost of the Work shall be subject to verification by audit pursuant to Article 12 of this Agreement. Contractor covenants and agrees to use its best efforts to achieve the lowest price or cost reasonably available and consistent with the Contract Documents, for all Cost of the Work items. Cost of the Work shall be strictly limited to and include only the items set forth in Article 7.

Section 5.10 Non-Allowable Costs of the Work. "Non-Allowable Costs of the Work" means the direct and/or indirect costs described in Article 8 and all similar costs and all other costs not included within the Cost of the Work, which are paid or incurred by Contractor during performance of the Work. All such Non-Allowable Costs of the Work are included in Contractor's Fee set forth in Subsection 5.1 above, regardless of whether they exceed the amount of such Contractor's Fee. Contractor shall not be entitled to receive any additional reimbursement for Non-Allowable Costs of the Work.

Section 5.11 Contractor's Responsibility for Taxes. Other than direct cost of amounts actually paid by Contractor for sales and use taxes directly relating to the work and /or materials and equipment incorporated or consumed into the Work and/or directly relating to rental equipment used in the Work that are imposed by governmental authorities and paid by the Contractor, it is expressly understood that no other taxes or duties (other than customs duties on equipment and material brought into the United States expressly and solely for incorporation or consumption in the Work and imposed by governmental authorities and paid by Contractor) of any nature whatsoever are considered Cost of the Work and that Contractor will not be separately reimbursed for, but shall be responsible for and shall timely pay, any other such taxes or duties whatsoever, including, but not limited to, federal, state and local taxes, duties, excise taxes, personal property taxes on construction equipment and other property owned or leased by Contractor, taxes on net income of Contractor, filing fees on taxes, business taxes, and similar taxes applicable to or arising directly or indirectly out of performance of the Work or Contractor's property, business or operations.

Section 5.12 Discounts, Rebates and Refunds. All cash discounts, trade discounts, rebates and refunds obtained by Contractor during the course of the Work, and all amounts received from sales of surplus materials and equipment, shall accrue to Owner. Contractor shall take all necessary steps to obtain, secure and pass through all such credits to Owner and all such discounts, rebates and refunds shall be fully reflected in Contractor's monthly Applications for Progress Payment submitted pursuant to Article 10 of this Agreement. All right, title and interest in and to all materials, tools, and equipment paid for by Owner shall be vested solely in Owner. Amounts which accrue to the Owner in accordance with the provisions of Section 10.1 shall be credited to the Owner as a deduction from the Cost of the Work and shall not result in any adjustment of the Guaranteed Maximum Price.

Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 44 of 122 PageID #: 53

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**Section 5.13  No Duplication.** Notwithstanding the breakdown or categorization of any costs in this Article 5 or elsewhere in the Contract Documents, there shall be no duplication of payment in the event any particular items for which payment is requested can be characterized as falling into more than one of the categories of compensable or reimbursable amounts.

ARTICLE 6
CHANGES IN THE WORK

**Section 6.1  Change.** A "Change" in the Work means an increase, decrease, variation, modification, amendment or change in the Work as set forth in the Contract Documents, including without limitation a modification to the Project Schedule. Suspensions and terminations for convenience shall be governed by Article 13 of this Agreement and shall not be considered a Change except to the extent provided herein. A Change may only be implemented by execution of a Contract Amendment or by a Change Order. Accordingly, no course of conduct or dealings between the parties, nor express or implied acceptance of modifications, variations, alterations or additions to the Work, and no claim that Owner has been unjustly enriched by any modification, variation, alteration or addition to the Work, whether or not there is in fact any such unjust enrichment, shall be the basis for any claim to an increase in the Guaranteed Maximum Price or extension of the Contract Time. Changes in the Work shall be performed under applicable provisions of the Contract Documents, and Contractor shall proceed promptly, unless otherwise provided in the Contract Amendment or Change Order.

**Section 6.2  Contract Amendment.** A "Contract Amendment" is a written instrument electronically signed by Owner and Contractor through the use of Owner's computer based project management system, stating their agreement upon all of the following: (i) a Change in the Work including a full description of such Change; (ii) the amount of the adjustment, if any, to the Guaranteed Maximum Price; and/or (iii) the extent of the adjustment, if any, in the Contract Time. The addition of any new Work, or any Change to the Work being performed by a Subcontractor in excess of twenty-five percent (25%) of the cost allocated to such Work in the Guaranteed Maximum Price, shall require, and shall not be performed without, a fully executed Contract Amendment or Change Order.

**Section 6.3  Change Order.** A "Change Order" is a written order signed by Owner directing a Change in the Work being performed by Contractor or a Subcontractor pursuant to a current and enforceable Subcontract. A Change Order shall state a proposed basis for adjustments, if any, in the Guaranteed Maximum Price and Contract Time, or either of them. Upon receipt of a Change Order, Contractor shall promptly proceed with the Change in the Work involved (including implementing any reductions or accelerations in the Work) and advise Owner of the Contractor's agreement (in which case Contractor shall electronically sign and upload the

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

Change Order to Owner through Owner's computer based project management system) or disagreement with the method, if any, provided in the Change Order for determining the proper adjustment, if any, in the Guaranteed Maximum Price or Contract Time. Contractor agrees to immediately, when directed in writing by Owner, perform the Change in Work diligently and without delay. If the Change Order provides for an adjustment to the Guaranteed Maximum Price, the adjustment may be based on a mutually accepted lump sum, which shall be properly itemized and supported by sufficient substantiating data to permit evaluation by the parties. A Change Order electronically signed, unmodified, and uploaded into Owner's computer based project management system by Contractor evidences the agreement of Contractor, including the method, if any, provided in the Change Order for determining the adjustment, if any, in the Guaranteed Maximum Price or Contract Time. If Contractor fails to advise Owner of its agreement or disagreement with the proposed adjustment in the Guaranteed Maximum Price or Contract Time within seven (7) days after the delivery of the Change Order to Contractor, then the Change Order shall be deemed approved, and Contractor shall have no right to claim any adjustment to the Guaranteed Maximum Price or Contract Time in excess of the adjustments, if any, provided in the Change Order.

**Section 6.4   Determination of Increases in Guaranteed Maximum Price.** Notwithstanding any other provision in the Contract Documents, and regardless of the pricing method for any Change, any increase in the Guaranteed Maximum Price as a result of net Changes in the Work, ~~shall not exceed the sum of: (a) the aggregate additional amounts (if any) actually paid by Contractor to its Subcontractors and Vendors for the applicable Change in the Work, without mark-up or other add-on by Contractor; and (b) the actual increase (if any) in the Cost of the Work incurred by Contractor with respect to the applicable Change in the Work to the extent (if any) such Change is performed by Contractor directly. Any and all amounts or items excluded from the determination of the Cost of the Work, including all Non-Allowable Costs of the Work, shall also be excluded from the determination of the cost of any Change in the Work.~~ **equal no less than the Cost of the Work (including, if applicable and approved, any additional Contractor's General Conditions) to perform the Changes in the Work plus Contractor's Fee of 2.25% on said Cost.**

~~Once the actual cost of such Change in the Work and corresponding extension, if any, in the Contract Time have been determined, prior to using such actual cost to make any adjustment in the Guaranteed Maximum Price, or extension in the Contract Time, such actual cost and/or extension, as the case may be, shall be reduced and offset by any and all reductions or Changes in the Work which result in reduced Cost of the Work and/or advancement of the Contract Time, as the case may be (*i.e.,* Changes in the Work shall be netted out).~~

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 46 of 122 PageID #: 55

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

Additional adjustments to the Guaranteed Maximum Price attributable to any Change in the Work shall be determined as provided in <u>Section 11.1.1 of the General Conditions</u>.

# ARTICLE 7
## COSTS TO BE REIMBURSED

**Section 7.1  Cost of the Work.**  Subject to the provisions of <u>Section 5.2</u>, the Owner agrees to reimburse the Contractor for the Cost of the Work.  The term "Cost of the Work" means all actual and direct costs reasonably and necessarily incurred in the proper performance of the Work and paid or payable by the Contractor, ~~subject to the General Condition Costs set forth on Exhibit D hereto, if applicable,~~ **including Contractor's General Conditions as set forth on Exhibit D hereto** and except as otherwise limited by this Agreement.  Such actual and direct costs comprising the Cost of the Work shall be at rates no higher than the standard rate paid in the locality of the Work, except with the prior written consent of the Owner and shall only include the following items set forth in this <u>Article 7</u>:

### 7.1.1  <u>Labor and Personnel Costs.</u>

**7.1.1.1**  Actual wages paid by Contractor for labor in the direct employ of the Contractor in the performance of the Work under applicable collective bargaining agreements or under a salary or wage schedule approved in writing by the Owner.

**7.1.1.2**  Actual wages or salaries of the Contractor's **managerial/**supervisory and administrative personnel when stationed at the Jobsite **or upon written approval of Owner** ~~with the Owner's agreement~~ (but not including bonuses paid to such personnel unless approved in writing by Owner).  Contractor's **managerial/**supervisory or administrative personnel engaged at shops or on the road in expediting the production or transportation of materials or equipment shall be considered as stationed at the field office and their actual wages or salaries paid for that portion of their time spent on the Work, provided that Owner shall be entitled to approve in advance the numbers and identity of all Contractor supervisory and administrative personnel entitled to charge their time as a Cost of the Work.

**7.1.1.3**  Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions (net of employee contributions, experience modifications and the like), provided such costs are based on actual costs of the Contractor.

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**7.1.1.4** Reasonable travel expenses (including transportation at coach or economy rates, meals and lodging) of the officers or employees of the Contractor incurred in connection with the performance of the Work. Out of town travel is subject to the prior, written approval of the Owner.

**7.1.1.5** During Value Engineering, the actual wage and salary cost and reasonable travel expenses (including transportation at coach or economy rates, meals and lodging) of all personnel directly engaged in the performance of Value Engineering services, regardless of whether such personnel are stationed at the Jobsite or elsewhere. Out of town travel is subject to the prior, written approval of the Owner.

**7.1.2** **Costs of Materials and Equipment Incorporated in the Completed Construction.**

**7.1.2.1** Costs, including transportation, of materials, supplies and equipment incorporated, or to be incorporated, in the completed construction in accordance with the Contract Documents.

**7.1.2.2** Costs of materials described in Section 7.1.2.1 in excess of those actually installed but required to provide reasonable allowance for waste and spoilage. Unused excess materials, if any, shall be delivered to the Owner at the completion of the Work or, at the Owner's option, shall be sold by the Contractor, and any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

**7.1.3** **Costs of Other Materials and Equipment, Temporary Facilities and Related Items.**

**7.1.3.1** Costs (including transportation and maintenance) of all materials, supplies, equipment, temporary facilities, small tools, and hand tools not owned by Contractor's personnel, which are provided by the Contractor at the Jobsite and which are fully consumed in the performance of the Work; and the cost less salvage value on such items (if not fully consumed) whether sold to others or, if and to the extent approved in writing by the Owner, will be retained by the Contractor. Cost for items previously used by the Contractor means fair market value of the item used, as reasonably determined by the Owner.

**7.1.3.2** Rental charges for equipment which are provided by the Contractor at the Jobsite, whether rented from the Contractor or third parties, including installation, minor repairs and replacements, dismantling, removal, transportation and delivery costs thereof. In no event shall the rental rates of any piece of equipment from the Contractor's own stock exceed seventy-five percent (75%) of the blue book rental rates or such other industry standard, or based on prevailing market rates in the local area if such publication is not available, unless otherwise approved by the Owner in writing. In no event shall the total cost of

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 48 of 122 PageID #: 57

renting a piece of equipment exceed seventy-five percent (75%) of the Contractor's original cost of the equipment, and substitution of similar or like equipment on the Jobsite will not be considered as a change in Equipment under this provision.

As to the cost charged for any piece of equipment, the rates charged for rental shall reflect any reduction in rate based on the amount of usage, such that Contractor is charged the lowest rent for the rental period (e.g., if certain equipment rents for $75/day or $12.50/hour, if more than six (6) hours are need, the daily rate will apply). Equipment and facilities which are job purchased shall be salvaged at the completion of the Work and such salvage values shall be credited to the Cost of the Work.  The Owner shall accrue any accumulated equity in the rental of equipment used at the Jobsite which is leased under a purchase option agreement.

### 7.1.4  Subcontract Costs.

7.1.4.1   Payments made by the Contractor to Subcontractors in accordance with the requirements of the agreements with the Subcontractors and the Contract Documents, net of any back-charges to any such Subcontractor.

### 7.1.5  Miscellaneous Costs.

**7.1.5.1**  Costs of removal of all debris caused by the Contractor's operations.

**7.1.5.2**  Costs of long-distance telephone calls, postage and parcel delivery charges, telephone service at the Jobsite and reasonable petty cash expenses of the Jobsite office.

**7.1.5.3**  If maintenance of a Jobsite office is approved in advance by Owner, reasonable costs and expenses of the operation of the Jobsite office, such as stationery, supplies, document reproduction, furniture, fixtures, and office equipment (all of which are subject to salvage by the Owner).

**7.1.5.4**  Cost of premiums for all bonds and insurance which the Contractor is required by the Contract Documents to purchase and maintain, net of all adjustments or credits related to the Work for discounts, dividends or premium modifications.  Premiums for insurance which covers other operations of the Contractor in addition to its operations pursuant to this Agreement will be allocated to this Agreement in the same proportion which the value of the Work completed during the premium period bears to the value of all work (including the Work) completed by the Contractor during the same period.  Any cost charged to the Owner for Subcontractor bond premiums must be approved in advance by the Owner.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 49 of 122 PageID #: 58

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**7.1.5.5** Sales, use or similar taxes imposed by any governmental authority which are related to the Work and for which the Contractor is liable or is obligated to collect.

**7.1.5.6** Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement by the Contract Documents; payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent; provided, however, that such costs of legal defenses, judgment and settlements shall not be included in the calculation of the Contractor's Fee or of the Guaranteed Maximum Price, and provided that such royalties, fees and costs are not excluded by the last sentence of Subsection 4.14 of the General Conditions or other provisions of the Contract Documents.

**7.1.5.7** Fees and assessments for permits, licenses and inspections for which the Contractor is required by the Contract Documents to pay, including cost of validating or certifying Work in connection with the delivery of a certificate of occupancy.

**7.1.5.8** Costs of obtaining utility services.

**7.1.5.9** Deposits lost for causes other than the Contractor's fault or negligence.

**7.1.6** **Other Costs**.

**7.1.6.1** Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

**7.1.7** **Emergency-Related Costs and Damaged Work**.

**7.1.7.1** The Cost of the Work shall also include costs described in Section 8.1 which are incurred by the Contractor:

**7.1.7.1.1** In taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Section 9.3 of the General Conditions.

**7.1.7.1.2** In repairing damaged Work, provided such damage did not result from the fault or negligence of the Contractor or the Contractor's personnel, and only to the extent that the cost of such repairs is not recoverable by the Contractor from others and the Contractor is not compensated therefor by insurance or otherwise.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 50 of 122 PageID #: 59

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**7.1.7.2**   The costs incurred by the Contractor described in Section 7.1.7.1.2 do not include the cost of repairing or replacing non-conforming or defective Work, and such costs shall not be included in the calculation of the Contractor's Fee or the Cost of the Work.

## ARTICLE 8
## COSTS NOT TO BE REIMBURSED

**Section 8.1  Exclusions from Cost of the Work.**  The Cost of the Work shall not include any of the items set forth below in this Article 8:

**8.1.1** Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the Jobsite office, except as expressly provided in Sections 7.1.1.2, 7.1.1.3 and 7.1.1.5, or approved in writing by the Owner.

**8.1.2** Expenses of the Contractor's principal branch offices other than the Jobsite field office.

**8.1.3** Any part of the Contractor's capital expenses, including interest on the Contractor's capital employed for the Work.

8.1.4 Overhead or general expenses of any kind, except as expressly set forth in Article 7.

8.1.5 Except as provided in Section 7.1.7 hereof and Section 14.4 of the General Conditions, costs due to the fault or negligence of the Contractor, Subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to costs for the correction of damaged Work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and repairing damage to property not forming part of the Work.

**8.1.6** Rental costs for machinery and equipment, except as expressly provided in Section 7.1.3.2, including repairs to such machinery and equipment.

**8.1.7** The cost of any item not specifically and expressly identified in Article 7.

**8.1.8**  Costs which would cause the Guaranteed Maximum Price to be exceeded.

**8.1.9**  Costs and fees of attorneys, accountants or other consultants, unless expressly authorized by Owner in writing in advance.

GMP_10082015

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 51 of 122 PageID #: 60

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

## ARTICLE 9
## SUBCONTRACTS

**Section 9.1  Subcontractors and Vendors.**  Contractor shall be responsible for the performance of Subcontractors and Vendors of every tier to the same extent as if performed by Contractor on a direct basis, including coordination of those portions of the Work performed by Subcontractors and Vendors.

**Section 9.2  Awarding of Subcontracts.**  Subject to Article 5 of the General Conditions, and Section 5.7 of this Agreement for each element of the Work to be performed, Contractor shall propose a minimum of three (3) qualified bidders. Contractor may be included among the proposed bidders.  Owner shall, within five (5) business days after receipt thereof, reply to Contractor stating whether Owner has a reasonable objection to any such proposed person or entity.  Owner's failure to reply to Contractor's proposed list within such period shall constitute Owner's acceptance of such list.

**Section 9.3  Award of Subcontractor.**  Those portions of the Work that shall be performed under Subcontracts shall be awarded pursuant to the provisions of Section 5.2 of the General Conditions.  All Subcontracts shall conform to the requirements of the General Conditions.  Subcontracts and agreements with suppliers furnishing materials or equipment fabricated to Owner's design shall be awarded solely on a lump-sum, cost-not-to-exceed basis, and shall not be awarded on the basis of cost plus a fee without the prior written consent of Owner in advance. ~~The lump-sum of each subcontract shall be inclusive of all Subcontractor overhead and profit, which shall not exceed eight percent (8%) and five percent (5%), respectively, of the cost of such Work being performed.~~

**Section 9.4  Form of Subcontracts and Purchase Orders.**  Contractor shall furnish Owner with a copy of Contractor's proposed forms for use as subcontracts (including professional services agreements) and purchase orders for Owner's review and approval prior to Contractor's use thereof, and Contractor shall only enter into those subcontracts approved by Owner in writing, without material modification; provided, however, subcontracts and purchase orders which do not subject Contractor to liability in excess of Fifty Thousand and 00/100 dollars ($50,000) individually, and otherwise are in accordance with the Contract Documents, shall not require Owner's prior written approval. Contractor shall furnish to Owner a copy of each subcontract and purchase order it enters into in connection with the Work within ten (10) calendar days after execution of such subcontract or purchase order. All subcontracts and purchase orders shall require all Subcontractors and Vendors to assume toward Contractor the same legal obligations and responsibilities which Contractor assumes toward Owner in this Agreement, including requiring the indemnities provided in Article 14 hereof, except as specifically provided otherwise in the Contract Documents or waived by Owner in writing. All subcontracts and purchase orders shall also provide that any

GMP_10082015

warranties contained or referenced therein shall run to the benefit of and be enforceable by Owner. Contractor shall not waive or fail to exercise any material or significant right or remedy under any subcontract or waive any material or significant default under any subcontract without Owner's prior written approval.

Section 9.5. **Subcontractor Overhead.**  Contractor shall limit Subcontractor's overhead (to include Subcontractor's general conditions, insurance and all other corporate and Project specific overhead) and profit mark-up to fifteen percent (15%).

## ARTICLE 10
## PROGRESS PAYMENTS

### Section 10.1 Applications for Payment.

**10.1.1 Time for Submission; Supporting Data**. Each month the Contractor shall furnish to the Owner an electronically filed statement using Owner's computer based project management system (the Application for Payment) for Work completed during the preceding calendar month for which it claims it is entitled to be paid. Each Application for Payment shall be submitted through Proliance® and shall be evidenced by ~~payrolls~~, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner, the Owner's lender(s) or the Architect to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed: (i) progress payments already received by the Contractor, less (ii) that portion of those payments attributable to the Contractor's Fee, plus (iii) ~~payrolls~~ for the period covered by the Application for Payment in question, plus (iv) retainage provided in Section 10.2.1.3, if any, applicable to prior progress payments.

**10.1.2 Schedule of Values**.  Each Application for Payment shall be based upon the most recent Schedule of Values approved by the Owner. For each category and portion of the Work as shown on the Schedule of Values: (i) the amount requested on all previous Applications for Payment, (ii) the amount requested on the current Application for Payment, and (iii) the amount allocated to the Work yet to be completed.

**10.1.3 Percentage of Completion**.  Each Application for Payment shall show the actual Cost of Work ~~or~~ and the percentage of completion applicable to each portion of the Work, as of the end of the period covered by the Application for Payment.

**10.1.4 Retainage.**  Each Application for Payment shall reflect Retainage in the amount provided for pursuant to Section 10.2 of this Agreement.

GMP_10082015

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**10.1.4** <u>Waivers of Lien</u>. Each Application for Payment prior to Final Payment shall be accompanied by a sworn statement of Contractor and, with regard to Work that was covered by the immediately preceding Application for Payment, unconditional waivers and releases of liens, in a form approved by Owner and executed by the Contractor, each Subcontractor, sub-subcontractor and supplier entitled to assert a lien or claim against the Project and providing more than Five Thousand and 00/100 Dollars ($5,000) worth of labor, services or materials to the Project.

**10.1.5** <u>Progress Reports</u>. If requested by Owner, each Application for Payment shall be accompanied by a signed and completed progress report in accordance with Section 4.8 of the General Conditions for the period covered by the Application for Payment.

**10.1.6** <u>Requirements of Owner's Lender</u>. In addition to the foregoing provisions of this Section 10.1, each Application for Payment shall be accompanied by such supporting data as may be **reasonably** required by Owner's lender(s) or development partners.

**Section 10.2 Payments to Contractor.**

**10.2.1** <u>Computation of Amount of Payments</u>. Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

**10.2.1.1** There shall first be determined the Cost of the Work actually incurred by the Contractor on account of that portion of the Work which has been completed, as calculated on a percentage complete basis in accordance with the approved Schedule of Values, less retainage of ten percent (10%); provided, however, there shall be no retainage on approved amounts to be paid to Contractor for Contractor's direct Cost of the Work (exclusive of amounts to be paid to Subcontractors directly or through Contractor). The Contractor's Application for Payment shall include copies of any Subcontractor applications forming the basis, in whole or in part, of the Contractor's Application for Payment.

**10.2.1.2** There shall be added to such sum the earned portion of the Contractor's Fee, less ten percent (10%) retainage.

**10.2.1.3** There shall be subtracted from such sum:

**10.2.1.3.1** The aggregate of previous payments made by the Owner.

**10.2.1.3.2** The amount by which the sum of (i) the Cost of the Work actually incurred by Contractor and (ii) the earned portion of the

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 54 of 122 PageID #: 63

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

Contractor's Fee exceeds the Guaranteed Maximum Price as pro-rated on a percentage completion basis in accordance with the Schedule of Values

**10.2.1.3.3** The shortfall, if any, evidenced by the Contractor in the documentation required by Section 10.2.1 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner in such documentation.

**10.2.1.3.4** Amounts, if any, for which approval for payment has been withheld as provided in Section 8.3.1 of the General Conditions.

**10.2.3 Time Within Which Payments Are To Be Made.** Within thirty (30) days after the Contractor shall have furnished the Owner with a complete and accurate Application for Payment in accordance with the provisions of Section 10.1.1, the Owner shall make payment to the Contractor of the amount computed in accordance with the provisions of Section 10.2.1 with respect to such Application for Payment. Owner may, in its sole discretion, remit payments to Contractor via ACH electronic fund transfer by Owner's financial institution. Such payments shall be deemed credited to Contractor's account when received by Contractor's financial institution.

**Section 10.3 Payments to Subcontractors.**

**10.3.1 Subcontractor Payment Conditions.** Except with the Owner's prior approval, payments to Subcontractors shall comply with the following conditions:

**10.3.1.1** Contractor shall not bill Owner for sums due to Subcontractors for which Contractor does not intend to pay such Subcontractors **without adequate justification.**

**10.3.1.2** Retainage on Subcontractor payments shall be ten percent (10%) unless otherwise approved by Owner in writing. Early release of retainage to a Subcontractor completing its Work early in the Project Schedule shall be based on the mutual agreement of the Owner and Contractor, and upon Final Completion of all items of the Subcontractor's Work.

**Section 10.4 Material or Equipment Not Delivered to Jobsite.** Except with the Owner's prior written approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the Jobsite.

**Section 10.5 Reliance on Information Furnished by Contractor.** The Contractor represents, warrants and covenants to and with the Owner that all data and information contained in each Application for Payment, and all other

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 55 of 122 PageID #: 64

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

information furnished in connection therewith is and shall be true, accurate and complete and that all documents furnished in connection therewith are and shall be genuine and, if not originals, are true, accurate and complete copies of the originals thereof. This representation, warranty and covenant shall be deemed reaffirmed as to each Application for Payment presented to Owner as provided herein.  In taking action on the Contractor's Applications for Payment, the Owner shall be entitled to rely on the accuracy and completeness of the information furnished by the Contractor, as well as on the genuineness of all documents furnished by Contractor in connection therewith, and such reliance shall not be deemed to represent that the Owner has made a detailed examination, audit or arithmetic verification of such information or supporting data or documents or that the Owner has made exhaustive or continuous on-site inspections, or that it has made examinations to ascertain how or for what purposes the Contractor has used amounts previously paid on account of this Agreement.

**Section 10.6  Joint Checks.** Owner shall have the right (but not the obligation) to issue in its discretion, at any time and from time to time, payment checks for portions of a progress payment or the Final Payment (as defined in Section 11.1) payable jointly to Contractor and the person or persons owed (including, without limitation, any Subcontractor or Vendor). Without limiting the generality of the foregoing, if Contractor fails, neglects, or refuses to pay for labor or services performed or materials or equipment supplied in connection with the Work as payments become due and owing, Owner shall have the right (but not the obligation) upon written notice to Contractor to make payments directly for any and all such labor, materials, or equipment and to deduct the amount of such payment from the Guaranteed Maximum Price.

**Section 10.7 Withholding.** In addition to any amount withheld from an Application for Payment by Owner pursuant to Section 10.2.1 or Section 8.3.1 of the General Conditions, or in the event of any breach or failure by Contractor to perform its obligations pursuant to this Agreement, or any claims arising out of any work Contractor is providing to Owner pursuant to any other agreement, Owner shall have the right, and Contractor expressly authorizes Owner, to withhold such amounts and payments to Contractor as Owner in good faith deems necessary: (i) to protect Owner against, or compensate Owner for, any damage, cost, expense and loss attributable to the foregoing; (ii) to cure any breach, default or failure to perform; or (iii) to assure the payment of claims of third persons.  Owner shall have the right to apply such sums in any manner as Owner may in good faith deem necessary or proper to secure protection from or to satisfy such claims, and Owner shall not be deemed in default by reason of withholding payment under this Agreement in accordance with the foregoing.

Staten Island Mail - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

## ARTICLE 11
## FINAL PAYMENT

**Section 11.1  Conditions Precedent to Final Payment.**  The final payment of all amounts due and owing by the Owner to the Contractor under this Agreement (the "Final Payment") shall be made only after all of the following shall have occurred:

11.1.1 All of Contractor's obligations under this Agreement and the other Contract Documents shall have been fully performed, including punch list work, but excluding Contractor's subsequent responsibility to correct defective or nonconforming Work, as provided in Section 12.2.2 of the General Conditions, and to satisfy other requirements, if any, which necessarily survive Final Payment.

11.1.2 A final Application for Payment and a final accounting for the Cost of the Work shall have been submitted to the Owner and Owner's accountants or representatives shall have completed such review or audit thereof as they shall deem appropriate. The Contractor shall submit the final Application for Payment within forty-five (45) days after Final Completion of the Work, along with the consent of Contractor's surety (if any) to Final Payment.

11.1.3 The Contractor shall have delivered to the Owner final waivers of lien, in the form approved by Owner, duly executed and correctly completed by Contractor and all Subcontractors, sub-subcontractors, Vendors and suppliers entitled to file liens against the Project or any part thereof, and who have furnished at least Five Thousand and 00/100 Dollars ($5,000) of labor, services or materials to the Project.

11.1.4 The issuance of a permanent certificate of occupancy for the Project and any other permits, licenses or approvals required by the Contract Documents, unless the issuance of such permanent certificate of occupancy or other permit, license or approval shall be withheld or delayed due to no fault of the Contractor or anyone working under Contractor.

11.1.5 Submittal of any and all as-built documents, training or operation manuals, warranties, guarantees, attic stock and any other closeout documents or items required by the Contract Documents.

**Section 11.2  Amount of Final Payment.**  The amount of the Final Payment shall be calculated as follows:

11.2.1 There shall first be determined the Cost of the Work, as substantiated by Contractor's final accounting and adjusted to reflect the results of the review or audit conducted by the Owner's accountants or representatives.

11.2.2 There shall be added to such amount the Contractor's Fee.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 57 of 122 PageID #: 66

**11.2.3**  If such sum exceeds the Guaranteed Maximum Price, there shall be subtracted from such sum the amount by which it exceeds the Guaranteed Maximum Price.

**11.2.4** There shall be subtracted from such sum all amounts, if any, for which the Owner has withheld approval for payment as provided in Section 8.3.2 of the General Conditions.

## ARTICLE 12
## ACCOUNTING RECORDS

**Section 12.1 Records to be Maintained by Contractor.**  The Contractor shall keep full and detailed accounts, and exercise such controls as may be necessary for proper financial management under this Agreement.  All accounting and control systems shall be satisfactory to the Owner.  Owner, the Owner's lender and the Owner's accountants and representatives shall be afforded access to, and shall be permitted to copy and audit, the Contractor's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Agreement, and the Contractor shall preserve all of the same for a period of five (5) years after Final Payment, or for such longer period as may be required by applicable law, rule or regulation.

**Section 12.2  Audit and Approval for Final Payment.**  The Owner's accountants or representatives may conduct such review and audit of the Contractor's final accounting as they deem appropriate and will report the results of same in writing within thirty (30) days after delivery of the final accounting to the Owner by the Contractor; provided however that if Owner is unable to complete the final accounting within such thirty (30) day period, Owner may close out the Agreement and pay Contractor based on the proposed amount, subject to the final accounting being completed.  In the event the subsequent final accounting reveals that the proposed amount is not accurate, Contractor shall refund any amount in excess of the actual final accounting amount to Owner within fifteen (15) days of Owner notifying Contractor of such deficiency. Based upon such Cost of the Work as the Owner's accountants report to be substantiated by the Contractor's final accounting, and provided the other conditions of Section 10.1 have been met, the Owner's Representative shall, within fifteen (15) days after receipt of the written report of the Owner's accountants, either approve for Final Payment by the Owner such amount as shall be due Contractor (in which event the Owner shall make payment to the Contractor of such amount within thirty (30) days after such approval), or notify the Contractor in writing of the Owner's reasons for withholding such approval as provided in Section 8.3.2 of the General Conditions.

GMP_10082015

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**Section 12.3  Costs Incurred Subsequent to Final Application for Payment.**
After Contractor delivers the final Application for Payment to the Owner, Contractor shall not be entitled to make any further Applications for Payment or to be reimbursed or paid any sum not claimed in the final Application for Payment; provided, however, that if, subsequent to the delivery of the final Application for Payment and at the Owner's written request, the Contractor incurs costs described in Article 7 (and not excluded by Article 8), the Owner shall reimburse the Contractor for such actual costs and the Contractor's Fee applicable thereto (if any) on the same basis as if such costs had been incurred prior to Final Payment, but not in excess of the Guaranteed Maximum Price.

ARTICLE 13
TERMINATION

**Section 13.1 Termination by the Contractor.**

**13.1.1 Grounds for Termination.** The Contractor may terminate the Agreement if the Work is stopped for a period of ninety (90) consecutive days through no act or fault of the Contractor or a Subcontractor, sub-subcontractor or their agents or employees or any other persons performing portions of the Work with the Contractor, for any of the following reasons:

**13.1.1.1** Issuance of an order of a court or other public authority having jurisdiction over the Project;

**13.1.1.2** An act of government, such as a declaration of national emergency, making any material progress or performing the Work impractical; or

**13.1.1.3** Failure of the Owner to make payment as provided in this Agreement; provided such payment is not subject to a good faith dispute.

**13.1.2 Notice of Termination, Right of Recovery.** If one of the above reasons exists, the Contractor may, upon seven (7) days' prior written notice to the Owner, terminate the Agreement and recover from the Owner payment for Work completed (including Contractor's Fee earned to date) through the date of termination, and any actual and reasonable costs incurred in terminating the Work. The Owner shall have no further liability to the Contractor on the Project. Such payment shall be Contractor's sole and exclusive remedy under this Section 13.1.

**Section 13.2 Termination by the Owner for Cause.**

**13.2.1  Grounds for Termination.** The Owner may terminate this Agreement at any time if the Contractor:

GMP_10082015

13.2.1.1 Fails to perform any of its **material** obligations under this Agreement or any Contract Document; or

13.2.1.2 Becomes financially insolvent and is unable, upon request by the Owner, to give the Owner reasonable assurances of its ability to meet its obligations hereunder, or is the subject of a voluntary or involuntary bankruptcy proceeding.

**13.2.2 Notice of Termination; Owner's Rights.** When any of the above reasons exist, the Owner may, without prejudice to any other rights or remedies of the Owner and after giving the Contractor seven (7) days prior written notice **and opportunity to cure not to exceed thirty (30) days from the date of such notice**, terminate this Agreement and may:

13.2.2.1 Take possession of the Project and Jobsite and of all materials, equipment, tools, and construction equipment and machinery thereon ~~owned by the Contractor~~ or to which Owner has any ownership rights or interests;

13.2.2.2 Accept assignment of subcontracts pursuant to Section 5.4 of the General Conditions; and

13.2.2.3 Finish the Work by whatever reasonable method the Owner may deem expedient; and/or

13.2.2.4 Pursue any other rights or remedies provided for under this Agreement, the Contract Documents or available at law, in equity or otherwise.

**13.2.3 Contractor Not Entitled to Further Payment Until Work Finished.** When the Owner terminates the Agreement for one of the reasons stated in Section 13.2.1, the Contractor shall not be entitled to receive further payment until the Work is completed by Owner, and all damages or costs suffered or incurred by the Owner have been deducted from the amounts otherwise due the Contractor. In the event of such termination, the Contractor shall immediately deliver all Project, Jobsite and Work documents and deliverables over to the Owner, including permit drawings, record drawings, subcontractor and supplier files, permit files and other files, documents and materials as may be requested by Owner.

**Section 13.3 Suspension by the Owner for Convenience.**

**13.3.1 Owner's Right to Suspend Work.** Owner may at any time, with or without cause, suspend, delay, reduce or interrupt performance of all or any portion of the Work for such period or periods as Owner elects by giving Contractor written notice specifying which portion of the Work is to be suspended and the effective date of such suspension. Such suspension, delay or interruption shall continue

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 60 of 122 PageID #: 69

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

until Owner terminates such suspension, delay or interruption by written notice to Contractor. No such suspension, delay, interruption or reduction by Owner shall constitute a breach or default by Owner under the Contract Documents. Contractor shall continue to diligently perform any remaining Work that is not suspended, delayed, reduced or interrupted and shall take all actions necessary to maintain and safeguard all materials, equipment, supplies and Work in progress affected by the suspension, delay, reduction or interruption.

**13.3.2 Adjustments for Increased Cost of Performance**. An adjustment shall be made for increases in the cost of and if applicable, time for performance of the Agreement (per the Change Order provisions of Article 11 of the General Conditions), including the Contractor's Fee on the increased cost of performance, caused by Owner's suspension, delay or interruption; provided, however, no adjustment shall be made to the extent: (i) that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible or over which the Owner had no control; or (ii) that an equitable adjustment is made or denied under another provision of this Agreement.

**Section 13.4 Owner's Right to Terminate for Convenience.** The Owner may, at its option, terminate this Agreement for its convenience by written notice thereof to the Contractor. Upon receipt of any such notice, Contractor shall, unless the notice directs otherwise, immediately discontinue the Work on that date, and, to the extent specified in the notice, place no further orders or subcontracts for materials, equipment, services, or facilities, except as may be necessary for completion of such portion of the Work as is not discontinued; promptly make every reasonable effort to procure cancellation upon terms satisfactory to Owner of all orders and subcontracts to the extent they relate to the performance of the discontinued portion of the Work and shall thereafter do only such Work as may be necessary to preserve and protect work already in progress and to protect materials and equipment at the Jobsite or in transit thereto. Upon such termination, the obligations of the Agreement shall continue as to portions of the Work already performed and as to bona fide obligations assumed by Contractor prior to the date of termination. Upon termination, Contractor shall be entitled to be paid the full cost amount of all Work performed in accordance with the Contract Documents by Contractor to the date of termination not previously paid for, plus a pro rata portion of the Contractor's Fee earned on account of such Work and such other costs incurred by Contractor as a result of the termination. The Owner shall have no further liability to the Contractor, including consequential damages, lost profits or other damages arising out of such termination. If, as of the date of such termination, Contractor has properly prepared or fabricated off the Jobsite any goods for subsequent incorporation in the Work, and if Contractor delivers such goods to the Jobsite or to such other place as the Owner shall reasonably direct, then Contractor shall be paid for such goods or materials. In the event of

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

such termination, the Contractor shall immediately deliver all Project, Jobsite and Work documents and deliverables over to the Owner, including permit drawings, record drawings, Subcontractor and supplier files, permit files and other files, documents and materials as may be requested by Owner.

**Section 13.5 Limitations.** Owner shall have no liability to Contractor or any Subcontractor or Vendor, and neither Contractor nor any Subcontractor nor Vendor will make and collectively hereby waive any claim for (a) compensation, expenses, additional fees or anticipated profits for unperformed Work, (b) delays, acceleration or disruption except as otherwise permitted by the Contract Documents, (c) lost business or other opportunities, (d) special, indirect or consequential damages or losses or loss of use, (e) impaired bonding capacity, (f) unabsorbed, unrealized or other overheads, or (g) General Condition Costs attributable to a termination for convenience, suspensions, reductions, delays or interruptions for convenience (except to the extent provided in Section 13.3.2 hereof) or breach, or a termination for default by Owner, and in no event shall there be any increase in the Guaranteed Maximum Price (except as expressly provided in Section 13.3.2 above) or Contractor's Fee as a result of any of the foregoing Owner elections under Sections 13.2 or 13.3 above or due to any other delays. All amounts payable by Owner shall be subject to Owner's right of audit and offset.

## ARTICLE 14
## GENERAL MISCELLANEOUS PROVISIONS

**Section 14.1 Entire Agreement.** This Agreement, which includes the exhibits referenced herein and attached hereto, sets forth the entire understanding and agreement of the parties with respect to the subject matter of this Agreement and supersedes all prior agreements, representations, warranties, understandings and commitments of the parties, whether oral or written, with respect thereto.

**Section 14.2 Assignment.** This Agreement may not be assigned, in whole or in part, by the Contractor without the prior written consent of Owner. Owner may freely assign this Agreement to any affiliate or to any other assignee; provided that any such assignee (or other affiliate) is of sufficient financial means and agrees in writing to fulfill all obligations of Owner under this Agreement.

**Section 14.3 Notices.** Any notice required by the terms of this Agreement, and any other notice, in order to be effective shall be in writing and shall be personally delivered, forwarded by registered or certified mail (return receipt requested), or by overnight delivery service to:

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 62 of 122 PageID #: 71

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

To the Owner:     GGP Staten Island Mall, LLC, a Delaware limited
                  liability company
                  110 N. Wacker Drive
                  Chicago, IL 60606
                  Attn: Vice President, Development

With a copy to:   Legal Department
                  Corporate Contracts and Securities
                  110 N. Wacker Drive
                  Chicago, IL 60606

To the Contractor: Aurora Contractors
                  100 Raynor Avenue
                  Ronkonkoma, New York 11779
                  Attn: Attn: Frank Vero/Anthony Higgins
                  Ph: 631.981.3785

Notice personally delivered shall be effective on the date of delivery. Notice given by mail or overnight delivery shall be effective on the date of receipt or, in the absence of delivery, on the date of mailing.

**Section 14.4 Governing Law; Disputes.** This Agreement shall be governed by, construed and enforced in accordance with the laws of the state in which the Project is located without regard to its choice of law or conflicts of laws provisions. **THE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE.** If either party shall institute any action or proceeding against the other relating to the provisions of this Agreement, the prevailing party in the action or proceeding shall be entitled to recover all reasonable costs and attorneys' fees from the unsuccessful party.

**Section 14.5 Reformation and Severability.** If any provision or term of this Agreement shall, to any extent, be held invalid, illegal or unenforceable by a court of competent jurisdiction, that provision shall, to the extent possible, be modified in such a manner as to be valid, legal and enforceable but so as to most nearly retain the intent of the parties as expressed herein, and if such a modification is not possible, that provision shall be severed from this Agreement, and in either case the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

GMP_10082015

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 63 of 122 PageID #: 72

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**Section 14.6  Waivers; Modification; Amendment.**  No waiver, modification or amendment of any term or condition of this Agreement shall be valid or of any force or effect unless made in writing, signed by the parties hereto or their duly authorized representatives, and specifying with particularity the nature and extent of such waiver, modification or amendment and the Shopping Center(s) to which it applies.  The failure of a party at any time to exercise any of its rights or options under this Agreement shall not be construed to be a waiver of such rights or options or prevent such party from subsequently asserting or exercising such rights or options, nor shall it be construed, deemed or interpreted as a waiver of, or acquiescence in, any such breach or default or of any similar breach or default occurring later.

**Section 14.7   Independent Contractor.** The parties are independent contractors with respect to one another and this Agreement, and shall not be construed to be the agent of the other under any circumstances.  Neither party shall make any express or implied agreements, warranties, guarantees or representations, or incur any debt in the name of or on behalf of the other, or be obligated by or have any liability under any agreement or representations made by the other that are not expressly authorized in writing.

**Section 14.8  Force Majeure.**  Neither party shall be liable for any Unavoidable Delay or failure to perform its obligations under this Agreement, except for obligations arising under Section 14.11 (Indemnification) and the obligation to pay, if such delay or failure is caused by a force beyond such party's control.

**Section 14.9  Counterparts.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by electronic mail or tele-facsimile shall be equally as effective as delivery as a manually executed counterpart of this Agreement.  An electronically executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.

**Section 14.10 Compliance  with  Laws.**  The  Contractor  assumes  all responsibility for complying with all federal, state and local statutes, ordinances, codes, rules and regulations, including all local building codes and regulations, applicable to the **performance of the** Work.  The Contractor shall not violate any zoning, setback or other locational requirements of applicable laws, codes, ordinances and regulations, any special site plan conditions applicable to the Work, or any recorded covenants of which the Contractor has knowledge.  Without limiting the foregoing, Contractor shall comply with all statutory and/or contractual safety requirements (including ADA, OSHA and state equivalents thereof) applying to its Work and/or those initiated by the Owner of its insurance carriers, and report within twenty-four hours to the Owner any injury to persons or property at the Jobsite.   Contractor  shall  ensure  compliance  with  all  requirements  of  the

GMP_10082015

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 64 of 122 PageID #: 73

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

Immigration Reform and Control Act of 1986, including all substantive and clerical I-9 requirements, and shall comply with all such other applicable statues or regulations regarding immigration. With respect to any construction related disability statutes, regulations and requirements, Contractor acknowledges and agrees that all dimensions, slopes, grades, clearances and similar requirements are strictly enforced and normal construction tolerances shall not excuse proper compliance with such requirements by Contractor.

**Section 14.11    Indemnification.**    The Contractor hereby agrees to indemnify, defend and hold harmless (collectively, "indemnify" or "indemnification") the Owner, and its direct and indirect parents and subsidiaries, any of its affiliated entities, successors and assigns and any current or future director, officer, employee, partner or member of any of them ("Indemnified Parties"), from and against all claims, actions, suits, damages, losses, liabilities or expenses (including reasonable attorneys' fees and litigation expenses) against any of them to the extent arising from for: (i) any negligence, willful misconduct or fraud of Contractor, any Subcontractor or Vendor relating in any way to the Work or the preparation of the Contract Documents; (ii) any claim made by any employee, Subcontractor, Vendor or agent of Contractor arising from or related to the employment, contractor or agency relationship with Contractor; or (iii) arising out of or resulting from the performance of the Work, except to the extent caused by an Indemnified Party's own negligence or willful misconduct; or (iv) arising out of injuries to persons or damage to property, to the extent caused by the negligent acts or omissions of Contractor, its consultants, Subcontractors, Vendors, agents or employees. Contractor shall deliver the Work to Owner free and clear of all liens, claims and encumbrances, and shall defend, indemnify and hold harmless Owner from all such liens, claims and encumbrances arising out of the Contractor's performance of the Work, or the work of any of Contractor's employees, agents, Subcontractors or consultants, including reasonable attorney's fees and litigation expenses incurred by the Owner as a result of such claims. Contractor shall bond off or otherwise discharge any lien or encumbrance filed against the Project within ten (10) days of written demand by Owner, whether or not Contractor believes the claim is valid.

**Section 14.12  Confidentiality.**  The Contractor shall not publish, permit to be published, or distribute for public consumption or otherwise, any **confidential** information, oral or written concerning the Work, the Owner, the Owner's Affiliates, the Contract Documents, contract performance, or any other matter or information relating to or developed for the Project without the prior written consent of the Owner, except to Contractor's attorneys, counsel, representatives and other advisors and Subcontractors, all of which the Contractor shall ensure are subject to this same confidentiality restriction as set forth in this Agreement.

**Section 14.13  Survival.** All representations and warranties of Contractor herein and any provision of this Agreement which obligates the Contractor after the termination or expiration of this Agreement shall be deemed to survive such

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 65 of 122 PageID #: 74

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

termination or expiration. In addition to the foregoing, each of the following provisions shall survive termination or expiration of this Agreement: (i) Section 3.2 (Warranty); (ii) Section 3.5 (Insurance); Section 3.9 (Hazardous Materials); Article 5 (Contractor's Fee; Guaranteed Maximum Price); Article 12 ( Accounting Records; Article 13 (Termination); and Article 14 (General Miscellaneous Provisions.

**Section 14.14  Rights and Obligations Cumulative.** The duties and obligations imposed by the Contract Documents and the rights and remedies available thereunder shall be in addition to and not a limitation of any duties, obligations, rights and remedies otherwise imposed or available by law.

**Section 14.15  Corporate Status and Qualification of Contractor.** The persons executing this Agreement on behalf of the Contractor represent and warrant that: (i) the Contractor duly organized and is qualified and licensed to perform construction services in the state in which the Project is located; (ii) is authorized to do business in such state; (iii) all of Contractor's franchise and other taxes have been paid to date; (iv) such persons are duly authorized to execute and deliver this Agreement; and (v) the execution and delivery of this Agreement does not conflict with or otherwise violate and other agreement to which the Contractor is a party.

**Section 14.16  Further Documents.** The Contractor agrees to provide from time to time such certificates, documents, reports and information, including forms of Contractor performance letters and notices for the benefit of the Owner's lender, as may be reasonably requested by such lender, or any escrowee under any construction loan escrow or title insurer, and to cooperate with any such lender, escrowee or insurer to the fullest extent possible. If requested by Owner, Contractor shall subordinate its lien rights to the rights of any lender furnishing financing for the construction of the Project.

**Section 14.17  Joint and Several Liability.** If there be more than one person or entity constituting the Contractor, the liability of all such persons or entities for compliance with and performance of the terms of this Agreement shall be joint and several.

**Section 14.18  Project Management System.** The Owner has implemented a web-based project management system to ensure that the Project is delivered on time and within budget. Contractor acknowledges that it has received a copy of the General Growth /Proliance® Communication Specifications, and Contractor agrees to administer this Agreement and perform the Work in accordance with such Communication Specifications.

**Section 14.19  Third Party Beneficiary.** The parties agree that this Agreement shall not be construed, in whole or in part, to give rise to any rights, claims or benefits to any person, firm or entity other than the parties to this Agreement. There are no third-party beneficiaries to this Agreement and no terms or provisions

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

created by this Agreement (except as set forth herein) may be enforced by or for the benefit of any person or party not a signatory to this Agreement.

**Section 14.20** **Publicity**. Contractor shall not use the name of Owner, any Drawings or Specifications, or any other information provided or developed in connection with the Project in any award applications, announcements, press releases, on Contractor's company website, Contractor sponsored websites of any kind, on any social media websites or services such as Twitter, Facebook, LinkedIn, Instagram, etc., or in any advertisements or for any other purpose whatsoever, without the prior written consent of Owner in its sole and absolute discretion.

**Section 14.21 Waiver of Consequential Damages. Except for liabilities arising under Section 14.11, the Contractor and Owner waive claims against each other for consequential damages arising out of or relating to this Agreement. This mutual waiver includes (1) damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and (2) damages incurred by Contractor for principal office expenses including compensation of personnel stationed there, for losses of financing, business and reputation, and loss of profit. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with this Agreement.**

This Agreement is hereby fully executed electronically by an authorized representative of the Owner and the Contractor.

GMP_10082015

## EXHIBIT A

## Northside Mall Expansion & Parking Garage: Phase 1 Release

CONTRACTOR: Aurora Contractors Inc.
PROJECT:  Staten Island Mall Expansion and Parking Garage

## SECTION I. SCOPE OF WORK

The Contractor shall furnish all scaffolding, equipment, machinery, labor, materials, supervision, tools, supplies, services and insurance and shall perform all other acts and supply all other things (including, but not limited to all light, power, heat, water and sanitary facilities for workmen during the progress of the Work) necessary to build a two story (826) space precast parking garage, one hundred and eighty eight thousand square foot expansion connecting to the existing mall, a new outdoor piazza area that will include a eighty five hundred square foot building, landscape and hardscape common area and new sitework including paving, curb and gutter, landscaping located at Staten Island Mall 2655 Richmond Ave, Staten Island, NY 10314.

**Scope of Work includes but is not limited to**:

The Mall expansion will be constructed in two phases and identified as the Northside and Southside. The Northside will be under construction prior to the Southside of the expansion. The Northside of the expansion will begin construction August 2016 and is scheduled to open April 2018. The construction of the Southside will begin spring/summer of 2017 and schedule to open September of 2018.

**Phase 1 Release:**

Contractor will build the Northside of the expansion which includes approximately one hundred and eighty eight thousand square foot two level expansion that also include an approximately new twenty five thousand food court located on the second floor to the expansion and will connect to the existing mall building as per the construction drawings and specifications. The contractor will also build an eight hundred and sixty two space precast parking garage that will include two elevator banks,  egress stairwells and a precast bridge that will connect the parking garage second level to the second level of the new Northside mall expansion as per the construction drawings and specifications. The contractor will also build the piazza common area patio and landscaping area to include building pad and core and shell as identified per the construction drawings and specifications. The schedule of values for this release does not include the entire Phase I release. Additional releases will be required to complete this phase.

ICAP: Contractor will follow the requirements outlined in the ICAP Contractors Package dates 4-23-14 Marcus & Pollock LLP. This document will be attached to the Exhibit A.

## SECTION II. CONTRACT DOCUMENTS

A.  Plans entitled Issued for Construction Drawings as prepared by S9Architecture, containing the following sheets:

| Sheet  No. | Sheet Title | Dated |
|---|---|---|
| A-000.00 | COVER PAGE | 01/22/2016 |
| A-001.00 | DRAWING INDEX | 3/4/2016 |
| A-002.00 | DRAWING INDEX | 3/4/2016 |

| A-003.00 | CODE CHART GENERAL NOTES | 3/4/2016 |
| A-004.00 | FEMA MAP | 12/9/2015 |
| A-011.00 | EGRESS PLAN FIRST FLOOR | 12/9/2015 |
| A-012.00 | EGRESS PLAN SECOND FLOOR | 12/9/2015 |
| A-013.00 | EXISTING MALL EGRESS PLAN FIRST FLOOR | 12/9/2015 |
| A-014.00 | EXISTING MALL EGRESS PLAN SECOND FLOOR | 12/9/2015 |
| A-050.00 | FIRST FLOOR PLAN NORTH - BELOW GRADE WATER PROOFING | 1/22/2016 |
| A-051.00 | FIRST FLOOR PLAN SOUTH - BELOW GRADE WATER PROOFING | 1/22/2016 |
| A-052.00 | FIRST FLOOR PLAN EAST - BELOW WATER PROOFING | 1/22/2016 |
| A-053.00 | FIRST FLOOR PLAN EAST - BELOW GRADE WATERPROOFING DETAILS | 12/9/2015 |
| A-054.00 | FIRST FLOOR PLAN EAST - BELOW GRADE WATERPROOFING DETAILS | 12/9/2015 |
| A-101.00 | FIRST FLOOR SITE PLAN | 1/22/2016 |
| A-102.00 | SECOND FLOOR SITE PLAN | 1/22/2016 |
| A-107.00 | SOUTH ROOF ENLARGED PLAN PLAN | 11/11/2015 |
| A-110.00 | NORTH FIRST FLOOR ENLARGED PLAN | 11/11/2015 |
| A-111.00 | FIRST FLOOR PLAN NORTH | 1/22/2016 |
| A-112.00 | FIRST FLOOR PLAN SOUTH | 3/4/2016 |
| A-113.00 | FIRST FLOOR PLAN EAST | 1/22/2016 |
| A-121.00 | SECOND FLOOR PLAN NORTH | 1/22/2016 |
| A-122.00 | SECOND FLOOR PLAN SOUTH | 1/22/2016 |
| A-123.00 | SECOND FLOOR PLAN EAST | 1/22/2016 |
| A-123.01 | SECOND FLOOR PLAN EAST ALTERNATE | 11/11/2015 |
| A-131.00 | ROOF FLOOR PLAN - NORTH | 3/4/2016 |
| A-133.00 | ROOF FLOOR PLAN - EAST | 3/4/2016 |
| A-134.00 | ROOF FLOOR PLAN - SOUTH | 1/22/2016 |
| A-141.00 | FIRST FLOOR EOS PLAN NORTH | 1/22/2016 |
| A-142.00 | FIRST FLOOR EOS PLAN SOUTH | 1/22/2016 |
| A-143.00 | FIRST FLOOR PLAN EAST | 12/9/2015 |
| A-151.00 | SECOND FLOOR EOS PLAN NORTH | 1/22/2016 |
| A-152.00 | SECOND FLOOR EOS PLAN SOUTH | 1/22/2016 |
| A-153.00 | SECOND FLOOR EOS PLAN EAST | 1/22/2016 |
| A-161.00 | ROOF EOS PLAN NORTH | 12/9/2015 |
| A-162.00 | ROOF EOS PLAN SOUTH | 12/9/2015 |
| A-163.00 | ROOF EOS PLAN EAST | 1/22/2016 |
| A-211.00 | FIRST FLOOR REFLECTIVE CEILING PLAN NORTH | 1/22/2016 |
| A-212.00 | FIRST FLOOR REFLECTIVE CEILING PLAN SOUTH | 1/22/2016 |
| A-221.00 | SECOND FLOOR REFLECTIVE CEILING PLAN NORTH | 1/22/2016 |
| A-223.00 | SECOND FLOOR REFLECTIVE CEILING PLAN EAST | 12/9/2015 |
| A-301.00 | OVERALL EXTERIOR ELEVATIONS | 1/22/2016 |
| A-321.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS NORTH | 3/4/2016 |
| A-322.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS NORTH @ BIG BOX | 1/22/2016 |
| A-323.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS WEST @ BIG BOX | 1/22/2016 |
| A-324.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS SOUTH @ BIG BOX | 1/22/2016 |
| A-325.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS WEST | 1/22/2016 |
| A-326.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS WEST | 1/22/2016 |
| A-327.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS WEST | 1/22/2016 |
| A-328.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS SOUTH | 1/22/2016 |
| A-329.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS SOUTH | 1/22/2016 |
| A-330.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS GROCER SOUTH | 3/4/2016 |
| A-331.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS GROCER EAST | 12/9/2015 |
| A-332.00 | ENLARGED EXTERIOR ELEVATIONS & PLANS GROCER NORTH | 3/4/2016 |
| A-340.00 | BRICK COURSING DETAILS | 12/9/2015 |
| A-341.00 | BRICK COURSING DETAILS | 12/9/2015 |
| A-342.00 | BRICK COURSING DETAILS | 12/9/2015 |
| A-401.00 | BUILDING SECTIONS | 12/9/2015 |
| A-451.00 | ENLARGED STAIR PLANS & SECTIONS A & B | 12/9/2015 |
| A-452.00 | ENLARGED STAIR PLANS & SECTIONS C & K | 12/9/2015 |
| A-453.00 | ENLARGED STAIR PLANS & SECTIONS D & E | 12/9/2015 |

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 69 of 122 PageID #: 78

| A-454.00 | ENLARGED STAIR PLANS & SECTIONS F & G | 12/9/2015 |
|---|---|---|
| A-455.00 | ENLARGED STAIR PLANS & SECTIONS H & J | 12/9/2015 |
| A-461.00 | ENLARGED ESCALATOR PLANS & SECTIONS | 12/9/2015 |
| A-462.00 | ENLARGED PLANS & SECTIONS FREIGHT ELEVATOR FE-1 | 12/9/2015 |
| A-463.00 | ENLARGED PLANS & ELEVATIONS - EXISTING FREIGHT ELEVATOR FE-2 | 12/9/2015 |
| A-464.00 | ENLARGED PLANS & SECTIONS - EXISTING FREIGHT ELEVATOR FE-3 | 12/9/2015 |
| A-465.00 | ENLARGED PLANS & SECTIONS FREIGHT ELEVATOR FE-4 | 12/9/2015 |
| A-466.00 | ENLARGED PLANS & SECTIONS PASSENGER ELEVATOR PE-1 | 12/9/2015 |
| A-471.00 | ENLARGED SECOND FLOOR SHAFTS | 12/9/2015 |
| A-472.00 | ENLARGED SECOND FLOOR SHAFT PLAN | 12/9/2015 |
| A-501.00 | WALL SECTIONS | 1/22/2016 |
| A-502.00 | WALL SECTIONS | 1/22/2016 |
| A-503.00 | WALL SECTIONS | 1/22/2016 |
| A-504.00 | WALL SECTIONS | 1/22/2016 |
| A-505.00 | WALL SECTIONS | 1/22/2016 |
| A-506.00 | WALL SECTIONS | 1/22/2016 |
| A-507.00 | WALL SECTIONS | 1/22/2016 |
| A-508.00 | WALL SECTIONS GROCER | 1/22/2016 |
| A-509.00 | WALL SECTIONS EXISTING - NEW CONDITIONS | 1/22/2016 |
| A-510.00 | WALL SECTIONS EXISTING - NEW CONDITIONS | 1/22/2016 |
| A-511.00 | WALL SECTIONS EXISTING - NEW CONDITIONS | 1/22/2016 |
| A-512.00 | ENLARGED WEST ELEVATIONS & PLANS | 6/26/2014 |
| A-513.00 | ENLARGED WEST ELEVATIONS & PLANS | 6/26/2014 |
| A-514.00 | ENLARGED WEST ELEVATIONS & PLANS | 6/26/2014 |
| A-515.00 | ENLARGED EXTERIOR PLANS & ELEVATIONS | 6/26/2014 |
| A-516.00 | ENLARGED EXTERIOR PLANS & ENTRANCES | 6/26/2014 |
| A-517.00 | ENLARGED EXTERIOR PLANS & ENTRANCES | 6/26/2014 |
| A-518.00 | ENLARGED EXTERIOR PLANS & ENTRANCES | 6/26/2014 |
| A-521.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS - SOUTH | 2/12/2015 |
| A-522.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS - WEST | 2/12/2015 |
| A-523.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS - WEST | 2/12/2015 |
| A-524.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS - WEST | 2/12/2015 |
| A-525.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS - SOUTH @ BIG BOX | 2/12/2015 |
| A-526.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS - WEST @ BIG BOX | 2/12/2015 |
| A-527.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS - NORTH @ BIG BOX | 2/12/2015 |
| A-528.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS - SOUTH @ BIG BOX | 2/12/2015 |
| A-530.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS | 2/12/2015 |
| A-531.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS | 2/12/2015 |
| A-532.00 | ENLARGED EXTERIOR ELEVATIONS AND PLANS | 2/12/2015 |
| A-550.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-551.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-552.00 | WALL SECTION DETAILS | 3/4/2016 |
| A-553.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-554.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-555.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-556.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-557.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-558.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-559.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-560.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-561.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-562.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-563.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-564.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-565.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-566.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-567.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-568.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-569.00 | WALL SECTION DETAILS | 1/22/2016 |

FILED: RICHMOND COUNTY CLERK 01/25/2021 06:19 PM

Case 1:24-cv-04939-VMS Document 1-1 Filed 07/16/24 Page 70 of 122 PageID #: 79

| | | |
|---|---|---|
| A-570.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-571.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-572.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-573.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-574.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-575.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-576.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-577.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-578.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-579.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-580.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-581.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-582.00 | WALL SECTION DETAILS | 1/22/2016 |
| A-601.00 | INTERIOR ENLARGED PLANS 1ST FLOOR ENTRANCES AND MALL ARCADES | 1/22/2016 |
| A-602.00 | INTERIOR ENLARGED RCP 1ST FLOOR ENTRANCES AND MALL ARCADES | 1/22/2016 |
| A-604.00 | INTERIOR ENLARGED PLANS 1ST FLOOR ENTRANCES & MALL ARCADES | 1/22/2016 |
| A-605.00 | INTERIOR ENLARGED PLANS 1ST FLOOR ENTRANCES & BIKE STORAGE | 3/4/2016 |
| A-606.00 | INTERIOR ENLARGED RCP 1ST FLOOR ENTRANCES & BIKE STORAGE | 1/22/2016 |
| A-608.00 | INTERIOR ENLARGED TILE PATTERN 1ST FLOOR ENTRANCES & BIKE STORAGE | 12/9/2015 |
| A-609.00 | INTERIOR ENLARGED PLAN 2ND FLOOR FOOD COURT | 1/22/2016 |
| A-610.00 | INTERIOR ENLARGED RCP 2ND FLOOR FOOD COURT | 1/22/2016 |
| A-611.00 | INTERIOR ENLARGED PLANS FOOD COURT EXPANSION JOINTS | 3/4/2016 |
| A-612.00 | INTERIOR ENLARGED FURNITURE PLAN 2ND FLOOR FOOD COURT | 1/22/2016 |
| A-613.00 | INTERIOR ENLARGED TILE PATTERN 2ND FLOOR FOOD COURT | 1/22/2016 |
| A-614.00 | INTERIOR ENLARGED PLANS 2ND FLOOR NORTH MALL ARCADE RESTROOM & MEP ROOM | 1/22/2016 |
| A-615.00 | INTERIOR ENLARGED RCP 2ND FLOOR NORTH MALL ARCADE RESTROOM & MEP ROOMS | 3/4/2016 |
| A-617.00 | INTERIOR ENLARGED TILE PATTERN 2ND FLOOR NORTH MALL ARCADE RESTROOM & MEP | 1/22/2016 |
| A-618.00 | INTERIOR ENLARGED PLANS 1ST FLOOR NORTH LOADING DOCK | 1/22/2016 |
| A-619.00 | INTERIOR ENLARGED RCP 1ST FLOOR NORTH LOADING DOCK | 1/22/2016 |
| A-621.00 | INTERIOR ENLARGED PLANS 1ST FLOOR SOUTH LOADING DOCK | 1/22/2016 |
| A-622.00 | INTERIOR ENLARGED RCP 1ST FLOOR SOUTH LOADING DOCK | 1/22/2016 |
| A-624.00 | INTERIOR ENLARGED PLAN & RCP - 2ND FLOOR FOOD COURT CLEARSTORY | 1/22/2016 |
| A-630.00 | INTERIOR ELEVATIONS 1ST FLOOR NORTH LOADING DOCK | 3/4/2016 |
| A-631.00 | INTERIOR ELEVATIONS 1ST FLOOR SOUTH LOADING DOCK | 3/4/2016 |
| A-632.00 | INTERIOR ELEVATIONS 1ST FLOOR SOUTH LOADING DOCK | 1/22/2016 |
| A-633.00 | INTERIOR ELEVATIONS 1ST FLOOR BIKE & STORAGE ROOM | 1/22/2016 |
| A-634.00 | INTERIOR ELEVATIONS 1ST FLOOR MAIN ARCADE | 12/9/2015 |
| A-635.00 | INTERIOR ELEVATIONS FIRST FLOOR SOUTH ARCADE | 1/22/2016 |
| A-636.00 | INTERIOR ELEVATIONS SECOND FLOOR MALL ARCADE | 1/22/2016 |
| A-637.00 | INTERIOR ELEVATIONS 2ND FLOOR FOOD COURT SOUTH NEUTRAL PIER SECTION | 1/22/2016 |
| A-638.00 | INTERIOR ELEVATIONS 2ND FLOOR FOOD COURT NORTH & WEST | 1/22/2016 |
| A-639.00 | INTERIOR ELEVATIONS 2ND FLOOR FOOD COURT, NORTH MALL ARCADE & EAST | 1/22/2016 |
| A-640.00 | INTERIOR ELEVATIONS 2ND FLOOR FOOD COURT, NORTH MALL ARCADE & WEST | 1/22/2016 |
| A-641.00 | INTERIOR ELEVATIONS 2ND FLOOR RESTROOMS & LOUNGES | 1/22/2016 |
| A-642.00 | INTERIOR ELEVATIONS 2ND FLOOR RESTROOMS & LOUNGES | 12/9/2015 |

| | | |
|---|---|---|
| A-643.00 | INTERIOR ELEVATIONS 2ND FLOOR NURSING ROOM, FAMILY ROOM & LOUNGES | 1/22/2016 |
| A-651.00 | INTERIOR SECTIONS 1ST FLOOR NORTH LOBBY & MAIN ARCADE | 12/9/2015 |
| A-652.00 | INTERIOR SECTIONS 2ND FLOOR FOOD COURT | 1/22/2016 |
| A-660.00 | INTERIOR SECTIONS WALL DETAILS | 12/9/2015 |
| A-661.00 | INTERIOR SECTIONS WALL DETAILS | 1/22/2016 |
| A-670.00 | MALL FOOD COURT TRANSITION PORTAL | 1/22/2016 |
| A-671.00 | ENLARGED PLAN, RCP, ELEVATION & SECTION - VESTIBULE 140 & 240 | 1/22/2016 |
| A-672.00 | ENLARGED PLAN, RCP, ELEVATION & SECTION - VESTIBULE 147 | 1/22/2016 |
| A-673.00 | ENLARGED PLAN, RCP, ELEVATION - VESTIBULE 144 | 1/22/2016 |
| A-674.00 | ENLARGED SECTIONS VESTIBULE 140,144 & 147 | 1/22/2016 |
| A-675.00 | ENLARGED PLAN, RCP, ELEVATION & SECTION - VESTIBULE 240 | 12/9/2015 |
| A-680.00 | ENLARGED PLANS & SECTION PASSENGER ELEVATOR 1 | 1/22/2016 |
| A-681.00 | ENLARGED PLANS & ELEVATIONS FREIGHT ELEVATOR 1 | 12/9/2015 |
| A-682.00 | ENLARGED PLANS & ELEVATIONS FREIGHT ELEVATOR 2 ALT. | 1/22/2016 |
| A-683.00 | ENLARGED PLANS & ELEVATIONS FREIGHT ELEVATOR 3 ALT. | 1/22/2016 |
| A-684.00 | ENLARGED PLANS & ELEVATIONS FREIGHT ELEVATOR 4 | 12/9/2015 |
| A-685.00 | DETAILS OF PASSENGER ELEVATOR & FREIGHT ELEVATOR 1 | 1/22/2016 |
| A-690.00 | INTERIOR ENLARGED PLANS FIRST FLOOR ENTRANCES & MALL ARCADES | 1/22/2016 |
| A-691.00 | INTERIOR ENLARGED PLANS FIRST FLOOR ENTRANCES & MALL ARCADES | 1/22/2016 |
| A-692.00 | INTERIOR ENLARGED PLANS FIRST FLOOR ENTRANCES & MALL ARCADES | 1/22/2016 |
| A-693.00 | INTERIOR ENLARGED TILE PATTERN 1ST FLOOR ENTRANCES & BIKE STORAGE | 1/22/2016 |
| A-694.00 | INTERIOR ENLARGED TILE PATTERN 2ND FLOOR FOOD COURT | 1/22/2016 |
| A-695.00 | INTERIOR TILE DETAILS 2ND FLOOR FOOD COURT | 1/22/2016 |
| A-696.00 | INTERIOR TILE DETAILS 2ND FLOOR FOOD COURT | 12/9/2015 |
| A-697.00 | INTERIOR ENLARGED TILE DETAILS 2ND FLOOR FOOD COURT | 12/9/2015 |
| A-698.00 | INTERIOR ENLARGED TILE DETAILS 2ND FLOOR FOOD COURT | 1/22/2016 |
| A-699.00 | INTERIOR ENLARGED TILE PATTERN 2ND FLOOR FOOD COURT | 12/9/2015 |
| A-700.00 | INTERIOR ENLARGED TILE PATTERN 2ND FLOOR RESTROOMS | 1/22/2016 |
| A-704.00 | STOREFRONT SYSTEM PLAN & SECTION DETAILS | 12/9/2015 |
| A-706.00 | BI- PART DOOR DETAILS | 12/9/2015 |
| A-709.00 | TYPICAL PIER DETAILS | 1/0/1900 |
| A-710.00 | TYPICAL PIER DETAILS | 12/9/2015 |
| A-711.00 | TYPICAL PIER DETAILS | 12/9/2015 |
| A-712.00 | TYPICAL PIER DETAILS | 12/9/2015 |
| A-713.00 | TYPICAL PIER DETAILS | 12/9/2015 |
| A-714.00 | TYPICAL PIER DETAILS | 1/22/2016 |
| A-715.00 | TYPICAL PIER DETAILS | 12/9/2015 |
| A-716.00 | TYPICAL PIER DETAILS | 12/9/2015 |
| A-717.00 | TYPICAL PIER DETAILS | 1/22/2016 |
| A-718.00 | TYPICAL PIER DETAILS | 12/9/2015 |
| A-719.00 | TYPICAL PIER DETAILS | 12/9/2015 |
| A-720.00 | TYPICAL PIER DETAILS | 12/9/2015 |
| A-721.00 | ROOF DETAILS | 1/22/2016 |
| A-722.00 | ROOF DETAILS | 12/9/2015 |
| A-723.00 | ROOF DETAILS | 12/9/2015 |
| A-730.00 | INTERIOR DETAILS | 11/11/2015 |
| A-731.00 | CEILING DETAILS | 1/22/2016 |
| A-732.00 | CEILING DETAILS | 1/22/2016 |
| A-733.00 | CEILING DETAILS | 1/22/2016 |
| A-740.00 | STAIR DETAILS | 12/9/2015 |
| A-741.00 | STAIR DETAILS | 12/9/2015 |
| A-742.00 | GUARD RAIL DETAILS | 12/9/2015 |
| A-743.00 | GUARD RAIL DETAILS | 12/9/2015 |
| A-750.00 | LOADING DOCK DETAILS | 1/22/2016 |
| A-751.00 | LOADING DOCK DETAILS | 3/4/2016 |

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 72 of 122 PageID #: 81

| | | |
|---|---|---|
| A-752.00 | LOADING DOCK DETAILS | 12/9/2015 |
| A-760.00 | FOOD COURT NEUTRAL PIER DETAILS | 1/22/2016 |
| A-801.00 | PARTITION TYPES | 1/22/2016 |
| A-802.00 | SCHEDULES DOOR & FINISHES | 1/22/2016 |
| A-803.00 | PARTITION TYPES & MISC. DETAILS | 12/9/2015 |
| A-804.00 | PARTITION TYPES & MISC. DETAILS | 12/9/2015 |
| A-805.00 | FURNITURE SCHEDULE | 12/9/2015 |
| A-806.00 | FURNITURE SCHEDULE | 12/9/2015 |
| A-807.00 | FINISH SCHEDULE | 1/22/2016 |
| A-811.00 | EXPANSION JOINT DETAILS | 3/4/2016 |
| A-815.00 | TRANSITION DETAILS | 1/22/2016 |
| A-820.00 | FOOD COURT CEILING DETAILS | 1/22/2016 |
| A-821.00 | FOOD COURT CEILING DETAILS WOOD BOX | 12/9/2015 |
| A-830.00 | PART PLAN & ELEVATIONS EIFS DETAILS | 1/22/2016 |
| A-831.00 | PART PLAN & ELEVATIONS EIFS DETAILS | 1/22/2016 |
| AD-111.00 | FIRST FLOOR PLAN DEMOLITION- NORTH | 1/22/2016 |
| AD-112.00 | FIRST FLOOR PLAN DEMOLITION- SOUTH | 1/22/2016 |
| AD-113.00 | FIRST FLOOR PLAN DEMOLITION- WEST | 1/22/2016 |
| AD-121.00 | SECOND FLOOR PLAN DEMOLITION- NORTH | 1/22/2016 |
| AD-122.00 | SECOND FLOOR PLAN DEMOLITION- SOUTH | 1/22/2016 |
| AD-123.00 | SECOND FLOOR PLAN DEMOLITION- WEST | 1/22/2016 |
| AD-131.00 | ROOF FLOOR PLAN DEMOLITION - NORTH | 12/9/2015 |
| AD-132.00 | ROOF FLOOR PLAN DEMOLITION - SOUTH | 12/9/2015 |
| AD-133.00 | ROOF FLOOR PLAN DEMOLITION - EAST | 12/9/2015 |
| AD-134.00 | DEMOLITION WALL SECTION | 12/9/2015 |
| AD-135.00 | DEMOLITION WALL SECTION | 12/9/2015 |
| AD-136.00 | DEMOLITION WALL SECTION | 12/9/2015 |
| EN-001.00 | ENERGY CALCULATIONS ARCHITECTURE | 12/9/2015 |
| EN-002.00 | ENERGY CALCULATIONS ARCHITECTURE | 12/9/2015 |
| Z-1.0 | AREA MAP | 12/9/2015 |
| Z-2.0 | Zoning Tabulations First Floor | 12/9/2015 |
| Z-3.0 | Site Sections | 12/9/2015 |
| Z-4.0A | Interim Site Plan | 12/9/2015 |
| C-000.00 | COVER SHEET | 1/22/2016 |
| C-001.00 | COVER SHEET | 1/22/2016 |
| C-050.00 | LIMITS OF WORK PLAN | 12/9/2015 |
| C-100.00 | OVERALL SITE PLAN | 1/22/2016 |
| C-101.00 | SITE PLAN | 1/22/2016 |
| C-102.00 | SITE PLAN | 1/22/2016 |
| C-103.00 | SITE PLAN | 12/9/2015 |
| C-104.00 | SITE PLAN | 12/9/2015 |
| C-105.00 | PAVING PLAN | 12/9/2015 |
| C-106.00 | SIGNAGE & STRIPING PLAN | 12/9/2015 |
| C-107.00 | SIGNAGE & STRIPING PLAN | 12/9/2015 |
| C-108.00 | SIGNAGE & STRIPING PLAN | 12/9/2015 |
| C-110.00 | PARKING PLAN | 12/9/2015 |
| C-200.00 | OVERALL GRADING & DRAINAGE PLAN | 1/22/2016 |
| C-201.00 | GRADING & DRAINAGE PLAN | 1/22/2016 |
| C-202.00 | GRADING & DRAINAGE PLAN | 12/9/2015 |
| C-203.00 | GRADING & DRAINAGE PLAN | 1/22/2016 |
| C-300.00 | OVERALL SOIL EROSION & SEDIMENT CONTROL PLAN | 12/9/2015 |
| C-301.00 | SOIL EROSION & SEDIMENT CONTROL PLAN | 12/9/2015 |
| C-302.00 | SOIL EROSION & SEDIMENT CONTROL PLAN | 12/9/2015 |
| C-303.00 | SOIL EROSION & SEDIMENT CONTROL PLAN | 12/9/2015 |
| C-304.00 | SOIL EROSION & SEDIMENT CONTROL DETAILS | 12/9/2015 |
| C-400.00 | OVERALL UTILITY PLAN | 1/22/2016 |
| C-401.00 | UTILITY PLAN | 1/22/2016 |
| C-402.00 | UTILITY PLAN | 1/22/2016 |
| C-403.00 | UTILITY PLAN | 1/22/2016 |
| C-411.00 | ELECTRIC CONDUIT ROUTING PLAN | 11/11/2015 |
| C-600.00 | SITE CIVIL DETAILS | 12/9/2015 |
| C-601.00 | SITE CIVIL DETAILS | 12/9/2015 |
| C-602.00 | SITE CIVIL DETAILS | 12/9/2015 |
| CS-101 | SCHEMATIC SITE PLAN | 11/11/2015 |
| CU-101 | SCHEMATIC UTILITY PLAN | 11/11/2015 |
| CU-301 | STORM SEWER RELOCATION PLAN | 11/11/2015 |

FILED: RICHMOND COUNTY CLERK 01/25/2021 06:19 PM

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 73 of 122 PageID #: 82

| | | |
|---|---|---|
| CU-401 | SANITORY SEWER RELOCATION PLAN | 11/11/2015 |
| CU-501 | STORM & SANITORY SEWER RELOCATION DETAILS | 11/11/2015 |
| CG-101 | SCHEMATIC GRADING AND DRAINAGE PLAN | 11/11/2015 |
| L-100.00 | OVERALL LANDSCAPE PLAN | 12/9/2015 |
| L-101.00 | LANDSCAPE PLAN | 12/9/2015 |
| L-102.00 | LANDSCAPE PLAN | 12/9/2015 |
| L-103.00 | LANDSCAPE PLAN | 12/9/2015 |
| L-104.00 | LANDSCAPE PLAN | 12/9/2015 |
| L-200.00 | OVERALL LIGHTING PLAN | 12/9/2015 |
| L-201.00 | LIGHTING PLAN | 12/9/2015 |
| L-202.00 | LIGHTING PLAN | 12/9/2015 |
| L-203.00 | LIGHTING PLAN | 12/9/2015 |
| L-204.00 | LIGHTING PLAN | 12/9/2015 |
| L-210.00 | LANDSCAPE NOTES & DETAILS | 11/11/2015 |
| L-300.00 | LANDSCAPE DIMENSIONS PLAN | 11/11/2015 |
| L-400.00 | PIAZZA AND GARAGE ENTRANCE PLANTING PLAN | 11/11/2015 |
| L-410.00 | MALL ENTRANCES PLANTING PLAN | 11/11/2015 |
| L-500.00 | LANDSCAPE NOTES & DETAILS | 12/9/2015 |
| L-501.00 | LIGHTING NOTES & DETAILS | 12/9/2015 |
| L-510.00 | MALL ENTRANCE LIGHTING PLAN | 12/20/2013 |
| L-600.00 | LANDSCAPE DETAILS | 12/20/2013 |
| VB-101 | BOUNDARY AND TOPOGRAPHIC SURVEY | 12/9/2015 |
| VB-102 | BOUNDARY AND TOPOGRAPHIC SURVEY | 12/9/2015 |
| VB-103 | BOUNDARY AND TOPOGRAPHIC SURVEY | 12/9/2015 |
| PAGE 1/9 | CURRENT CONDITIONS | 12/13/2014 |
| PAGE 2/9 | A-101.00 SITE PLAN | 12/13/2014 |
| PAGE 3/9 | A-102.00 SECOND FLOOR SITE PLAN | 12/13/2014 |
| PAGE 4/9 | CONCEPT 1 | 12/13/2014 |
| PAGE 5/9 | CONCEPT 1 | 12/13/2014 |
| PAGE 6/9 | CONCEPT 2 | 12/13/2014 |
| PAGE 7/9 | CONCEPT 2 | 12/13/2014 |
| PAGE 8/9 | CONCEPT 3 | 12/13/2014 |
| PAGE 9/9 | CONCEPT 3 | 12/13/2014 |
| C-403.00 | Overall Internal Water Main Plan (STAMPED) | 8/12/2015 |
| FD-100.00 | Fire Department Access Plan (STAMPED) | 4/13/2015 |
| SCR-695/14 (MP) | Site Plan- Site Connection Proposal (STAMPED) | 8/21/2015 |
| SCR-695/14 (PH-1) | Site Plan- Site Connection Proposal (STAMPED) | 8/24/2015 |
| SCR-695/14 (PH-2) | Site Plan- Site Connection Proposal (STAMPED) | 8/24/2015 |
| SCR-695/14 (PH-5) | Site Plan- Site Connection Proposal (STAMPED) | 8/24/2015 |
| SCR-695/14 (PH-6) | Site Plan- Site Connection Proposal (STAMPED) | 8/24/2015 |
| C-126.00 | Overall Street Tree Plan | 12/16/2015 |
| C-127.00 | Street Tree Plan | 12/16/2015 |
| C-128.00 | Street Tree Plan | 12/16/2015 |
| C-129.00 | Street Tree Plan | 12/16/2015 |
| C-130.00 | Street Tree Plan | 12/16/2015 |
| C-131.00 | Street Tree Plan | 12/16/2015 |
| | Protective Fencing & Tree Decompaction | 7/24/2013 |
| C-111.00 | Overall Sidewalk Replacement Plan | 12/10/2015 |
| C-112.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-113.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-114.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-115.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-116.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-117.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-118.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-119.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-120.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-121.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-122.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-123.00 | Sidewalk Replacement Plan | 6/26/2015 |

| | | |
|---|---|---|
| C-124.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-125.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-126.00 | Sidewalk Replacement Plan | 6/26/2015 |
| C-127.00 | Sidewalk Replacement Plan | 6/26/2015 |
| E-000.00 | COVER SHEET | 1/0/1900 |
| E-001.00 | ELECTRICAL NOTES, SYMBOLS, ABBREVATIONS AND DRAWING LIST | 1/22/2016 |
| E-100.00 | ELECTRICAL FIRST FLOOR PART PLAN NORTH | 11/11/2015 |
| E-101.00 | ELECTRICAL SITE PLAN | 3/11/2016 |
| E-102.00 | ELECTRICAL FIRST FLOOR PART PLAN SOUTH | 11/11/2015 |
| E-103.00 | ELECTRICAL SECOND FLOOR PART PLAN NORTH | 11/11/2015 |
| E-104.00 | ELECTRICAL SECOND FLOOR PART PLAN SOUTH | 11/11/2015 |
| E-105.00 | ELECTRICAL SITE PLAN | 11/11/2015 |
| E-110.00 | ELECTRICAL FIRST FLOOR PART PLAN NORTH | 3/11/2016 |
| E-111.00 | ELECTRICAL FIRST FLOOR PART PLAN SOUTH | 3/11/2016 |
| E-112.00 | ELECTRICAL FIRST FLOOR PART PLAN EAST | 3/11/2016 |
| E-112A.00 | ELECTRICAL FIRST FLOOR PART PLAN EAST (ALT.) | 3/11/2016 |
| E-120.00 | ELECTRICAL SECOND FLOOR PART PLAN NORTH | 1/22/2016 |
| E-121.00 | ELECTRICAL SECOND FLOOR PART PLAN SOUTH | 12/9/2015 |
| E-121A.00 | ELECTRICAL SECOND FLOOR PART PLAN SOUTH (ALT.) | 12/9/2015 |
| E-122.00 | ELECTRICAL SECOND FLOOR PART PLAN EAST | 3/11/2016 |
| E-130.00 | ELECTRICAL ROOF PART PLAN NORTH AND SOUTH | 3/11/2016 |
| E-130A.00 | ELECTRICAL ROOF PART PLAN NORTH (ALT.) | 3/11/2016 |
| E-131.00 | ELECTRICAL ROOF PART PLAN SOUTH | 1/22/2016 |
| E-131A.00 | ELECTRICAL ROOF PART PLAN SOUTH (ALT.) | 1/22/2016 |
| E-132.00 | ELECTRICAL ROOF PART PLAN EAST | 3/11/2016 |
| E-132A.00 | ELECTRICAL ROOF PART PLAN EAST (ALT.) | 3/11/2016 |
| E-133.00 | ELECTRICAL ROOF PART PLAN | 1/22/2016 |
| E-133A.00 | ELECTRICAL ROOF PART PLAN (ALT.) | 1/22/2016 |
| E-210.00 | ELECTRICAL FIRST FLOOR PART LIGHTING PLAN - NORTH | 1/22/2016 |
| E-211.00 | ELECTRICAL FIRST FLOOR PART LIGHTING PLAN - SOUTH | 1/22/2016 |
| E-220.00 | ELECTRICAL SECOND FLOOR PART LIGHTING PLAN - NORTH | 1/22/2016 |
| E-221.00 | ELECTRICAL SECOND FLOOR PART LIGHTING PLAN - SOUTH | 1/22/2016 |
| E-222.00 | ELECTRICAL SECOND FLOOR PART LIGHTING PLAN - EAST | 1/22/2016 |
| E-300.00 | ELECTRICAL PANEL SCHEDULES SHEET 1 | 12/9/2015 |
| E-301.00 | ELECTRICAL PANEL SCHEDULES SHEET 2 | 3/11/2016 |
| E-400.00 | ELECTRICAL DETAILS SHEET | 12/9/2015 |
| E-500.00 | ELECTRICAL SINGLE-LINE DIAGRAM | 1/22/2016 |
| E-500A.00 | ELECTRICAL SINGLE-LINE DIAGRAM (ALT.) | 1/22/2016 |
| E-501.00 | ELECTRICAL RISER DIAGRAM | 1/22/2016 |
| ED-101.00 | ELECTRICAL DEMOLITION SITE PLAN | 12/9/2015 |
| ED-110.00 | ELECTRICAL FIRST FLOOR DEMOLITION PART PLAN NORTH | 12/9/2015 |
| ED-111.00 | ELECTRICAL FIRST FLOOR DEMOLITION PART PLAN SOUTH | 12/9/2015 |
| ED-121.00 | ELECTRICAL SECOND FLOOR DEMOLITION PART PLAN SOUTH | 12/9/2015 |
| ED-122.00 | ELECTRICAL SECOND FLOOR DEMOLITION PART PLAN EAST | 12/9/2015 |
| EN-002.00 | ENERGY PROGRESS INSPECTIONS & LIGHTING FIXTURE SCHEDULE | 12/9/2015 |
| EN-003.00 | ENERGY MECHANICAL COMPLIANCE | 12/9/2015 |
| EN-004.00 | ENERGY LIGHTING COMPLIANCE | 12/9/2015 |
| EN-101.00 | ENERGY SIE PLAN | 12/9/2015 |
| EN-210.00 | ENERGY FIRST FLOOR PART LIGHTING PLAN - NORTH | 1/22/2016 |
| EN-211.00 | ENERGY FIRST FLOOR PART LIGHTING PLAN - SOUTH | 1/22/2016 |
| EN-220.00 | ENERGY SECOND FLOOR PART LIGHTING PLAN - NORTH | 1/22/2016 |
| EN-221.00 | ENERGY SECOND FLOOR PART LIGHTING PLAN - SOUTH | 1/22/2016 |
| EN-222.00 | ENERGY SECOND FLOOR PART LIGHTING PLAN - EAST | 1/22/2016 |
| | LIGHTING REPORT | 1/0/1900 |
| | LOT LIGHTING MAP | 1/0/1900 |
| | IRRIGATION LOCATION | 1/0/1900 |
| G-100.00 | GRAPHIC SIGNAGE DISPLAYS | 3/4/2016 |
| G-101.00A | FIRST FLOOR SITE PLAN | 3/4/2016 |
| G-101.00B | FIRST FLOOR SITE PLAN (Detail) | 3/4/2016 |
| G-102.00 | SECOND FLOOR SITE PLAN | 3/4/2016 |
| G-103.00 | GRAPHIC SIGNAGE DISPLAYS | 3/4/2016 |
| G-104.00 | GRAPHIC SIGNAGE DISPLAYS | 3/4/2016 |
| G-105.00 | GRAPHIC SIGNAGE DISPLAYS | 3/4/2016 |

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 75 of 122 PageID #: 84

| | | |
|---|---|---|
| G-106.00 | GRAPHIC SIGNAGE DISPLAYS | 3/4/2016 |
| G-107.00 | GRAPHIC SIGNAGE DISPLAYS | 3/4/2016 |
| FA-000.00 | COVER SHEET | 1/0/1900 |
| FA-111.00 | FIRST FLOOR FIRE ALARM PLAN NORTH | 12/9/2015 |
| FA-112.00 | FIRST FLOOR FIRE ALARM PLAN SOUTH | 12/9/2015 |
| FA-121.00 | SECOND FLOOR FIRE ALARM PLAN NORTH | 12/9/2015 |
| FA-122.00 | SECOND FLOOR FIRE ALARM PLAN SOUTH | 12/9/2015 |
| FA-123.00 | SECOND FLOOR FIRE ALARM PLAN EAST | 12/9/2015 |
| FA-201.00 | FIRE ALARM NOTES AND MATRIX | 12/9/2015 |
| FA-202.00 | FIRE ALARM DETAILS & TENANT INTERFACE DETAILS | 12/9/2015 |
| FA-203.00 | FIRE ALARM RISER DIAGRAM | 12/9/2015 |
| FA-204.00 | FIRE ALARM NOTES AND MATRIX (GROCER) | 1/0/1900 |
| FA-205.00 | FIRE ALARM RISER DIAGRAM (GROCER) | 1/0/1900 |
| FA-301.00 | FIRE ALARM NOTES AND MATRIX | 11/11/2015 |
| SP-101.00 | NORTH FIRE SPRINKLER FIRST FLOOR ENLARGED PLAN | 11/11/2015 |
| SP-102.00 | SOUTH FIRE SPRINKLER FIRST FLOOR ENLARGED PLAN | 11/11/2015 |
| SP-103.00 | NORTH FIRE SPRINKLER SECOND FLOOR ENLARGED PLAN | 11/11/2015 |
| SP-104.00 | SOUTH FIRE SPRINKLER SECOND FLOOR ENLARGED PLAN | 11/11/2015 |
| SP-011.00 | FIRST FLOOR FIRE SPRINKLER REMOVAL PLAN- NORTH | 1/22/2016 |
| SP-012.00 | FIRST FLOOR FIRE SPRINKLER REMOVAL PLAN- SOUTH | 12/9/2015 |
| SP-021.00 | SECOND FLOOR FIRE SPRINKLER REMOVAL PLAN- NORTH | 12/9/2015 |
| SP-022.00 | SECOND FLOOR FIRE SPRINKLER REMOVAL PLAN- SOUTH | 12/9/2015 |
| SP-111.00 | FIRST FLOOR FIRE SPRINKLER PLAN NORTH | 1/22/2016 |
| SP-112.00 | FIRST FLOOR FIRE SPRINKLER PLAN SOUTH | 1/22/2016 |
| SP-121.00 | SECOND FLOOR FIRE SPRINKLER PLAN NORTH | 1/22/2016 |
| SP-122.00 | SECOND FLOOR FIRE SPRINKLER PLAN SOUTH | 1/22/2016 |
| SP-123.00 | SECOND FLOOR FIRE SPRINKLER PLAN EAST | 1/22/2016 |
| SP-201.00 | FIRE SPRINKLER NOTES AND DETAILS | 1/22/2016 |
| SP-202.00 | FIRE SPRINKLER NOTES AND DETAILS | 12/9/2015 |
| SP-601.00 | FIRST FLOOR ENLARGED FIRE SPRINKLER PLANS | 1/22/2016 |
| SP-602.00 | FIRST FLOOR ENLARGED FIRE SPRINKLER PLANS | 1/22/2016 |
| SP-603.00 | FIRST FLOOR ENLARGED FIRE SPRINKLER PLANS | 1/22/2016 |
| SP-604.00 | FIRST FLOOR ENLARGED FIRE SPRINKLER PLANS | 12/9/2015 |
| SP-605.00 | FIRST FLOOR ENLARGED FIRE SPRINKLER PLANS | 12/9/2015 |
| SP-606.00 | FIRST FLOOR ENLARGED FIRE SPRINKLER PLANS | 12/9/2015 |
| SP-607.00 | FIRST FLOOR ENLARGED FIRE SPRINKLER PLANS | 12/9/2015 |
| SP-608.00 | SECOND FLOOR ENLARGED FIRE SPRINKLER PLAN | 1/22/2016 |
| SP-609.00 | SECOND FLOOR ENLARGED FIRE SPRINKLER PLAN | 1/22/2016 |
| SP-610.00 | SECOND FLOOR ENLARGED FIRE SPRINKLER PLAN | 1/22/2016 |
| SP-611.00 | SECOND FLOOR ENLARGED FIRE SPRINKLER PLAN | 12/9/2015 |
| SP-612.00 | SECOND FLOOR ENLARGED FIRE SPRINKLER PLAN | 1/22/2016 |
| SP-613.00 | SECOND FLOOR ENLARGED FIRE SPRINKLER PLAN | 12/9/2015 |
| SP-614.00 | SECOND FLOOR ENLARGED FIRE SPRINKLER PLAN | 12/9/2015 |
| SP-301.00 | FIRE SPRINKLER NOTES AND DETAILS | 6/26/2014 |
| A-101.00 | FIRST FLOOR SITE PLAN | 6/26/2014 |
| A-102.00 | SECOND FLOOR SITE PLAN | 6/26/2014 |
| GD-103.00 | GRAPHIC SIGNAGE | 6/26/2014 |
| 6 PAGES | GRAPHIC SIGNAGE 11X17 | 6/26/2014 |
| LA-000.00 | COVER SHEET | 1/22/2016 |
| LA-010.00 | LANDSCAPE GENERAL NOTES | 12/9/2015 |
| LA-020.00 | LANDSCAPE SITE PLAN | 1/22/2016 |
| LA-030.00 | NORTH & SOUTH ENTRANCE DEMOLITION PLANS | 12/9/2015 |
| LA-100.00 | PIAZZA LANDSCAPE SITE PLAN | 1/22/2016 |
| LA-100A.00 | PIAZZA LANDSCAPE GRADING PLAN | 12/9/2015 |
| LA-110.00 | GARAGE LANDSCAPE PLAN | 1/22/2016 |
| LA-120.00 | MAIN ENTRANCE LANDSCAPE PLAN | 1/22/2016 |
| LA-130.00 | NORTH & SOUTH ENTRANCE LANDSCAPE PLANS | 12/9/2015 |
| LA-200.00 | PIAZZA DIMENSIONS PLAN | 12/9/2015 |
| LA-210.00 | PLAZA DIMENSIONS PLAN | 1/22/2016 |
| LA-220.00 | MAIN ENTRANCE DIMENSIONS PLAN | 1/22/2016 |
| LA-230.00 | NORTH & SOUTH ENTRANCE DIMENSIONS PLAN | 12/9/2015 |
| LA-300.00 | PIAZZA PLANTING PLAN | 12/9/2015 |
| LA-310.00 | GARAGE PLANTING PLAN | 1/22/2016 |
| LA-320.00 | MAIN ENTRANCE PLANTING PLAN | 1/22/2016 |
| LA-330.00 | NORTH & SOUTH ENTRANCE PLANTING PLAN | 12/9/2015 |

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 76 of 122 PageID #: 85

| | | |
|---|---|---|
| LA-400.00 | SITE FURNISHING SCHEDULE | 1/22/2016 |
| LA-600.00 | LANDSCAPE SITE DETAILS | 12/9/2015 |
| LA-610.00 | LANDSCAPE SITE DETAILS | 12/9/2015 |
| LT-10.00 | LIGHTING FIXTURE LEGEND 1 INTERIOR | 11/9/2015 |
| LT-10.01 | LIGHTING FIXTURE LEGEND 2 EXTERIOR | 11/9/2015 |
| LA-620.00 | LANDSCAPE SITE DETAILS | 12/9/2015 |
| LA-630.00 | LANDSCAPE PLANTING DETAILS | 12/9/2015 |
| LT-100.00 | LIGHTING FIXTURE  SCHEDULE - 1 INTERIOR | 12/9/2015 |
| LT-101.00 | LIGHTING FIXTURE  SCHEDULE - 2 INTERIOR | 12/9/2015 |
| LT-101.01 | LIGHTING FIXTURE LEGEND- 2 ENLARGEMENT | 11/13/2015 |
| LT-102.00 | LIGHTING FIXTURE  SCHEDULE - 3 INTERIOR | 12/9/2015 |
| LT-103.00 | LIGHTING FIXTURE  SCHEDULE - 4 INTERIOR | 12/9/2015 |
| LT-104.00 | FIRST FLOOR LIGHTING RCP NORTH | 11/13/2015 |
| LT-105.00 | FIRST FLOOR LIGHTING RCP SOUTH | 11/13/2015 |
| LT-106.00 | SECOND FLOOR LIGHTING RCP SOUTH | 11/13/2015 |
| LT-107.00 | SECOND FLOOR LIGHTING RCP NORTH | 11/13/2015 |
| LT-108.00 | SECOND FLOOR LIGHTING RCP SOUTH | 11/13/2015 |
| LT-109.00 | SECOND FLOOR LIGHTING RCP EAST | 11/13/2015 |
| LT-200.00 | LIGHTING FIXTURE ILLUSTRATIONS 1 | 12/9/2015 |
| LT-201.00 | LIGHTING FIXTURE ILLUSTRATIONS 2 | 12/9/2015 |
| LT-202.00 | LIGHTING FIXTURE ILLUSTRATIONS 3 | 12/9/2015 |
| LT-203.00 | LIGHTING FIXTURE ILLUSTRATIONS 4 | 12/9/2015 |
| LT-204.00 | LIGHTING FIXTURE ILLUSTRATIONS 5 | 12/9/2015 |
| LT-205.00 | LIGHTING FIXTURE ILLUSTRATIONS 6 | 12/9/2015 |
| LT-206.00 | LIGHTING FIXTURE ILLUSTRATIONS 7 | 12/9/2015 |
| LT-207.00 | LIGHTING FIXTURE ILLUSTRATIONS 8 | 12/9/2015 |
| LT-208.00 | LIGHTING FIXTURE ILLUSTRATIONS 9 | 12/9/2015 |
| LT-209.00 | LIGHTING FIXTURE ILLUSTRATIONS 10 | 12/9/2015 |
| LT-210.00 | LIGHTING FIXTURE ILLUSTRATIONS 11 | 11/13/2015 |
| LT-211.00 | LIGHTING FIXTURE ILLUSTRATIONS 12 | 11/13/2015 |
| LT-212.00 | LIGHTING FIXTURE ILLUSTRATIONS 13 | 11/13/2015 |
| 44 PAGES | LIGHTING FIXTURE ILLUSTRATIONS 14 | 11/13/2015 |
| LT-210.00 | LIGHTING FIXTURE ILLUSTRATIONS 11 | 12/9/2015 |
| LT-211.00 | LIGHTING FIXTURE ILLUSTRATIONS 12 | 12/9/2015 |
| LT-212.00 | LIGHTING FIXTURE ILLUSTRATIONS 13 | 12/9/2015 |
| LT-213.00 | LIGHTING FIXTURE ILLUSTRATIONS 14 | 12/9/2015 |
| LT-214.00 | LIGHTING FIXTURE ILLUSTRATIONS 15 | 12/9/2015 |
| DM-000.00 | COVER SHEET | 1/0/1900 |
| DM-110.00 | MECHANICAL FIRST FLOOR DEMOLITION PART PLAN NORTH | 12/9/2015 |
| DM-111.00 | MECHANICAL FIRST FLOOR DEMOLITION PART PLAN SOUTH | 12/9/2015 |
| DM-120.00 | MECHANICAL SECOND FLOOR DEMOLITION PART PLAN NORTH | 12/9/2015 |
| DM-121.00 | MECHANICAL SECOND FLOOR DEMOLITION PART PLAN SOUTH | 12/9/2015 |
| M-001.00 | MECHANICAL NOTES, SYMBOLES, ABBREVIATIONS & DRAWING LIST | 12/9/2015 |
| M-101.00 | MECHANICAL FIRST FLOOR PART PLAN NORTH | 6/24/2014 |
| M-102.00 | MECHANICAL FIRST FLOOR PART PLAN SOUTH | 6/24/2014 |
| M-103.00 | MECHANICAL SECOND FLOOR PART PLAN NORTH | 6/24/2014 |
| M-104.00 | MECHANICAL SECOND FLOOR PART PLAN SOUTH | 6/24/2014 |
| M-105.00 | MECHANICAL SECONF FLOOR PART PLAN EAST | 6/24/2014 |
| M-106.00 | MECHANICAL ROOF PART PLAN NORTH | 6/24/2014 |
| M-107.00 | MECHANICAL ROOF PART PLAN SOUTH | 6/24/2014 |
| M-110.00 | MECHANICAL FIRST FLOOR PART PLAN NORTH | 1/22/2016 |
| M-111.00 | MECHANICAL FIRST FLOOR PART PLAN SOUTH | 1/22/2016 |
| M-120.00 | MECHANICAL SECOND FLOOR PART PLAN NORTH | 1/22/2016 |
| M-121.00 | MECHANICAL SECOND FLOOR PART PLAN SOUTH | 1/22/2016 |
| M-122.00 | MECHANICAL SECOND FLOOR PART PLAN EAST | 1/22/2016 |
| M-130.00 | MECHANICAL ROOF PART PLAN NORTH | 1/22/2016 |
| M-131.00 | MECHANICAL ROOF PART PLAN SOUTH | 1/22/2016 |
| M-132.00 | MECHANICAL ROOF PART PLAN EAST | 1/22/2016 |
| M-133.00 | MECHANICAL ROOF PATY PLAN EAST | 11/11/2015 |
| M-300.00 | MECHANICAL SCHEDULES I | 1/22/2016 |
| M-400.00 | MECHANICAL DETAILS I | 12/9/2015 |
| M-401.00 | MECHANICAL DETAILS II | 6/24/2014 |

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 77 of 122 PageID #: 86

| | | |
|---|---|---|
| M-401.00 | MECHANICAL DETAILS II | 12/9/2015 |
| P-000.00 | COVER SHEET | 1/0/1900 |
| P-001.00 | ABBREVATIONS NOTES & SYMBOLS LIST | 12/9/2015 |
| P-002.00 | PLUMBING UNDERGROUND PIPING PART PLAN NORTH | 3/21/2016 |
| P-003.00 | PLUMBING UNDERGROUND PIPING PART PLAN SOUTH | 3/21/2016 |
| P-101.00 | UNDERGROUND FIRST FLOOR PART PLAN NORTH | 11/11/2015 |
| P-102.00 | UNDERGROUND FIRST FLOOR PART PLAN SOUTH | 11/11/2015 |
| P-101.00 | Grade Level Plumbing Plan | 3/21/2016 |
| P-102.00 | Second Level Plumbing Plan | 3/21/2016 |
| P-103.00 | Plumbing First Floor Part Plan | 3/21/2016 |
| P-110.00 | PLUMBING FIRST FLOOR PART PLAN NORTH | 3/21/2016 |
| P-111.00 | PLUMBING FIRST FLOOR PART PLAN SOUTH | 3/11/2016 |
| P-120.00 | PLUMBING SECOND FLOOR PART PLAN NORTH | 3/21/2016 |
| P-121.00 | PLUMBING SECOND FLOOR PART PLAN SOUTH | 12/9/2015 |
| P-122.00 | PLUMBING SECOND FLOOR PART PLAN EAST | 12/9/2015 |
| P-130.00 | PLUMBING ROOF FLOOR PART PLAN NORTH | 1/22/2016 |
| P-131.00 | PLUMBING ROOF FLOOR PART PLAN  SOUTH | 1/22/2016 |
| P-132.00 | PLUMBING ROOF FLOOR PART PLAN EAST | 12/9/2015 |
| P-300.00 | PLUMBING SCHEDULE | 3/11/2016 |
| P-400.00 | PLUMBING DETAILS 1 OF 4 | 12/9/2015 |
| P-401.00 | PLUMBING DETAILS 2 OF 4 | 12/9/2015 |
| P-402.00 | PLUMBING DETAILS 3 OF 4 | 1/22/2016 |
| P-500.00 | PLUMBING SANITARY RISER DIAGRAM 1 OF 2 (NORTH & EAST) | 12/9/2015 |
| P-501.00 | PLUMBING SANITARY RISER DIAGRAM 2 OF 2 (SOUTH & PIAZZA PAD) | 12/9/2015 |
| P-502.00 | PLUMBING DOMESTIC WATER RISER DIAGRAM | 1/22/2016 |
| P-503.00 | PLUMBING GAS RISER DIAGRAM | 12/9/2015 |
| P-504.00 | PLUMBING STORM RISER DIAGRAM | 12/9/2015 |
| P-201.00 | PLUMBING SECOND FLOOR PART PLAN NORTH | 6/24/2014 |
| P-202.00 | PLUMBING SECOND FLOOR PART PLAN SOUTH | 6/24/2014 |
| P-203.00 | PLUMBING SECOND FLOOR PART PLAN EAST | 6/24/2014 |
| SSD-101.00 | SUB-SLAB DEPRESSURIZATION PIPING | 12/9/2015 |
| SSD-102.00 | SUB-SLAB DEPRESSURIZATION PIPING | 1/22/2016 |
| FO-000.00 | COVER SHEET | 1/25/2016 |
| FO-104.00 | NORTH GROUND FLOOR FOUNDATION PLAN | 3/31/2016 |
| FO-105.00 | SOUTH GROUND FLOOR FOUNDATION PLAN | 1/22/2016 |
| FO-106.00 | EAST CELLAR FLOOR FOUNDATION PLAN | 1/22/2016 |
| FO-110.00 | EAST CELLAR FLOOR FOUNDATION PLAN | 11/19/2015 |
| S-104.00 | NORTH SECOND FLOOR FRAMING PLAN | 3/31/2016 |
| S-105.00 | SOUTH SECOND FLOOR FRAMING PLAN | 12/9/2015 |
| S-106.00 | EAST ROOF FRAMING PLAN | 12/9/2015 |
| S-107.00 | NORTH ROOF FRAMING PLAN | 3/31/2016 |
| S-108.00 | SOUTH ROOF FRAMING PLAN | 12/9/2015 |
| S-109.00 | SOUTH ROOF FRAMING PLAN | 11/19/2015 |
| S-111.00 | EAST ROOF FRAMING PLAN | 11/19/2015 |
| S-111.00 | EAST GROUND FLOOR FRAMING PLAN | 11/19/2015 |
| S-200.00 | SECTIONS & DETAILS i | 3/11/2016 |
| S-201.00 | SECTIONS & DETAILS ii | 3/11/2016 |
| S-202.00 | SECTIONS & DETAILS iii | 12/9/2015 |
| S-300.00 | COLUMN SCHEDULE NORTH & EAST | 3/31/2016 |
| S-301.00 | COLUMN SCHEDULE SOUTH | 12/9/2015 |
| S-400.00 | FRAMING ELEVATIONS I | 12/9/2015 |
| S-401.00 | FRAMING ELEVATIONS II | 12/9/2015 |
| S-402.00 | FRAMING ELEVATIONS III | 12/9/2015 |
| S-500.00 | ELEVATIONS I | 3/11/2016 |
| S-501.00 | ELEVATIONS II | 3/11/2016 |
| S-502.00 | ELEVATIONS III | 12/9/2015 |
| S-601.00 | TYPICAL DETAILS AND SECTIONS I | 1/22/2016 |
| S-602.00 | TYPICAL DETAILS AND SECTIONS II | 1/22/2016 |
| S-604.00 | TYPICAL DETAILS AND SECTIONS IV | 12/9/2015 |
| VT-001.00 | HATCH PLAN, MACHINE ROOM & SECTION FOR PE1 & FE1 | 12/9/2015 |
| VT-002.00 | HATCH PLAN, MACHINE ROOM & SECTION FOR FE2 & FE3 | 12/9/2015 |
| VT-003.00 | HATCH PLAN, MACHINE ROOM & SECTION FOR FE4 | 12/9/2015 |
| VT-004.00 | ESCALATORS ESC- 1 & 2 PLAN, SECTIONS & DETAILS | 12/9/2015 |
| Page 1 | HATCH PLAN, MACHINE ROOM & SECTION FOR PE1 & FE1 | 6/26/2014 |
| Page 2 | HATCH PLAN, MACHINE ROOM & SECTION FOR FE2 & FE3 | 6/26/2014 |
| Page 3 | HATCH PLAN, MACHINE ROOM & SECTION FOR FE4 | 6/26/2014 |

| Page 4 | ESCALATORS ESC- 1 & 2 PLAN, SECTIONS & DETAILS | 6/26/2014 |
| SKM-1 | MECHANICAL SKETCH FIRST FLOOR PART PLAN | 12/13/2013 |
| SKM-2 | MECHANICAL SKETCH FIRST FLOOR PART PLAN | 12/13/2013 |
| SKM-3 | MECHANICAL SKETCH SECOND FLOOR PART PLAN | 12/13/2013 |
| SKM-4 | MECHANICAL SKETCH SECOND FLOOR PART PLAN | 12/13/2013 |
| SKM-5 | MECHANICAL SKETCH SECOND FLOOR PART PLAN | 12/13/2013 |
| SKM-6 | MECHANICAL SKETCH ROOF PART PLAN | 12/13/2013 |
| SKM-7 | MECHANICAL SKETCH ROOF PART PLAN | 12/13/2013 |
| SKM-8 | MECHANICAL SKETCH ROOF PART PLAN | 12/13/2013 |
| SKE-1 | ELECTRICAL FIRST FLOOR PLAN | 12/13/2013 |
| SKE-2 | ELECTRICAL FIRST FLOOR PLAN | 12/13/2013 |
| SKA-001 | Gas Room Dimensions | 6/28/2016 |
| SKA-002 | 2nd Fl - Column B and 10.2 | 7/28/2016 |
| **Outdoor Gas Rig Enclosure** | | |
| A-000.00 | Cover Sheet | 5/17/2016 |
| A-001.00 | Drawing Index | 5/17/2016 |
| A-002.00 | Code Chart General Notes | 1/15/2016 |
| A-100.01 | Floor Plans, Sections & Elevations | 5/17/2016 |
| A-200.00 | Typ. Section Details, Schedules Etc. | 1/15/2016 |
| E-001.00 | Electrical Notes, Symbols, Abbreviations & Drawing List | 1/15/2016 |
| E-100.00 | Electrical Outdoor Gas Rig Enclosure Plan | 1/15/2016 |
| EN-001.00 | Energy Cover Sheet | 1/15/2016 |
| EN-100.00 | Energy Outdoor Gas Rig Enclosure Plan | 1/15/2016 |
| P-001.00 | Plumbing Abbreviations, Notes, Symbols, Details & Drawing List | 1/15/2016 |
| P-100.00 | Plumbing First Floor Part Plan South Outdoor Gas Enclosure | 1/15/2016 |
| S-101G.00 | Gas Room Plan & Details | 8/28/2015 |
| S-102G.00 | Gas Room Notes | 8/28/2015 |
| S-105G.00 | Gas Room Plan, Details & Notes | 5/17/2016 |
| **GENERATOR** | | |
| E-001.00 | Energy Compliance Notes and Generator Specifications | 3/11/2016 |
| E-002.00 | Generator Part Plan & Details | 3/11/2016 |
| **PARKING GARAGE** | | |
| T-001.0 | Title Sheet | 6/5/2015 |
| T-002.0 | Abbreviations, Symbols, & Code Analysis | 6/5/2015 |
| A-100.0 | Site Plan | 6/5/2015 |
| A-101.0 | Grade Level Plan | 6/5/2015 |
| A-102.0 | Second Level Plan | 6/5/2015 |
| A-103.0 | Third Level Plan | 6/5/2015 |
| A-201.0 | Building Elevations | 6/5/2015 |
| A-202.0 | Enlarged Elevations | 6/5/2015 |
| A-203.0 | 3D Elevations | 6/5/2015 |
| A-204.0 | 3D Elevations | 6/5/2015 |
| A-301.0 | Building Sections | 6/5/2015 |
| A-302.0 | Building Sections | 6/5/2015 |
| A-401.0 | Stair No. 1 Plans | 6/5/2015 |
| A-402.0 | Stair No. 1 Sections & Elevations | 6/5/2015 |
| A-402.1 | Stair No. 1 Sections & Elevations | 2/13/2015 |
| A-403.0 | Stair No. 2 Plans | 6/5/2015 |
| A-404.0 | Stair No. 2 Sections & Elevations | 6/5/2015 |
| A-404.1 | Stair No. 2 Sections & Elevations | 2/13/2015 |
| A-405.0 | Stair No. 4 Plans | 6/5/2015 |
| A-406.0 | Stair No. 4 Sections and Elevations | 6/5/2015 |
| A-407.0 | Stair No. 4 Plans | 6/5/2015 |
| A-408.0 | Stair No. 4 Sections and Elevations | 6/5/2015 |
| A-409.0 | Pedestrian Bridge Plans & Elevation | 6/5/2015 |
| A-410.0 | Pedestrian Bridge Sections | 6/5/2015 |
| A-411.00 | Macy's Pedestrian Bridge Plans | 1/11/2016 |
| A-412.00 | Macy's Pedestrian Bridge Elevation & Details | 1/11/2016 |
| A-413.00 | Macy's Pedestrian Sections | 1/11/2016 |
| A-414.00 | Macy's Pedestrian Sections | 1/11/2016 |
| A-501.0 | Door & Window Details | 6/5/2015 |
| A-601.0 | Wall Sections | 6/5/2015 |
| A-602.0 | Wall Sections | 6/5/2015 |
| A-701.0 | Typical Details | 6/5/2015 |

| A-702.0 | Typical Details | 6/5/2015 |
| A-801 | Grade Level Signage Plan | 6/5/2015 |
| A-802 | Second Level Signage Plan | 6/5/2015 |
| A-803 | Third Level Signage Plan | 6/5/2015 |
| A-804 | Signage Details | 6/5/2015 |
| S-001.0 | General Structural Notes | 6/5/2015 |
| S-002.0 | Typical Details | 6/5/2015 |
| S-003.0 | Typical Masonry Details | 6/5/2015 |
| S-101.0 | Foundation Plan | 11/11/2015 |
| S-101A.0 | Macy's Pedestrian Bridge Foundations & Details | 1/11/2016 |
| S-102.0 | Foundation Elevations | 11/11/2015 |
| S-103.0 | Foundation Sections | 11/11/2015 |
| S-104.0 | Stair Foundation Plans | 11/11/2015 |
| S-201.0 | Grade Level Framing Plan | 6/5/2015 |
| S-202.0 | Second Level Framing Plan | 6/5/2015 |
| S-202.1 | Pedestrian Bridge Framing Plan | 6/5/2015 |
| S-203.0 | Third Level Framing Plan | 6/5/2015 |
| S-301.0 | Typical Precast Details | 6/5/2015 |
| S-302.0 | Typical Precast Details | 6/5/2015 |
| E-001.0 | Electrical Notes, Abbreviations, Symbol List & Drawing List | 1/11/2016 |
| E-101.0 | Grade Level Electrical Plan & Partial Riser Diagram | 12/10/2015 |
| E-102.0 | Second Level Electrical Plan | 1/11/2016 |
| E-103.0 | Third Level Electrical Plan | 1/11/2016 |
| E-500.0 | Electrical Panel Schedules & Riser | 12/10/2015 |
| FP-001.0 | Fire Protection Cover Sheet | 6/5/2015 |
| FP-101.0 | Grade Level Fire Protection Plan | 6/5/2015 |
| FP-102.0 | Second Level Fire Protection Plan | 6/5/2015 |
| FP-103.0 | Third Level Fire Protection Plan | 6/5/2015 |
| P-001.0 | Plumbing Cover Sheet | 6/5/2015 |
| P-101.0 | Grade Level Plumbing Plan | 3/21/2016 |
| P-102.0 | Second Level Plumbing Plan | 3/21/2016 |
| P-103.0 | Third Level Plumbing Plan | 3/21/2016 |
| SK-01 | Loading on Bridge Spandrels | 12/2/2015 |
| SK-02 | Steel Beam to P.C. Column | 12/2/2015 |
| SK-03 | Steel Beam to P.C. Column | 12/2/2015 |
| SK-04 | Foundation Plan | 10/21/2015 |
| SK-05 | Pier Details | 10/21/2015 |
| SK-06 | Typical Precast Col.Pier Footing Detail | 10/21/2015 |
| SK-07 | Stair B at Grade for Shop Drawing F7.2 & F7.8 | 1/12/2016 |
| SK-08 | Section @ Precast Beam per comments on F10.1, F10.1A & F10.2 | 1/22/2016 |
| SK-09 | Section @ Steel Framing per comments on F10.1 & F10.2 | 1/22/2016 |

B.  Specifications for Staten Island Mall Expansion issued for bid/permit date 3-3-2016.
C.  Specifications for Staten Island Mall Parking Garage issued for bid/permit date 6-5-2015
D.  Addendum No. 1 issued on 01-22-2015 West Expansion by S9Architecture.
E.  Addendum No. 2 issued on 12-09-2015 Structural by S9Architecture.
F.  Addendum No. 3 issued on 01-22-2016 Structural by S9Architecture.
G.  Addendum No. 4 issued on 03-04-2016 RFI 1-130 by S9Architecture
H.  Geotechnical Reports for Staten Island Mall Expansion & PG by Langan dated 12-02-14.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 80 of 122 PageID #: 89

## SECTION III. SPECIAL CONDITIONS

A. Contractor shall have a superintendent on the project at all times while Work is being conducted.

B. All hours of Work shall be coordinated with mall operations staff in order to accommodate mall operations, shoppers and existing tenants.

C. All mall utilities shall be maintained and operational throughout the course of the Project that is affected by the Work.

D. All life safety and security systems shall be maintained and operational throughout the course of the Project that is affected by the Work.

E. Contractor shall provide an area for trash removal and a secure lay down/storage area.  Both to be located in an area pre-approved by Owner's mall operations.

F. The Owner's authorized representative shall be Anthony Gambino.  Any matters involving a change of schedule or cost shall get approval from Anthony Gambino, only, prior to initiating the change.  The Contractor's authorized representative shall be Anthony Higgins.

G. It is the Owner's responsibility to contract the services of an independent testing company and to hire the services of an abatement company should Hazardous Materials be encountered in the areas affected by the Work.

H. Geotechnical/materials testing, National Pollutant Discharge Elimination System (NPDES) and other special inspections and testing services are coordinated by the Owner.

I. Cost for building permits is excluded from the base bid, Contract Sum or Guaranteed Maximum Price, as applicable.

J. Performance and payment bonds are excluded from the base bid, Contract Sum, or Guaranteed Maximum Price, as applicable.

K. All impact fees, tap fees, water meters, utility fees, zoning fees or any other fees imposed by authorities having jurisdiction over the Project are excluded from the base bid, Contract Sum or Guaranteed Maximum Price, as applicable.

L. Contractor shall include temporary fencing, barricades, canopies, dust control, pedestrian control, and traffic control to ensure proper traffic flow and public safety through the active center of the Project.

M. Contractor shall include erosion control as shown on the bid documents and in accordance with the jurisdictional Storm Water Pollution Prevention Program (SWPPP).

N. Contractor shall provide protection for all existing and new affected materials.

O. Contractor shall patch any fireproofing required to maintain the structure's fire rating.

P. All lifts/scaffolding to be left in a safe and secured manner.

Q. Contractor to ensure that no tenant suffers loss of business due to any work being performed.

R. Contractor shall provide trade permits and licenses as required.

S. Contractor shall submit Change Order Requests to Owner within seven (7) calendar days of becoming aware that a Change is necessary to Scope of Work.  If such Change request is not submitted within twenty-one (21) calendar days of Contractor becoming aware of the need for such Change, Owner shall not be obligated to pay for such Change and the Contractor shall perform the extra work at no cost to the Owner and without affecting the Project Schedule.

T. Contractor shall submit a cash flow projection for the remainder of the Work to be completed with each Application for Payment.

U. Contractor shall provide subcontractor Applications for Payment as backup documentation to the monthly Application for Payment upon Owner's request.

V. Contractor shall provide Owner with a recycle report during the course of the Project.  The report should include, but is not limited to, the following:

1) Contractor will provide a manifest that will include the Percentage of material recycled from construction debris.

## SECTION IV. COMPENSATION

### A. Fees on Change Orders:
1. Contractor Fee applied to self-performed work is 10%.
2. Contractor Fee applied to work performed by subcontractors is 2.25%.
3. Subcontractor Fee applied to Change Orders is 10%.
4. Contractor's General Liability insurance percentage is 1.6%.
5. Fees on Change Orders shall not compound one another, they shall be individual fees based on the direct work total.

### B. Bid Alternates:

1. Alternate No. 1:  Alternates will be provided by the contractor throughout the buyout process.

### C. Unit Prices (cost to include furnish and install):

1. Unit Price No. 1:  Unit pricing will be submitted following the completion of trade buyout.

## SECTION V. PROJECT SCHEDULE

| Milestones | Date |
| --- | --- |
| Contract Award (Notice-to-Proceed): | 07/15/2016 |
| Construction Start: | 08/29/2016 |
| Substantial Completion Parking Garage: | 10/06/2017 |
| Substantial Completion Northside Expansion: | 04/06/2018 |
| Substantial Completion Southside Expansion: | 09/07/2018 |
| Final Completion: (Project Closeout Complete): | 10/15/2018 |

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 82 of 122 PageID #: 91

**Bid Breakdown (Schedule of Values)**

| Cost Code | Code Description | Total |
|---|---|---|
| A1010005 | Concrete | $7,999,000 |
| B0505005 | Precast Parking Structure | $9,050,000 |
| B1010070 | Miscellaneous Metals | $2,808,600 |
| B2010027 | Structural Steel (Northside Expansion) | $5,542,417 |
| B2010027 | Structural Steel (Southside Expansion) | $2,866,132 |
| B2030005 | Interior Mall Entrance (Emergency Egress space 1640) | $365,000 |
| D1090005 | Vertical Transportation | $2,444,000 |
| D2010005 | Plumbing | $5,504,680 |
| D3040005 | HVAC | $3,307,000 |
| D4010005 | Fire Protection | $4,009,100 |
| D5010005 | Electric | $11,794,039 |
| D5010010 | Electrical Blockhouse (Con-Ed Required Scope) | $1,158,850 |
| F2010020 | Demolition | $1,575,000 |
| G0505005 | Sitework (Includes 100% CD Scope Increase) | $10,675,067 |
| G0505011 | Sitework Pad 100 | $108,040 |
| G0505012 | Sitework Pad 113 | $250,206 |
| G4010005 | Site Architectural Lighting | $578,500 |
| A0505005 | Substructure (Acceleration Cost: Owners Allowance) | $1,356,112 |
| T1010005 | General Requirements | $14,078,300 |
| T1010005 | General Conditions | $4,367,540 |
| T1050020 | Insurance (Includes GGP Ins Requirement $50M) | $1,440,695 |
| T1060010 | Contractor's Fee | $2,063,024 |
| | | |
| | **TOTAL CONTRACT:** | **$93,341,302** |

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

## EXHIBIT B
## GENERAL CONDITIONS

### ARTICLE 1
### CONTRACT DOCUMENTS

**Section 1.1.    Definitions.**

1.1.1.    **"Construction Agreement".**  The term "Construction Agreement" or "Agreement" means the Agreement between Owner and Contractor to which these General Conditions are attached as **Exhibit B**.

1.1.2.    Intentionally omitted.

1.1.3.    **"Day".**  The term "day" as used in the Contract Documents means a calendar day, unless otherwise expressly defined in the Contract Documents.

1.1.4.    **Other Defined Terms.**    Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to them in the Construction Agreement.  Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

**Section 1.2.    Execution, Integration and Intent.**

1.2.1    **Comprehensive Nature of Contract Documents.**  The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Guaranteed Date of Substantial Completion. The Contract Documents are complementary, and what is required by any one shall be as binding as if required by all.

1.2.2.    **Supplemental Design Information.**  It is the intent of the Contract Documents to provide for complete installation of all portions of the Work.  Except where Work, or a portion thereof, is specifically noted as being Not In Contract ("N.I.C."), it is understood that all items, materials and equipment are to be furnished and installed, complete, ready for operation or use.  Where additional or supplemental details or instructions are required to complete an item or items, the Contractor shall request such information.  No Work shall be installed or fabricated which depends upon the furnishing of such information until such information is furnished.  The furnishing of such data shall not be the grounds for a claim of extra Work by the Contractor **where such data is consistent with the Contract documents**.  The Contractor will be deemed to have based its bid on a complete installation of the Work **in accordance with the Contract Documents** : where additional details or instructions are required to complete the Work, the Contractor is deemed to have made an allowance in its bid for the completion of such Work, consistent with adjoining or similar details and/or the best accepted practices of

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 84 of 122 PageID #: 93

the trade, whichever is more ~~expensive~~ suitable, unless such additional information clearly constitutes information which was not reasonably inferable from the Contract Documents, in which case the Guaranteed Maximum Price may be adjusted in accordance with Article 6 of the Construction Agreement.

**Section 1.3.   Ownership and Use of Documents.**   All Drawings, Specifications and copies thereof furnished to Contractor by the Architect or Owner are and shall remain the property of the Owner.  They are to be used only with respect to this Project and are not to be used on any other project and they are not to be used by the Contractor or any Subcontractor, Sub-Subcontractor, Vendor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the express written consent of the Owner. The Contractor, Subcontractors, Sub-subcontractors, Vendors and material or equipment suppliers are granted a limited license to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect appropriate to and for use in the execution of the Work under the Contract Documents.  Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Owner's reserved rights.

**ARTICLE 2**
**ADMINISTRATION; ARCHITECT RESPONSIBILITY**

**Section 2.1.   Administration of the Agreement.**

2.1.1.   **Architect to Provide Limited Administration.**  The Architect shall have authority to act on behalf of the Owner only to the extent expressly provided in the Contract Documents.  The Owner may direct the Architect to monitor the Project and provide instructions to the Contractor regarding the Project.  The Owner has the unfettered right to perform, or assign to the Architect, contract administration responsibilities as it deems appropriate, in its sole direction, consistent with applicable law, upon notice to Contractor.

2.1.2.   **Authority of Owner's Representative.**   The Owner's Representative shall have the general responsibility for administering the Work. The Owner may direct the Architect to monitor and instruct the Contractor with regard to matters set forth in the Drawings and Specifications; however, the Owner's Representative shall have the authority to make decisions regarding any and all questions which may arise as to the progress, quality or cost of the Work.

2.1.3.   **Architect's Visits to Jobsite.**  The Architect will visit the Jobsite at intervals appropriate to the stage of construction of the Project to familiarize itself with the progress and quality of the Work, and to determine if the Work is proceeding in accordance with the Drawings and Specifications.  On the basis of his or her on-site observations as an architect, the Architect will keep the Owner

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 85 of 122 PageID #: 94

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

informed of the progress of the Work, and will assist the Owner in identifying potential defects and deficiencies in the Work of the Contractor.

2.1.4.  **Matters for Which Architect Is Not Responsible.**  The Architect will not be responsible for, and will not have control or be in charge of, construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, and the Architect will not be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents.  The Architect will not be responsible for or have control or charge over the acts or omissions of the Contractor, Subcontractors, Vendors, or any of their agents or employees, or any other persons performing any of the Work.

2.1.5.  **Access to Work.**  The Owner (and Owner's lender or development partners, if applicable) and Architect shall have access at all times to the Work regardless of the stage it is in terms of preparation and progress.

2.1.6.  **Interpretations by Architect.**  At the request of the Owner, the Architect shall prepare graphic illustrations and other documents that clarify or interpret various aspects of the Drawings and Specifications.  The Architect shall render interpretations with reasonable promptness to Owner or Contractor so as not to delay the performance and progress of the Work.  Contractor shall make written request to the Owner in connection with any request for interpretations by the Architect.

2.1.7.  **Rejection of Work and Special Requirements.**  The Owner's Representative shall have the authority to reject Work which does not conform to the Contract Documents.  The Owner shall have the authority to require special inspection or testing of the Work in accordance with Section 13.2 of these General Conditions, whether or not such Work is fabricated, installed or completed whenever the Owner considers it necessary or advisable for the implementation of the intent of the Contract Documents.

2.1.8.  **Architect's Review of Submittals.**  At the request of Owner, the Architect will review and approve or take other appropriate action upon Contractor's submittals such as shop drawings, product data and samples to ensure conformance with the Contract Documents.  Such action shall be taken with reasonable promptness so as to cause no delay in the Work or in the activities of the Owner, the Contractor, Subcontractors or separate contractors, while allowing sufficient time in the Architect's professional judgment, to permit adequate review.  Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents.  The Architect's review of the Contractor's submittals shall not relieve the Contractor of any of its obligations under the Agreement or these General Conditions.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 86 of 122 PageID #: 95

2.1.9.  **Architect Inspection.**  If requested by Owner, the Architect shall observe the progress of the Work to determine the dates of Substantial Completion and Final Completion, and shall receive and forward to the Owner for the Owner's review, approval and records, written warranties, guarantees, as-builts and related closeout documents required by the Contract Documents and assembled by the Contractor.  If requested by the Owner, the Architect will issue a certification of Substantial Completion, upon Substantial Completion of the Work in compliance with the requirements of the Contract Documents.  The Owner will review the final Certificate for Payment for approval upon Contractor's compliance with the requirements of the Contract Documents.  If requested by Owner, neither the Certificate of Substantial Completion nor the final Certificate for Payment will be issued without a complete physical walk-through of the Project and approval by the Owner.  The Architect and Owner will review the Contractor's punch-list to be attached to the Certificate of Substantial Completion.

2.1.10.  **Modifications of Architect's Authority.**  The duties, responsibilities and limitations of authority of the Architect during construction of the Project as set forth in the Contract Documents will not be modified or extended without the prior written consent of the Owner given to the Contractor.

### ARTICLE 3
### OWNER

**Section 3.1.    Information and Services Required of the Owner.**

3.1.1.  **Information as to Site Conditions.**  The Owner shall furnish, as necessary for the performance of the Work, surveys describing physical characteristics, legal limitations and utility locations for the Jobsite of the Project and a legal description of the Jobsite.  The Contractor warrants and represents that it has **visually** inspected the Jobsite and all conditions affecting the performance of Work at the Jobsite.  The Contractor shall use best efforts to recommend to the Owner such further investigations and studies as may be necessary or useful to determine the surface and subsurface conditions of the Project and the Contractor shall advise the Owner prior to commencing the Work if it deems further investigations or studies are necessary.  The Contractor shall exercise special care in executing subsurface work in proximity of known subsurface utilities, improvements and easements. All information, data or reports as to the conditions at the Jobsite are furnished by the Owner for information purposes only, and the Owner makes no warranties as to such information.

3.1.2.  **Owner to Obtain and Pay for Approvals.**  Except as otherwise expressly provided in Section 4.6.1 of these General Conditions, or in any other provision of the Contract Documents, the Owner shall secure and pay for necessary site plan approvals, easements, variances, assessments and charges

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 87 of 122 PageID #: 96

required for the construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

     3.1.3.  **Information or Services Under Owner's Control.** Except as otherwise provided in, and subject to Section 3.1.1 of these General Conditions, upon receipt of a written request therefore from the Contractor, information or services under the Owner's control and reasonably required for the performance of the Work shall be furnished by the Owner with reasonable promptness so as to avoid delay in the performance and progress of the Work.

     3.1.4.  **Contractor to Receive Copies of Drawings and Specifications.** Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, one (1) reproducible copy of the Drawings, as-builts and Specifications and six (6) compact discs ("CD") of Drawings, as-builts, Specifications, and other drawings and documents reasonably necessary for the execution, performance and completion of the Work.

     **Section 3.2.**  **Owner's Right to Stop the Work.**

     3.2.1.  **Stop Work Orders.** If the Contractor fails to carry out the Work in accordance with the Contract Documents, including failure to correct defective Work as required by Section 12.2 of these General Conditions, the Owner, by written order, may order the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, this right of the Owner to stop the Work shall not give rise to any duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity. This right shall be in addition to, and not in restriction of, any of Owner's other rights and remedies under the Agreement.

     3.2.2.  **Suspension of the Work.** Subject to the provisions of Article 7 of these General Conditions concerning delay and in accordance with Section 13.3 of the Construction Agreement, if the Owner, acting in good faith, believes that suspension of the Work is warranted, the Owner may suspend the Work by written notice to the Contractor.

     **Section 3.3.**  **The Owner's Right to Carry Out the Work.** If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within five (5) days after receipt of written notice from the Owner to commence and correct such default or neglects to carry out the Work with diligence and promptness, the Owner may, without affecting any other remedy the Owner may have, correct any such deficiencies. In such case, an appropriate Change Order shall be issued deducting from the payments then or thereafter due the Contractor the cost of correcting any such deficiencies, including without limitation, architectural, consulting and **reasonable** legal fees required by the circumstances. If the payments then or thereafter due the Contractor are not

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

sufficient to cover such amount, the Contractor shall pay the difference to the Owner.

## ARTICLE 4
## CONTRACTOR

Section 4.1.   Review of Contract Documents.

    4.1.1.   **Contractor to Review Contract Documents.**   The Contractor shall carefully study and compare the Contract Documents with each other and with any information furnished by the Owner pursuant to <u>Section 3.1</u> of these General Conditions or information otherwise available to the Contractor, and immediately shall report to the Owner and the Architect all errors, inconsistencies or omissions discovered.  If the Contractor performs any construction activity and it knows, or should have known, that any of the Contract Documents contain a recognized error, inconsistency or omission, the Contractor shall be responsible for such performance and shall bear the cost of correction thereof.  Contractor shall review the Contract Documents, and if the Contractor observes that portions of the Contract Documents are at variance with applicable laws, statutes, ordinances, building codes, rules or regulations, the Contractor shall promptly notify the Owner and Architect in writing, and necessary changes shall be accomplished by appropriate Change Order.

    4.1.2.   **Verification of Field Measurements and Conditions.**   The Contractor shall take field measurements and verify field conditions, and shall carefully compare such field measurements and conditions and other information known to the Contractor with the Contract Documents before commencing the Work.  Errors, inconsistencies or omissions discovered shall be reported to the Owner and the Architect at once; and the Contractor's failure to verify field measurements and conditions shall not serve as basis for an adjustment in the Guaranteed Maximum Price.  To the extent, if any, that Owner has heretofore caused soil tests or test borings to have been made on the Jobsite, Owner has made such tests available to Contractor, and the Contractor has studied the result of such tests, test borings and information as to subsurface conditions and Jobsite geology.  Based upon the foregoing inspections, understandings, agreements and acknowledgments, the Contractor agrees and acknowledges (i) that the Guaranteed Maximum Price is just and reasonable compensation for all the Work, including all foreseen and foreseeable risks, hazards and difficulties in connection therewith, (ii) that the Contract Time is adequate for the performance of the Work and (iii) that the Work shall not result in any lateral or vertical movement of any structure.  The Contractor shall have no claims for surface or subsurface conditions encountered that could have reasonably been foreseen by the Contractor, based on all of the information made available to the Contractor at the time of execution of the Construction Agreement.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 89 of 122 PageID #: 98

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

4.1.3. **Work to Be in Accordance With Contract Documents and Approved Submittals.** The Contractor shall perform the Work in accordance with the Contract Documents and submittals approved pursuant to <u>Section 4.10</u> of these General Conditions.

## Section 4.2. Supervision and Construction Procedures.

4.2.1. **Supervision and Direction of Work.** The Contractor shall supervise and direct the Work, using its best skill and attention. The Contractor shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work, including coordination of the duties of all Subcontractors, Vendors, and trades, unless the Contract Documents provide otherwise. The Contractor shall be responsible for properly laying out the Work, and for all lines, elevations and measurements for all of the Work executed in accordance with the Contract Documents. The Contractor shall verify the figures shown on the Drawings before planning out the Work and will be held responsible for any error, omission or inaccuracies resulting from its failure to do so.

## Section 4.3. Labor and Materials.

4.3.1. **Contractor to Pay for Labor, Materials and Services.** Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for all labor, materials, supervision, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for the proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

## Section 4.4. Taxes. The Contractor shall pay all sales, consumer, use and other similar taxes for the Work or portions thereof provided by the Contractor which are legally enacted as of the later of the date of the Construction Agreement, or the date upon which the Owner and the Contractor agree upon the Guaranteed Maximum Price (if such Guaranteed Maximum Price was not determined as of the date of such Construction Agreement), regardless of whether any such tax is not yet effective or merely scheduled to go into effect. When pursuant to any government program, any grant, rebate, accelerated capital cost allowance or other form of cost reduction is made available with respect to a product which is to be incorporated into the Work, the Contractor, for itself, its Subcontractors, Vendors and suppliers, acknowledges and agrees that any such cost reduction by way of grant, rebate, accelerated capital cost allowance or the like is the sole and exclusive property of the Owner. Such grant, rebate or accelerated capital cost allowance or the like may include, but is not limited to, products or apparatus for the conservation or regulation of energy, the generating of electricity, solar heating systems and equipment used in the fabrication and control of same. The Contractor and Subcontractors shall advise the Owner of ~~every~~ products

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 90 of 122 PageID #: 99

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

Contractor or its Subcontractors obtained for incorporation into the Work for which they believe a rebate, refund, exemption, grant or other price reduction may be available and shall cooperate with the Owner in obtaining the same.

### Section 4.5.    Permits, Fees and Notices.

4.5.1.    **Contractor to Obtain Permits.**  Unless otherwise provided in the Contract Documents, the Contractor shall secure, and (except for the building permit), pay for permits and governmental fees, licenses and inspections necessary for the proper execution and completion of the Work which are customarily secured after execution of the Agreement and which are legally required when bids are received or negotiations concluded.  The Contractor shall procure all certificates of inspection, use, permits and licenses, pay all charges and fees and give all notices necessary and incidental to the due and lawful prosecution and performance of the Work.  Owner shall pay all costs, charges and fees in connection with the building permit and the Certificate of Occupancy, each at Contractor's actual cost and without markup.  Original copies of the certificates of inspection and use and the building permit shall be delivered to the Owner upon Final Completion of the Work.  The Contractor represents, warrants and covenants to the Owner that it is fully licensed, certified and authorized to enter into the Contract Documents and that it and its Subcontractors and Vendors are and shall continue to be fully licensed, certified and authorized to perform the Work contemplated by the Contract Documents and any other work performed in connection with the Project, and will provide evidence of the same to the Owner upon request.

4.5.2.    **Contractor to Give Notices.**  The Contractor shall give all notices and comply with all laws, ordinances, codes, rules, regulations and lawful orders of any public authority affecting the performance of the Work.  The Contractor shall not notify governmental authorities regarding environmental matters without consultation with the Owner prior to any such notification.

4.5.3.    **Tenant Certificates.**  Contractor acknowledges that the Owner may be required to provide evidence to tenants of the Project that the Project was completed in accordance with the Contract Documents and to the best of the Contractor's knowledge in compliance with all applicable laws, rules, codes and regulations.  Upon request by the Owner, Contractor shall provide the Owner and any tenants of the Project designated by the Owner with a certification of compliance to such effect.

### Section 4.7.    Project Manager and Supervisory Personnel.

4.7.1.    **Project Manager.**  The Contractor shall employ a competent project manager and ~~necessary~~ assistants who shall be in attendance at the Jobsite **when necessary** during the progress of the Work.  The project manager shall represent the Contractor and all communications given to the project

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 91 of 122 PageID #: 100

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

manager shall be as binding as if given directly to the Contractor. Material communications regarding the Project and the performance or progress of the Work shall be confirmed in writing to the Owner. Other communications shall be so confirmed on written request in each case. The project manager and superintendent shall be satisfactory to the Owner in all respects, and the Owner shall have the right to require the Contractor to dismiss from the Project any project manager or superintendent whose performance is not satisfactory to the Owner, and to replace such project manager or superintendent with a project manager or superintendent satisfactory to the Owner.

4.7.2.  **Supervisory Personnel.**  Prior to commencement of any of the Work the Contractor shall submit to the Owner, for the Owner's approval, a list of all supervisory personnel, including (without limitation) the project manager and superintendent, whom the Contractor intends to employ on the Project, as well as a chain-of-command organizational chart covering all aspects of the Contractor's organization related to the Project and the performance of the Work. The Contractor shall not employ supervisory personnel not approved by the Owner, and shall not change such supervisory personnel without the prior written approval of Owner.

Section 4.8.    Project Schedule; Records and Reports.

4.8.1.  **Project Schedule.**  The Contractor shall provide the Owner and Architect with timely reports as to the current status of, and deviations from, the Project Schedule, the causes of any such deviations, and the corrective action that has been taken or will be taken to correct such deviations. The Contractor shall update the Project Schedule each month or as requested by Owner and shall submit such updated schedule with each Application for Payment. Such Project Schedule updates are not Contract Documents, and any milestone, substantial or final completion dates required by the Contract Documents may not be modified except by written Change Order signed by both parties.

4.8.2.  **Daily Force and Activity Report.**  The Contractor shall on each business day prepare a report (the "Daily Force and Activity Report") on a form approved by the Owner's Representative describing the workforces present on the Jobsite during such day and their respective activities. The Daily Force and Activity Report shall be delivered to the Owner's Representative on a weekly basis submitted through Proliance® or in hard copy.

4.8.3.  **Materials Status Report.**  Within thirty (30) days after the date of the Construction Agreement, the Contractor shall prepare a report (the "Materials Status Report") which includes a complete list of Vendors, suppliers, items to be purchased from the Vendors, suppliers or fabricators, the time required for fabrication and the scheduled delivery dates for each item. As soon as available, copies of purchase orders shall be furnished to the Owner.

FILED: RICHMOND COUNTY CLERK 01/25/2021 06:19 PM        INDEX NO. 150180/2021

NYSCEF DOC. NO. 2        Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 92 of 122 PageID #: 101
        RECEIVED NYSCEF: 01/25/2021

**4.8.4.** **Monthly Status Report.** The Contractor shall prepare a monthly report in a form and of sufficient detail and character as approved by the Owner, which report shall include the following:

.1 The current Project Schedule, a statement by the Contractor's project manager as to the progress of the Work in accordance with such Project Schedule (including information concerning the work of each of the Subcontractors) and the Contractor's expectation of completion in accordance with such Project Schedule;

.2 an updated Materials Status Report;

.3 a listing of the number, amount and status of Change Orders, an outstanding design issues and/or Requests for Information (RFIs), a change proposal status log, and a projected final Cost of the Work;

.4 a concise written summary, prepared by the Contractor's project manager, outlining significant achievements, problems, and issues that affect the progress, quality or cost of the Project;

.5 progress photographs; and

.6 such other information as the Owner may request from time to time.

Nothing contained in the Monthly Report shall be deemed proper notice under other provisions of the Contract Documents for changes to the Guaranteed Maximum Price or Contract Time.

**4.8.5.** **Schedule of Submittals.** The Contractor shall prepare and keep current, a schedule of submittals, which shall be coordinated with the Project Schedule, and which allows the Architect and the Owner reasonable time to review and approve submittals in accordance with Section 4.10 of these General Conditions.

**4.8.6.** **Regular Progress Meetings.** The Contractor shall hold weekly progress meetings at the Jobsite at such time and frequency as is acceptable to the Owner's Representative. Each Subcontractor whose work is to be reported on or may be affected by the work of others shall be required to send a competent representative to such meetings to report on the progress of such Subcontractor's work and to receive information and instructions.

**4.8.7.** **Contractor Suspension of Work.** If the Contractor, in its reasonable judgment, believes that a suspension is warranted by reason of unforeseen circumstances which may adversely affect the quality of the Work if the Work were continued, the Contractor shall immediately notify the Owner of such belief and describe with particularity the reasons therefore.

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**Section 4.9.    Documents and Samples at the Jobsite.**

4.9.1.  **Copy of Certain Contract Documents**.    The Contractor shall maintain at the Jobsite for the Owner one (1) record copy of all current Drawings, Specifications, addenda, Change Orders and other modifications, in good order and incorporating for the record, all changes and selections made during construction, and, in addition, approved shop drawings, product data, samples and similar submittals.  Such documents shall be made available to the Owner and the Architect at Substantial Completion of the Work and, as a condition precedent to Final Payment, Contractor shall furnish to the Architect as-built (i.e., "record") drawings showing the effect of addenda, Change Orders, modifications, any other changes in the Work not authorized by such documents, general construction, mechanical, electrical, and all other Work, and indicating the Work as actually completed and installed. Such as-built drawings shall consist of carefully drawn markings on a reproducible set of the Drawings and Specifications (and electronically when available).  The final set of record documents shall be furnished to the Owner via Proliance®.

4.9.2.    **Approved Permit Drawings**.  All approved permit drawings shall be maintained by Contractor in an easily accessible format so that such drawings may be produced for the Owner, governmental inspectors and other authorized agencies.    All approved or permit drawings shall be labeled packages and delivered to the Owner within sixty (60) days of Final Completion of the Work.

**Section 4.10.    Shop Drawings, Product Data and Samples.**

4.10.1.  **Shop Drawings, Product Data and Samples Not Contract Documents.** Shop drawings, product data, samples and similar submittals are not considered Contract Documents.    The purpose of these submittals is to demonstrate for those portions of the Work for which submittals are required the way the Contractor proposes to perform the Work in conformance with the information given and the design concept expressed in the Contract Documents.

4.10.2.  **Review by Contractor**.  The Contractor shall review and submit, with reasonable promptness and in such sequence as to cause no delay in the Work or in the work of the Owner or any separate contractor, all shop drawings, product data and samples required by the Contract Documents.  By such review and submission the Contractor represents that it has determined and verified all materials, field measurements and field construction criteria related to the Work, and that it has verified, checked and coordinated information contained within such submittals with the requirements of the Work and of the Contract Documents.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 94 of 122 PageID #: 103

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

4.10.3. <u>**Approval by Architect**</u>. The Contractor shall perform no portion of the Work requiring submittal and review of shop drawings, product data, samples or similar submittals until the respective submittals have been approved by the Architect. Such Work shall be in accordance with approved submittals.

4.10.4. <u>**Deviations from Contract Documents**</u>. The Contractor shall not be relieved of responsibility for any deviation from the requirements of the Contract Documents by the Owner's or Architect's approval of shop drawings, product data or samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submission and the Architect has given written approval of the specific deviation. The Contractor shall not be relieved from responsibility for errors or omissions in the shop drawings, product data or samples by the Owner's or Architect's approval thereof.

4.10.5. <u>**Operating and Maintenance Data**</u>. The Contractor shall assemble for the approval by the Architect and/or Owner all operating and maintenance data from all manufacturers whose equipment is installed in the performance of the Work, and shall submit such information to the Owner via hard copy to the Owner's Representative and an electronic copy via Proliance® as a precondition to Final Payment.

**Section 4.11. Use of Site.**

4.11.1. <u>**Confinement of Contractor's Operations**</u>. The Contractor shall confine performance of the Work at the Jobsite to areas permitted by law, rule, regulation, ordinance, permits and the Contract Documents, and shall not unreasonably encumber the Jobsite with any materials or equipment. The Contractor represents that it has considered the need for use of adjacent properties during construction (including crane swings), and that all such needs and costs have been included in the Guaranteed Maximum Price, and that ~~Contractor~~ Owner has procured permission or approval for any such adjacent property needs.

4.11.2. <u>**Access to Neighboring Properties**</u>. The Contractor shall assure ~~free, convenient~~, unencumbered and direct access to properties neighboring the Jobsite for the owners of such properties and their respective tenants, agents, invitees and guests.

4.11.3. <u>**Storage Plan**</u>. Within fifteen (15) days after the execution of this Agreement, the Contractor will prepare for the Owner's review and the Contractor's use, a plan for efficient and effective use of the Jobsite and for secure storage of materials and equipment by the Contractor and all Subcontractors. Once approved by the Owner, this plan must be approved by the authority having jurisdiction (if required). In addition, it will be the Contractor's responsibility to assist the Owner in obtaining all necessary agreements from adjacent landowners

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

for the construction of the Project (including but not limited to approvals necessary for operation of a tower crane if required).

### Section 4.12.  Cutting and Patching of Work.

4.12.1.  **Cutting and Patching by Contractor**.  The Contractor shall be responsible for all cutting, fitting or patching that may be required to complete the Work or to make its several parts fit together properly.

4.12.2.  **Effect on Other Work**.  The Contractor shall not damage or endanger any portion of the Work or other work of the Owner, tenants or any separate contractors by cutting, patching or otherwise altering any work, or by excavation.  The Contractor shall not cut or otherwise alter the work of the Owner, its tenants or any separate contractor except with the prior written consent of such affected parties.  The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

### Section 4.13.  Cleaning Up.

4.13.1.  **Premises to Be Kept Clean**.  The Contractor shall keep the premises free from accumulation of waste materials or rubbish caused by its performance of the Work at all times.  Upon completion of the Work, the Contractor shall remove all waste materials and rubbish from and about the Jobsite as well as all tools, construction equipment, machinery and surplus materials.  The Contractor shall maintain streets, sidewalks and temporary means of access or passage around the Jobsite in a clean and safe condition.  The Contractor shall remove all spillage and tracking arising from the performance of the Work from such areas, and shall establish a regular maintenance program of sweeping and hosing to minimize accumulation of dirt and dust upon such areas.

4.13.2.  **Failure to Clean Up**.  If the Contractor fails to clean up at any time during or at the completion of the Work, the Owner may do so **after providing Contractor with twenty-four (24) hours written notice, which shall include effective notice electronic notice (i.e. email)** and the cost thereof shall be charged to the Contractor.

### Section 4.14.  Royalties and Patents.

The Contractor shall pay all royalties and license fees associated with the Project.  The Contractor shall defend suits or claims for infringement of patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is specifically required by the Contract Documents.  However, if the Contractor has any reason to believe that the required design, process or product is an infringement of a patent, the Contractor shall **furnish** be

Staten Island Mail - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

~~responsible for such loss unless~~ such information is ~~immediately furnished in writing~~ to the Architect and the Owner ~~by Contractor~~ of its belief.

## ARTICLE 5
## SUBCONTRACTORS

**Section 5.1.    Definitions.**

5.1.1.    **"Subcontractor".**  A "Subcontractor" shall have the meaning set forth in the Construction Agreement in <u>Section 1.1.34</u>.

5.1.2.    **"Sub-subcontractor"**.  A Sub-subcontractor is a person or entity at any tier who has a direct or indirect contract with a Subcontractor to perform any of the Work at the Jobsite.  The term Sub-subcontractor is referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative thereof.

**Section 5.2.    Award of Subcontracts and Other Contracts.**

5.2.1.    **Award Procedure**.  Unless and to the extent otherwise required by the Contract Documents, Subcontractors and Sub-subcontractors shall be chosen and contracts awarded to them in accordance with the provisions of this <u>Article 5</u> of the General Conditions and <u>Article 9</u> of the Construction Agreement. Contractor shall not proceed with any proposed person or entity prior to Owner's approval.  The Contractor, as soon as practicable after the execution of this Agreement, shall furnish to the Owner and the Architect in writing the names of the persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each of the principal portions of the Work.  The Owner will reply to the Contractor in writing stating whether or not the Owner or the Architect, after due investigation, has reasonable objection to any such proposed person or entity.  For Guaranteed Maximum Price Contracts, each subcontract to be awarded, unless otherwise agreed by the Owner in writing, shall be based on the Contractor obtaining competitive bids from not fewer than three (3) prospective Subcontractors which are qualified (such qualification to be determined by Contractor, subject to the approval of Owner and listed on Exhibit L attached to the Construction Agreement), and, subject to the approval of the Owner, the Contractor shall determine which bids will be accepted.  For Guaranteed Maximum Price Contracts, copies of all bids or other proposals from proposed Subcontractors and Sub-subcontractors shall be submitted to the Owner for review.  All Subcontractors and Sub-subcontractors shall be subject to the approval of Owner.

5.2.2.    **Objections**.  The Contractor shall not contract with any such proposed person or entity to which the Owner or the Architect has made reasonable objection under the provisions of <u>Section 5.2.1</u>, above.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 97 of 122 PageID #: 106

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

5.2.3.   **Substitutions.**  As to Guaranteed Maximum Price Contracts, if the Owner or the Architect has reasonable objection to any such proposed person or entity and the Owner directs the acceptance of a Subcontractor's bid in excess of the bid recommended by the Contractor for the same work, such excess shall be treated as a Change in the Work, the Guaranteed Maximum Price shall be increased or decreased by the difference in cost occasioned by such substitution, and an appropriate Change Order shall be issued.  However, no increase in the Guaranteed Maximum Price shall be allowed for any such substitution unless the Contractor has acted promptly and responsively in submitting names as required by this Section 5.

5.2.4.   **Objections to Substitutions.**   The Contractor shall make no substitution for any Subcontractor, person or entity previously selected if the Owner makes reasonable objection to such substitution.

**Section 5.3.   Subcontractual Relations.**

5.3.1.   **Nature of Subcontractor's Obligations.**   By an appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities which the Contractor, by these Documents, assumes toward the Owner and the Architect.  Said agreement shall preserve and protect the rights of the Owner and the Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that the subcontracting thereof will not prejudice such rights.  Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with its Sub-subcontractors.  For Guaranteed Maximum Price contracts, the Owner may require Contractor to furnish copies of executed subcontracts and purchase orders, including fees, rates and unit prices.

5.3.2.   **Subcontract Requirements.**   Notwithstanding any provision of Section 5.3.1 of these General Conditions, any part of the Work performed for the Contractor by a Subcontractor or its Sub-subcontractor shall be pursuant to a written subcontract between the Contractor and such Subcontractor (or the Subcontractor and its Sub-subcontractor at any tier), which shall be prepared on a form of subcontract satisfactory to the Owner.  Each such subcontract shall, where the context so requires, contain provisions that:

.1   require such Work to be performed in accordance with the requirements of the Contract Documents;

.2   waive all rights the contracting parties may have against one another or that the Subcontractor may have against the Owner for damages

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

caused by fire or other perils covered by the insurance described in the Contract Documents;

.3    require the Subcontractor to submit certificates, sworn statements and/or waivers of liens, as requested by Owner, for Work completed by it and by its Sub-subcontractors as a condition to the disbursement of the progress payment next due and owing, and on the forms referenced in the Contract Documents;

.4    require that each Subcontractor continue to perform under its subcontract in the event the Contract is terminated and the Owner shall request such Subcontractor to continue such performance; and

.5    require each Subcontractor to maintain its records in accordance with the provisions of the Construction Agreement, and to permit the Owner to exercise as to each such Subcontractor the audit rights granted under the Construction Agreement, and to otherwise audit trade rates, "time and material" and overtime costs to be charged to the Project as permitted herein.

5.3.3.    **Contract with Affiliates.**    The Contractor shall not enter into any subcontract, contract, agreement, purchase order, lease or other arrangement ("Arrangement") for the furnishing of any portion of the materials, services, insurance, equipment or Work with any party or entity if such party or entity is an Affiliated Contractor Entity (as defined below), unless such Arrangement has been approved by the Owner, after full disclosure in writing by the Contractor to the Owner of such affiliation or relationship and all details relating to the proposed Arrangement.  The term "Affiliated Contractor Entity" means any entity related to or affiliated with the Contractor or with respect to which the Contractor has direct or indirect ownership or control, including, without limitation, any entity owned in whole or part by the Contractor; any holder of more than ten percent (10%) of the issued and outstanding shares of, or the holder of any interest in, the Contractor; any entity in which any officer, director, employee, member, partner or shareholder (or member of the family of any of the foregoing persons) of the Contractor or any entity owned by the Contractor has a direct or indirect interest, which interest includes, but is not limited to, that of a partner, member, employee, agent or shareholder.

Section 5.4.    **Contingent Assignment of Subcontracts.**    Each subcontract agreement for a portion of the Work is hereby assigned by the Contractor to the Owner provided that:

.1    such assignment is effective only after termination of the Contract by the Owner pursuant to Article 13, and only for those subcontract agreements which the Owner accepts by notifying the Subcontractor in writing; and

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

.2      such assignment is subject to the prior rights of the surety, if any, obligated under any bond relating to the Agreement;

.3      the Owner may further assign such subcontract agreements to another general contractor; and

.4      Owner may assign such subcontract agreements to 522 Acquisition Owner LLC if required.

**Section 5.5.    Union Issues.**  The Contractor shall be responsible for managing and endeavoring to resolve all labor disputes resulting from the performance of the Work.  To the extent any labor union disputes the use of any non-union Subcontractors or trade on the Project, the Contractor shall be responsible for responding to all union demands and actions in accordance with applicable laws and for managing the resolution of any such disputes.

## ARTICLE 6
## WORK BY OWNER OR BY SEPARATE CONTRACTORS

**Section 6.1.    Owner's Right to Perform Work and to Award Separate Contracts.**

6.1.1.    **Reservation by Owner.**  The Owner reserves the right to perform construction activities or operations related to the Project with the Owner's own workforces, and to award separate contracts in connection with other portions of the Project, the Work or other construction activities or operations on the Jobsite.

6.1.2.    **Coordination of Activities.**  The Owner, at its option, either (i) shall provide for coordination of the activities of the Owner's own workforces and of each separate contractor (or tenant contractor) with the Work of the Contractor, who shall cooperate with them or (ii) shall require that the Contractor provide for such coordination, which the Contractor shall perform when directed by Owner to do so.  The Contractor shall participate with other separate contractors and the Owner in reviewing their respective construction schedules when directed to do so by the Owner.  The Contractor shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement with Owner **and Contractor.**  The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Owner until subsequently revised.   This Section shall not affect milestone, Substantial Completion or Final Completion dates required by the Contract Documents, which can only be modified by written Change Order signed by both parties.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 100 of 122 PageID #: 109

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**Section 6.2.          Mutual Responsibility.**

6.2.1.   <u>Coordination with Owner and Separate Contractors</u>.   The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities and shall connect and coordinate the Contractor's construction activities and operations with theirs as required by the Contract Documents.

6.2.2.   <u>Reporting of Discrepancies</u>.  If any part of the Contractor's Work depends upon proper execution of construction activities or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Owner apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results.  Failure of the Contractor to report such discrepancies or defects shall constitute an acknowledgment by the Contractor that the Owner's or separate contractors' completed or partially completed construction work is fit and proper to receive the Contractor's Work, except as to latent defects not then reasonably discoverable.

6.2.3.   <u>Delay Cost</u>.  Costs caused by Unavoidable Delays in the critical path activities of the Work, or by improperly timed activities or defective construction, shall be borne by the party responsible for incurring such costs.

6.2.4.   <u>Disputes Regarding Damage to Work or Property of Separate Contractors</u>.  If any separate contractor claims or alleges that the Contractor has caused damage to the work or property of such separate contractor, the Contractor shall promptly attempt to resolve such dispute.  If any separate contractor initiates legal action or any other proceedings against the Owner on account of any damage alleged to have been caused by the Contractor, the Owner shall notify the Contractor, who shall defend such proceedings at its own expense, and if any judgment or award against the Owner is entered against the Owner, the Contractor shall pay or satisfy it and shall reimburse the Owner for all attorneys' fees and court costs or other costs which the Owner has incurred over and above those paid for directly by the Contractor.

6.2.5.   <u>Same Responsibilities for Owner and Separate Contractors</u>. The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in <u>Section 4.12</u>, hereof. **In addition, Owner will endeavor to negotiate a provision in its agreements with other of its contractors to indemnify and name as an additional insured the Contractor to the same extent as each contractor is required to indemnify and insure the Owner.**

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 101 of 122 PageID #: 110

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**Section 6.3.    Owner's Right to Clean Up.** If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the Jobsite, premises and surrounding areas free from waste materials and rubbish as described in <u>Section 4.13</u> of these General Conditions, the Owner may **after providing Contractor with twenty-four (24) hour written notice, which shall include as effective notice electronic notice (i.e. email)** may clean up and allocate the cost among those responsible as the Owner determines to be just and equitable in its sole discretion.

<u>ARTICLE 7</u>
<u>TIME</u>

**Section 7.1.    Definitions.**

7.1.1.    <u>Date of Commencement of Work</u>. The date of commencement of the Work is the date established in the **Project Schedule and** Notice to Proceed. ~~If there is no Notice to Proceed, it shall be the execution of effective date of the Construction Agreement or such other date as may be established therein.~~

7.1.2.    <u>Date of Substantial Completion</u>.  The date of Substantial Completion of the Work or designated portion thereof is the date established pursuant the provisions of Section 1.1.35 of the Construction Agreement and <u>Section 8.4</u>, hereof.

**Section 7.2.    Progress and Completion.**

7.2.1.    <u>Premature Commencement</u>. The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the Project, Jobsite or elsewhere prior to the effective date of commencement established in the **Project Schedule and** Notice to Proceed issued by the Owner.

7.2.2.    <u>Commencement and Completion</u>.  The Contractor shall begin the Work on the date of commencement, shall thereafter proceed expeditiously with adequate workforces and shall achieve Substantial Completion within the Contract Time, and shall achieve any milestone dates or other completion dates referenced in the Contract Documents.

**Section 7.3.    Delays and Extensions of Time.**

7.3.1.    <u>Extensions of Time</u>.  There shall be no adjustment in the Guaranteed Maximum Price for delays not within the reasonable control of the Owner, Contractor, or Architect.

7.3.2.    <u>Claims for Increase in Contract Time/Guaranteed Date of Substantial Completion</u>. If the Contractor wishes to request an increase in the

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 102 of 122 PageID #: 111

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

Contract Time or Guaranteed Date of Substantial Completion, written notice as provided herein shall be given to Owner within seven (7) days after occurrence of the event believed to give rise to the delay. Contractor shall submit its claim (including evidence supporting such delay in the critical path activities of the Work) within twenty-one (21) days of the notice set forth above, and if such notice or claim is not provided in writing within the time required in this Section, any claim shall be deemed waived by the Contractor. The Contractor's claim shall include an estimate of cost and of probable effect of delay on the progress of the Work. In the case of a continuing delay only one (1) claim is necessary. Contractor shall not rely on any purported verbal waiver of this provision.

7.3.3.  **Claim for <u>Adverse Weather Conditions</u>.** If adverse weather conditions are the basis for a claim for extending the Contract Time, such claim shall be documented by data substantiating that weather conditions were abnormal, not customary adverse conditions for the Contract Time and could not have been reasonably anticipated and that weather conditions had an adverse effect on the critical path activities of the Work.

<u>ARTICLE 8</u>
<u>PAYMENTS AND COMPLETION</u>

**Section 8.1.    Schedule of Values.** Before the first Application for Payment is made, the Contractor shall submit to the Owner a proposed Schedule of Values meeting the requirements of the Construction Agreement. Such Schedule of Values, if approved by the Owner, shall be used solely as a basis for evaluating the Contractor's Applications for Payment.

**Section 8.2.    Payment for Stored Materials and Title.**

8.2.1.  **<u>Payment for Materials and Equipment</u>.** Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the Jobsite for subsequent incorporation in the Work, with the approval of the Owner. If approved in advance by the Owner, in its sole discretion, payment may similarly be made for materials and equipment suitably stored off the Jobsite at a location agreed upon in writing. Payment for materials and equipment stored on or off the Jobsite shall be conditioned upon Owner (and Owner's lender, if any) agreeing to advance funds for such stored materials, compliance by the Contractor with procedures satisfactory to the Owner and its lender to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include applicable insurance, storage and transportation to the Jobsite for such materials and equipment stored off the Jobsite. The Contractor shall submit, within thirty (30) days after the date of commencement of the Work and thereafter as the Owner requires, schedules of materials and equipment for each category or subcontract for which Application for Payment will be made, which schedules shall include items, quantities, value or unit prices with extensions, and the month in

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 103 of 122 PageID #: 112

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

which Application for Payment with respect thereto is expected to occur. Schedules shall be updated on a monthly basis and submitted as an attachment to the Contractor's Application for Payment.

      8.2.2.  <u>Warranties Deemed Included in Application for Payment</u>. By submitting any Application for Payment, the Contractor shall be deemed to warrant that title to all Work covered by such Application for Payment passes to the Owner at the time of the Application for Payment, and that all Work for which Owner has made payment is free and clear of liens, claims, security interests or encumbrances of any kind in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

      Section 8.3.    Progress Payments.

      8.3.1.   <u>Owner's Right to Refuse to Make Payment</u>. Without limiting any other right or remedy which it may have, the Owner may refuse to make any payment to the extent as may be necessary, in the Owner's good faith opinion, to protect the Owner from loss because of:

     .1     defective Work not remedied;

     .2     third party claims filed or reasonable evidence indicating probable filing of such claims **which are not covered by insurance**;

     .3     failure of the Contractor to make payments properly to its Subcontractors or Vendors or for labor, materials or equipment;

     .4     failure of the Contractor to submit properly prepared and complete Applications for Payment, including all required supporting materials and documentation; or

     .5     persistent failures to carry out the Work in accordance with the Contract Documents.

When the above reasons for withholding payment are resolved to Owner's satisfaction, payment will be made for such amounts withheld.

      8.3.2.  <u>Payment Does Not Constitute Acceptance of Work</u>. No Application for Payment, nor any payment on account thereof by the Owner, nor any partial or entire use or occupancy of the Project by the Owner, shall constitute an acceptance of any Work not performed in accordance with the Contract Documents.

GMP_10082015

Case 1:24-cv-04939-VMS Document 1-1 Filed 07/16/24 Page 104 of 122 PageID #: 113

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**Section 8.4.    Substantial Completion.**

8.4.1.    **Substantial Completion.**  Substantial Completion is the stage in the progress of the Work when the Work, or designated portion thereof, is sufficiently complete in accordance with the Contract Documents so Owner can fully occupy or utilize the Project. The Work will not be considered suitable for Substantial Completion review until: (i) all Project systems included in the Work are operational as designed and scheduled; (ii) all designated or required governmental inspections and certifications have been issued, made and posted, including, without limitation, the temporary certificate of occupancy and/or its equivalent; (iii) the designated instruction of Owner in the operation of all systems has been completed; and (iv) all final finishes set forth within the Contract Documents are completed. In general, the only remaining Work shall be minor in nature, so that Owner could occupy the building(s) comprising the Project and fully utilize such building(s) on that date (in the manner described above), and all elements and utilities in and under the Project are fully functional and operable in accordance with the Contract Documents, and the completion of the Work by Contractor would not materially interfere with or hamper Owner's intended use, occupancy or enjoyment of the Project.

8.4.2.    **Procedure; Punch List.**  When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is Substantially Complete, Contractor shall so notify Owner in writing. Upon receipt of Contractor's notice, Owner and the Architect will make an inspection of the Project to determine whether the Work, or any designated portion of the Work, is Substantially Complete in accordance with the Contract Documents. If such inspection discloses any items which are not in accordance with the requirements of the Contract Documents, the Architect shall prepare and submit to the Contractor a comprehensive punch list of items to be completed or corrected by Contractor.  The Contractor shall proceed promptly to complete and correct all items on the punch list.  Failure to include an item on such punch list does not relieve the Contractor of its responsibility to complete all Work in accordance with the Contract Documents.  Upon receipt of the Contractor's punch list of completed items, the Owner and the Architect will make an inspection to determine whether the Work or designated portion thereof is Substantially Complete.  If such inspection discloses any item, whether or not included on the punch list, which is not in accordance with the requirements of the Contract Documents, the Contractor shall, before Architect issues the Certificate of Substantial Completion (as defined in Section 8.4.3), complete or correct such item(s) upon notification by the Owner.  The Contractor shall then submit a request for another inspection at Contractor's sole cost by the Owner and the Architect to determine whether the Work is considered Substantially Complete.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 105 of 122 PageID #: 114

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

8.4.3.  **Certificate of Substantial Completion.**  When the Work or designated portion thereof is Substantially Complete, Architect will prepare a Certificate of Substantial Completion which shall determine the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix the time within which the Contractor shall finish all remaining items on the punch list accompanying such Certificate.  The Certificate of Substantial Completion shall be submitted to the Owner and Contractor by the Architect for their respective written acceptance of responsibilities assigned to them in such Certificate.

**Section 8.5.    Partial Occupancy or Use.**

8.5.1.  **Partial Occupancy.**  The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is agreed to by the property insurance carrier and authorized by public authorities having jurisdiction over the Work.  Such partial occupancy or use may commence whether or not the portion is Substantially Complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents.  Any consent required under this Section 8.5.1 shall not be unreasonably withheld, conditioned or delayed.

8.5.2.  **Partial Occupancy Does Not Constitute Acceptance of Work.**  Unless otherwise agreed upon in writing, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

**Section 8.6.    Final Completion and Final Payment.**

8.6.1.  **Final Completion.**  Final Completion shall occur when (i) all Work, including any items not required for Substantial Completion are complete in accordance with the Contract Documents and a Certificate of Final Completion has been issued, as provided in Paragraph 8.6.2, below and (ii) the Contractor has delivered the following to the Owner:

.1      an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner might be responsible or the Owner's property may be encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied;

.2      a certificate evidencing that insurance required by the Contract Documents is currently in effect, will remain in force after Final Payment, and will not be cancelled, substantially modified or allowed

Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 106 of 122 PageID #: 115

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

to expire until at least thirty (30) days' prior written notice has been
given to the Owner;

.3      consent of the surety, if required, for Final Payment;

.4      if required by the Owner, other data establishing payment or
        satisfaction of obligations, such as receipts, releases and waivers of
        liens, claims, security interests or encumbrances arising out of the
        Agreement, to the extent and in such form as required by the
        Contract Documents. If a Subcontractor or Vendor refuses to furnish
        a release or waiver required by the Owner, the Contractor may
        furnish a bond satisfactory to the Owner to indemnify the Owner
        against such lien or encumbrance.  If such lien or encumbrance
        remains unsatisfied after payments are made, the Contractor shall
        refund to the Owner all amounts that the Owner may be compelled
        to pay in discharging such liens or encumbrances, including all costs
        and reasonable attorneys' fees;

.5      all as-built drawings, closeout documents, warranties and similar
        documents required by the Contract Documents;

.6      all documents and records required by Owner for the release of all
        jurisdiction bonds, if any; and

.7      any other requirements necessary for Final Payment or completion
        stated in the Construction Agreement have been satisfied.

8.6.2.   **Certificate of Final Completion.**  Upon receipt of written notice
that the Work is ready for final inspection and acceptance, and upon receipt of a
final Application for Payment, the Owner's Representative and the Architect will
promptly make the final inspection.  When the Owner's Representative and the
Architect determine that the Work has been fully performed in accordance with the
Contract Documents, the Architect will promptly issue a Certificate of Final
Completion and Acceptance stating that (i) to the best of the Architect's knowledge,
information and belief, and on the basis of the Architect's observations and
inspections, the Work has been completed in accordance with terms and
conditions of the Contract Documents, and (ii) the completed Work has been
accepted by the Owner's Representative on behalf of the Owner.

8.6.3.   **Delay of Final Completion.**  If, after Substantial Completion of the
Work, Final Completion is materially delayed through no fault of the Contractor or
by issuance of Change Orders affecting Final Completion, and the Owner's
Representative and Architect are in agreement with such determination, the Owner
shall, upon application by the Contractor and approval by the Owner's
Representative, and without terminating the Agreement, make payment of the
balance due for that portion of the Work which has been fully completed and

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 107 of 122 PageID #: 116

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

accepted. If the remaining balance for the Work not fully completed or corrected is less than the retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Owner as a further condition precedent to its entitlement to receive such payment.

8.6.4   **Acceptance of Final Payment Constitutes Waiver of Claims by Contractor.** Acceptance of Final Payment by the Contractor, a Subcontractor, Vendor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing in accordance with the terms of the Contract Documents, and identified by such payee as unsettled at the time of the final Application for Payment.

## ARTICLE 9
## PROTECTION OF PERSONS AND PROPERTY

**Section 9.1.    Safety Precautions and Programs.**

9.1.1.   **Contractor's Responsibility.**   The Contractor shall be solely responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Work and requirements of the Contract Documents. The Contractor shall submit the Contractor's safety program to the Owner for review and coordination with the safety programs of other contractors, if any.

9.1.2.   **Discovery of Hazardous Materials.**  In the event the Contractor encounters on the Jobsite material reasonably believed to be a Hazardous Material by any federal, state or local authority, which has not been rendered harmless, the Contractor shall immediately stop Work in the affected area and report the condition to the Owner orally and in writing.  Except as otherwise provided in Paragraph 9.1.3, below, the Owner, at its expense, shall be responsible for obtaining the services of a properly licensed laboratory to verify the presence or absence of the Hazardous Materials reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. The Work in the affected area shall not be resumed except by written agreement of the Owner and Contractor if the material is a Hazardous Material and has not been rendered harmless. The Work in the affected area shall be resumed immediately following the occurrence of any one of the following events:

   .1    the Owner causes remedial work to be performed which results in the removal or absence of the Hazardous Materials; or

   .2    the Owner and the Contractor, by written agreement, decide to resume performance of the Work; or

GMP_10082015

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 108 of 122 PageID #: 117

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

.3      the Work may safely and lawfully proceed, as determined by an
appropriate governmental authority or as evidenced by a written
report to both the Owner and the Contractor, which is prepared by
an environmental engineer reasonably satisfactory to both the
Owner and the Contractor.

9.1.3.   **Hazardous Materials for Which Contractor is Responsible.**
Notwithstanding Section 9.1.2, above, Contractor shall be solely responsible for
the remediation, disposal, and transport of all Hazardous Materials (1) brought to
or created at the Site by the Contractor or anyone working under Contractor, or (2)
which were pre-existing at the Site but require remediation, disposal or transport
due to the negligence of Contractor, any Subcontractor or Vendor or Contractor's
breach of this Agreement.

**Section 9.2.   Safety of Persons and Property.**

9.2.1.   **Reasonable Precautions to Prevent Loss to Persons and
Property.**  The Contractor shall take reasonable precautions to provide for the
safety of, and shall provide reasonable protection to prevent damage, injury or loss
to:

.1      employees, Subcontractors, and Vendors performing the Work and
other persons including but not limited to customers, tenant
employees, and delivery persons who may be affected thereby;

.2      the Work and materials and equipment to be incorporated therein,
whether in storage on or off the Jobsite, under the care, custody or
control of the Contractor, its Subcontractors, Sub-subcontractors or
Vendors; and

.3      other property at the site or adjacent thereto, such as trees, shrubs,
lawns, walks, pavements, roadways, structures and utilities not
designated for removal, relocation or replacement in the course of
construction.

9.2.2.   **Compliance with Law.**  The Contractor shall give notices and
comply with applicable laws, ordinances, rules, regulations and lawful orders of
public authorities bearing on safety of persons or property or their protection from
damage, injury or loss, including, without limitation, all OSHA requirements.  The
Contractor shall reimburse and indemnify the Owner for any fines, penalties or
assessments levied against the Owner as a result of violations of safety regulations
occurring at the Jobsite **which are caused by Contractor, its Subcontractors
or Vendors.**

GMP_10082015

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 109 of 122 PageID #: 118

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

9.2.3.   **Signs and Warnings**.  The Contractor shall erect and maintain, as required by existing conditions and performance of the Agreement, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations, and notifying owners and users of the building and adjacent sites and utilities.

9.2.4.   **Explosives and Other Hazardous Materials**.  When use or storage of explosives or other Hazardous Materials or equipment or unusual methods are necessary for the performance of the Work, the Contractor shall exercise the utmost care and carry on such activities under the supervision of properly qualified and licensed (if required) personnel, and with the prior written approval of the Owner.  Contractor is the owner of all Hazardous Materials brought to the Project Jobsite by the Contractor, and shall be strictly liable for such Hazardous Materials while they are being stored, handled, used or installed at the Project Jobsite.  The Contractor shall submit Material Safety Data Sheets and other documentation required by the Owner, applicable governmental agencies, the Contract Documents or applicable law, rule or regulation.  The Contractor shall strictly comply with all applicable laws, rules, and regulations relating to environmental matters and the handling of Hazardous Materials at all times during the performance of the Work.

9.2.5.   **Contractor to Remedy Damage or Loss**.  The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents), to property referred to in Sections 9.2.1.2 and 9.2.1.3, above, caused in whole or in part by the Contractor, any Vendor, any Subcontractor, any Sub-subcontractor, or anyone directly or indirectly employed or supervised by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Sections 9.2.1.2 and 9.2.1.3, above, except damage or loss solely attributable to intentional acts or omissions of the Owner or Architect or anyone directly or indirectly employed or supervised by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under the Agreement or any other obligations set forth in these General Conditions.

9.2.6.   **Overloading of Work**. The Contractor shall not load or permit any part of the Work to be loaded beyond its designated capacity, and will obtain the approval of the Architect prior to storing any equipment or materials on any part of the Work.

9.2.7.   **Protection of Adjoining Property and Persons**.  Contractor shall protect adjoining private or municipal property and shall provide barricades, temporary fences, and covered walkways required to protect the safety of persons (including invitees and passersby), as required by prudent construction practices, local building codes, ordinances and other laws, rules, regulations, and in

Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 110 of 122 PageID #: 119

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

accordance with the Contract Documents. Contractor shall prepare and submit to the Owner, for its approval, a Jobsite utilization plan showing the location of its on-site office, if any, all perimeter fencing, protected walkways, staging areas and haul roads. Such plan, as same may be amended and updated from time to time by Contractor in writing with Owner's approval, shall be maintained at the Jobsite to reflect the current conditions of the Jobsite. Owner's right of approval hereunder shall not be deemed to reduce Contractor's responsibility under this Section 9.2.7.

     9.2.8. **Protection Against Elements.** Contractor shall take commercially reasonable steps to maintain and protect the Work, materials and apparatus free from injury or damage from rain, wind, storms, frost or heat. If adverse weather makes it impossible to continue performance of the Work safely in spite of weather precautions, the Contractor shall cease Work and notify the Owner and the Architect of such cessation. The Contractor shall not permit open fires on the Project Jobsite at any time.

     9.2.9. **Repair of Damage Resulting from Work.** In addition to its other obligations pursuant to this Article 9, the Contractor shall, at its sole cost and expense, promptly repair any damage or disturbance to walls, utilities, sidewalks, curbs and the property of third parties (including, without limitation municipalities) resulting from the performance of the Work, whether by it or by its Vendors, Subcontractors or Sub-subcontractors. The Contractor shall maintain streets in good repair and in a traversable condition during the performance of the Work.

     **Section 9.3. Emergencies.** In any emergency affecting the safety of persons or property, the Contractor shall act, at its discretion, to prevent threatened damage, injury or loss. Any additional compensation or extension of time claimed by the Contractor on account of emergency work shall be determined in accordance with Article 11, hereof.

<del>ARTICLE 10</del><br><del>BONDS</del>

<del>     Section 10.    Bonds.</del>

<del>     10.1.   Contractor's Surety/Performance Bonds. The Contractor shall provide, and shall cause its Subcontractors to provide (if applicable) to the Owner a letter from Contractor's and Subcontractors' sureties indicating the sureties' willingness to issue such payment and performance bonds in connection with this Agreement. Contractor and each Subcontractor shall furnish to Owner and maintain such performance and payment bonds in the form attached to this Exhibit B as Schedule 1. Such bonds shall be issued by sureties reasonably acceptable to Owner, shall name the Owner, its lender (if any), as obligees and shall be in an amount not less than the aggregate amount of the hard cost portion of the Cost of the Work. All dual obligee rider language is subject to the approval of the Owner</del>

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

and the lender (if any). The Contractor and each Subcontractor (if applicable) shall deliver the executed, approved bonds to the Owner within seven (7) days after execution of the Agreement.

10.2. Subcontractors' Labor and Material Payment Bonds. Contractor may elect to procure surety bonds from Subcontractors and Sub-subcontractors; provided, however, that Owner shall not be charged, directly or indirectly, for any fees or costs associated with such bonds.

10.3. Cost of Bonds. The costs of all bonds required under this Section 10 shall be included in the Guaranteed Maximum Price.

10.4. Contractor to Furnish Copies of Bonds. Upon the request of any person or entity appearing to be a potential beneficiary of any of the bonds required under this Section 10, the Contractor and each affected Subcontractor shall furnish promptly a copy of the bonds or shall permit a copy thereof to be made and delivered to such person or entity.

### ARTICLE 11
### CHANGES IN THE WORK

Section 11.1. Change Orders.

11.1.1. **Method of Determining Cost or Credit**. Any increase in the Guaranteed Maximum Price resulting from a Change in the Work performed by Contractor shall be determined by actual, incurred cost to be determined in a manner agreed upon by the parties in writing. The increase or decrease in the Guaranteed Maximum Price resulting from a Change in the Work shall be determined for work performed by Subcontractors in one (1) or more of the following ways (the fee being adjusted according to the percentages set forth in the Agreement):

.1    by mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

.2    by unit prices stated in the Contract Documents or subsequently agreed upon; or

.3    by actual, incurred cost to be determined in a manner agreed upon by the parties.

11.1.2 **Use of Approved Rates**. Any labor rates, overtime rates, equipment rental rates and unit prices shall be approved by the Owner in writing in advance of any Work to be charged on the basis of such rates or prices. All costs incurred pursuant to a Change Order shall be subject to audit by the Owner.

GMP_10082015

Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 112 of 122 PageID #: 121

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**Section 11.2. Concealed Conditions.** Subject to the provisions of Section 3.4 of the Construction Agreement, should concealed conditions be encountered in the performance of the Work below the surface of the ground which Contractor would be unable to ascertain upon a reasonable investigation of subsurface conditions, or should concealed or unknown conditions in an existing structure be at variance with the conditions indicated by the Contract Documents, or should unknown physical conditions below the surface of the ground or concealed or unknown conditions in an existing structure of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Agreement, be encountered, the Guaranteed Maximum Price shall be equitably adjusted by Change Order, subject to the notice of claim and claim procedures contained in the Agreement. No adjustment in the Guaranteed Maximum Price, or in the Contract Time, shall be made for conditions that could have reasonably been anticipated by the Contractor based on all of the information available to the Contractor at the time the Construction Agreement was executed.

**Section 11.3. Notice of Claim.** Notice of claims for adjustments in the Guaranteed Maximum Price, Contract Time, or Agreement completion dates, by the Contractor must be made within seven (7) days after occurrence of the event giving rise to such Claims. Claims with backup documentation shall be submitted within twenty-one (21) days of any notice required above. Claims must be submitted in writing, even if the Claim is allegedly based on a previous oral or written statement made by the Owner. Any Claim not made in accordance with the terms of this Section 11.3, hereof shall be deemed waived by the Contractor. The Contractor acknowledges and agrees that the Owner may only waive the requirements of this Section 11.3 in writing and that it cannot rely on any oral statement of the Owner to the contrary.

## ARTICLE 12
## UNCOVERING AND CORRECTION OF WORK

**Section 12.1. Uncovering of Work.**

12.1.1. **Where Work Covered Contrary to Request.** If a portion of the Work is covered by the Contractor contrary to the request of the Architect or the Owner or to requirements specifically expressed in the Contract Documents, it must, if required in writing by the Architect, the Owner or any governmental authority, be uncovered for their observation and be replaced at the Contractor's expense without an extension in the Contract Time, or adjustment in the Guaranteed Maximum Price.

12.1.2. **Where Work Covered Not Contrary to Request.** If a portion of the Work has been covered by the Contractor which the Architect, the Owner or any governmental authority has not specifically requested to observe prior to the

Case 1:24-cv-04939-VMS Document 1-1 Filed 07/16/24 Page 113 of 122 PageID #: 122

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

Work being covered, the Architect or the Owner may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, the cost of uncovering and replacement shall, by appropriate Change Order, be charged to the Owner. If such Work is not in accordance with the Contract Documents, the Contractor shall pay such costs.

### Section 12.2. Correction of Work.

12.2.1. **Rejected Work.** The Contractor shall promptly correct Work rejected by the Architect, the Owner or any governmental authority, or that does not conform to the requirements of the Contract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Contractor shall bear the costs of correcting such rejected Work, including additional testing and inspections and compensation for the Architect's services and expenses made necessary thereby.

12.2.2. **Repair Warranty.** If, within one (1) year after the date of Substantial Completion of the Work or designated portion thereof, or after the date for commencement of warranties established under Section 8.5.1, with respect to the repair or correction warranty any of the Work has not been performed in accordance with the requirements of the Contract Documents or as may be set forth in an applicable manufacturer's warranty or prescribed by applicable laws, ordinances, codes, rules, regulations, statutes and permits, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so, unless the Owner has previously given the Contractor a written acceptance of such condition. To the extent any repair or correction work performed by the Contractor is not accepted by the Owner, the Contractor shall continue to repair and correct the Work until such Work is finally accepted by the Owner as complete, regardless of whether the Warranty Period has run. This obligation shall survive acceptance of the Work and termination of the Agreement. The Owner shall give such notice promptly after discovery of the condition. This remedy is cumulative, and shall not preclude the Owner from exercising any other remedy for defective work available to it under the Contract Documents or at law, or in equity.

12.2.3. **Owner May Correct Nonconforming Work.** If the Contractor fails to correct nonconforming Work within ten (10) days of notice of such non-conformity, or within such period as agreed upon in writing by Owner in the event such corrections cannot be completed within such ten (10)-day period, the Owner may correct such nonconforming Work in accordance with Section 3.3, hereof and charge the cost of such work to the Contractor.

12.2.4. **No Limitation.** Nothing contained in this Section 12.2 shall be construed to establish a period of limitation with respect to any other obligations which the Contractor may have under the Contract Documents. Establishment of the time period of one (1) year as described in Section 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

## ARTICLE 13
## TESTS

13.1.    **Rights and Obligations Cumulative.**  The duties and obligations imposed by the Contract Documents and the rights and remedies available thereunder shall be in addition to and not exclusive of any other duties, obligations, rights and remedies otherwise conferred in the Agreement, the Contract Documents, or otherwise available at law or in equity.


13.2.    **Arrangements for Inspection, Testing or Approval.**  If the Contract Documents, laws, ordinances, rules, regulations or orders of any public authority having jurisdiction over the Project require any portion of the Work to be inspected, tested or approved, the Contractor shall make arrangements for such inspections, tests and approvals and shall give the Owner and the Architect timely notice of such inspection, testing or approval so the Owner and the Architect may observe such inspection, testing or approval.  The Contractor shall bear all costs of such inspections, tests or approvals conducted by public authorities or required by the Contract Documents.  Unless otherwise provided in the Contract Documents, the Owner shall bear all costs of other inspections, tests or approvals. In the event the Work is not ready for inspection on the date specified by the Contractor, the Contractor shall be liable to the Owner for any additional costs incurred by the Owner for the failure of such inspection to be performed.


13.3.    **Avoidance of Delay.**  Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

## EXHIBIT C

## Guaranteed Maximum Price Premises,
## Assumptions and Schedule of Values

### General Understanding

1. The Guaranteed Maximum Price (GMP) will be based upon drawings and specifications generally dated March 11, 2016. The Contractor will obtain competitive pricing from at least three (3) subcontractors from each trade involved in the Work, including work that may be able to be self-performed. It is anticipated that three (3) weeks after each "Issued for Bid" design document is released, the Contractor shall share the results of the subcontractor bidding with the Owner and allow the Owner to participate in the selection of successful subcontractors. At that time, the Owner and Contractor shall come to a Guaranteed Maximum Price (GMP) Contract Agreement by applying Preconstruction Services, General Conditions, Contractor Fee, Contingency, General Liability Insurance, Owner-elected Bonding or Subguard and the selected Subcontractor bid amounts:

      A. Preconstruction Services   NA
      B. General Conditions   NA
      C. Contractor's Fee   NA
      D. Contingency   NA
      E. General Liability Rate   NA
      F. Bonding Rate   NA
      G. Or Subguard Rate   NA

2. Owner and Contractor acknowledge that construction of the Project will commence without final Drawings and Specifications. More specifically while Drawings and Specifications are complete for certain portions of the Work, the design process will continue for other portions during construction. Contractor shall provide constructability and cost estimating services in a timely manner and method which supports the Project Schedule, all in accordance with and pursuant to the Agreement. Contractor shall provide to Owner such cost estimates, and recommend alternate means and methods, as may be required to meet the intended design within the budget parameters and assumptions provided in **Exhibit A**, Contractor's Preliminary Budget.

3. Schedule of Values – To Be determined

GMP_10082015

Staten Island Mall – Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

## EXHIBIT D
## GENERAL CONDITION COSTS

| DESCRIPTION | COST |
|---|---|
| Project Superintendent (Full time) | $ |
| Project Manager | |
| Project Administrator | |
| Other Staff (indicate job function) | |
| Truck/Vehicle/Fuel Expenses | |
| Jobsite Officer Trailer | |
| Jobsite Office Supplies/Equipment | |
| Delivery Services/Postage | |
| Telephone Service | |
| Jobsite (Construction) Photos | |
| Miscellaneous Tools (including rental) | |
| Temporary Power | From Mall Source |
| Temporary Toilets | |
| Job Layout and Supplies | |
| Blueprinting | |
| Other (list): | |
| | |
| **General Conditions:** | $ |
| A10-10005 | |
| | |
| **TOTAL AMOUNT OF CONTRACT** | |

GMP_10082015

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 117 of 122 PageID #: 126

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

## EXHIBIT E
## INSURANCE REQUIREMENTS

### REQUIRED INSURANCE.

The Contractor shall furnish and maintain in effect during the term of this Agreement the insurance coverage described below, which shall be placed with insurance companies authorized to do business in the state in which the Project is located and rated "A – VII" or better by the most recent edition of Best's Key Rating Guide:

**Commercial General Liability Insurance.** Commercial General Liability Insurance on an occurrence basis which shall include bodily injury (including death), property damage, personal injury, sickness, disease, products and completed operations and broad form blanket contractual liability covering the indemnities required herewith, with a per occurrence limit of not less than $50,000,000 and general aggregate limit of not less than $50,000,000. Contractor may provide the coverage required herein through the use of a primary liability policy or through a combination of primary liability and umbrella liability policies.

**Worker's Compensation Insurance.** Worker's Compensation or similar insurance in amounts and in form in accordance with all statutory requirements, including Broad Form All States and Voluntary Compensation Endorsements, and Employer's Liability Insurance with limits of not less than $1,000,000 per accident, $1,000,000 per disease and $1,000,000 policy limit on disease.

**Business Automobile Liability Insurance.** Automobile Liability Insurance to insure operations of all owned, non-owned, leased and hired motor vehicles. Limits of liability shall not be less than $1,000,000 combined single limit per occurrence for bodily injury and property damage.

### POLICY REQUIREMENTS.

The insurance required of the Contractor shall be written for not less than any limits of liability required by applicable law.

The General Liability Insurance and Automobile Liability Insurance required shall name, as "Additional Insureds", Owner, General Growth Properties, Inc., General Growth Services, Inc., and GGPLP REIT Services, LLC,.

The General Liability Insurance shall contain the following coverages, endorsements or modifications: (i) Completed Operations Coverage (which shall be maintained for three (3) consecutive calendar years following Owner's acceptance of the Work); (ii) Contractor's Protective Liability to cover Contractor's liability arising out of Work performed by its Subcontractors; (iii) broad form blanket Contractual Liability, including liability arising out of the indemnification agreement set forth in the Agreement; (iv) Personal Injury Liability, including liability arising out of the indemnification set forth in the Agreement; and (v) all exclusions related to loss by explosion, collapse or underground damage (X, C, U) shall be deleted.

GMP_10082015

Case 1:24-cv-04939-VMS Document 1-1 Filed 07/16/24 Page 118 of 122 PageID #: 127

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

The general liability, workers' compensation and employer's liability Insurance policies shall contain a waiver of the insurer's right of subrogation against the Additional Insureds, or if such waiver is unobtainable or unenforceable: (a) an express agreement that such policy shall not be invalidated if the insured waives, or has waived before the casualty, its right to recovery therefor against the Additional Insureds, or (b) any other form of agreement or permission for the release of the Additional Insureds, and shall contain either a cross-liability endorsement or severability of interest provision, which provision shall permit the limits of liability under Contractor's policies to apply separately to each Additional Insured.

All Insurance policies required by this Agreement shall state that they are primary and not additional to, or contributing with, any other insurance carried by, or for the benefit of the Additional Insureds with respect to the negligence of Contractor, its employees, agents, contractors and/or subcontractors.

Before any Work is performed pursuant to this Agreement, Owner shall be furnished valid and original certificate(s) of insurance evidencing that all required insurance coverages are in force. All insurance policies required by this Agreement shall bear an endorsement prohibiting such policy from being canceled, allowed to lapse or substantially modified without thirty (30) days prior written notice to Owner, except for non-payment of premium for which ten (10) days' notice shall be provided. Certificates evidencing renewal of all such required insurance shall be delivered to Owner at least ten (10) business days prior to the stated expiration dates. Compliance with the insurance requirements of this Agreement shall not be relieved by Owner's receipt or review of any insurance certificates.

## OWNER'S BUILDER'S RISK INSURANCE.

Owner will self-insure or will purchase and maintain Builder's Risk Insurance, covering the entire Work at the Project site including all materials and equipment destined to become a part of the Work. Such insurance shall include the perils of fire, extended coverage, vandalism, and malicious mischief, and so called "All Risk" perils (including earthquake and flood) as defined and limited in the policy or policies. Coverage is not provided for Contractor's or Subcontractor's tools, apparatus, machinery, equipment, building materials, scaffolding, hoists, forms or any other property of Contractor or any Subcontractor not destined to become a part of the Work, and any loss or damage to such property is the Contractor's sole responsibility. Contractor shall be responsible for, and shall bear the cost of, the first fifty thousand dollars ($50,000) of the deductible portion of any covered loss under the Builder's Risk policy, however caused. The Contractor should purchase a rider to cover the first Fifty Thousand Dollars ($50,000) of the deductible. Owner will reimburse the Contractor for this policy to fulfill the above referenced requirements. If not covered under the Builders' Risk Insurance or otherwise provided in the Contract Documents, the Contractor shall effect and maintain similar property insurance on portions of the Work stored off the site or in transit. Any loss covered by Owner's Builder's Risk Insurance is to be adjusted with Owner and made payable to Owner as trustee for the insureds, the Contractor, its Subcontractors and vendors as their interests may appear. The Contractor shall pay each Subcontractor a just share of any insurance moneys received by the Contractor, and by appropriate agreement, written where legally required for validity, shall require each Subcontractor to make payments to its Subcontractors in similar manner.

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

### Additional Insureds

GGP Staten Island Mall LLC, (f/k/a) Rouse SI Shopping Center, LLC
General Growth Properties, Inc.,
GGPLP REIT Services, LLC,
General Growth Services, Inc.

GMP_10082015

Case 1:24-cv-04939-VMS    Document 1-1    Filed 07/16/24    Page 120 of 122 PageID #: 129

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

## EXHIBIT F

PROLIANCE®

**Section 1 Introduction** - The Owner has elected to use Proliance® as the project management tool for this Project. Proliance® is a web-based tool that increases productivity and improves processes and accountability for all stakeholders throughout the design, construction and facilities lifecycle of the Project. The following sections have been drafted in order to provide an understanding of how the system will be used in the management of the Project. All usage of Proliance® is to strictly adhere to the procedures defined in this exhibit.

### Section 2  Technology Requirements

**2.1 Technology Overview.** Each company doing business with Owner is required to have access to computer hardware and software that meet the requirements of the Proliance® project management software. Proliance® software and licenses to use the project database will be provided by Owner or its parent, for the duration of the Project. The hardware and software required to access this system via the Internet is to be provided by each party accessing the software. Licenses to Owner's or its parent's database will permit access only to this project, in accordance with permission levels configured by Owner's or its parent's Proliance® administrator.

### 2.2  System Requirements

| | |
|---|---|
| **2.21** | Pentium based (or equivalent) workstation or laptop. |
| **2.22** | 32-bit operating system such as Windows XP, 2000, 98 or Windows NT. |
| **2.23** | Microsoft's Internet Explorer 6.0 (or higher) browser software that supports HTML 1.1, tables, cookies, JavaScript, and frames. If any of the computers do not have Internet Explorer 6.0 (or higher) installed, it may be downloaded for free by accessing www.microsoft.com. |
| **2.24** | There is a one-time install of Java Runtime Environment (JRE) software utilized by portions of Proliance®. Computers operating on Windows 2000 or XP will need to be enabled with local administrator rights in order to facilitate installation of JRE. When using certain features of Proliance®, users will be prompted to download a JRE file for installation on their computers. This will install Java JRE 1.4.1_05. |
| **2.25** | There is a one-time install of an ActiveX upload component. Computers will need to be enabled with local administrator or power user rights in order to facilitate of the installation of this component. When using certain features of Proliance®, users will be prompted to download an ActiveX file on their computers. |

- 36 -

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 121 of 122 PageID #: 130

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

**2.26**    A scanner will need to be provided by the Contractor for use in scanning in documents received from subcontractors and vendors too small to be made users. This scanner is to be located at the Project Jobsite for use by the Contractor or others needing to scan documents. Other users will be required to either purchase their own scanning equipment, if needed, or utilize the scanner provided by the Contractor.

**2.27**    Owner or its parent owns the data that is contained in Proliance®.

**Section 3** <u>Training Requirements</u>. It is the responsibility of the Contractor to request access to Owner's Online Proliance® Training. Upon completion of Owner's Online Proliance® Training, upon request, the Owner will provide additional support via online conference.

**Section 4** <u>Project Documentation</u>

**4.1** <u>**Requests For Information (RFI's)**</u> - All formal Requests For Information requiring a response from the Contractor shall be initiated within Proliance®.

**4.2** <u>**Submittals.**</u> All submittals requiring the approval of the Contractor shall flow through Proliance® in an electronic format with exception to product samples.

**4.3** <u>**Change Notices (Change Order Requests).**</u> All change order requests shall be submitted via email to the Contractor on Owner's Change Order Request Form with all applicable supporting documentation attached as set forth within the Agreement.

**4.4** <u>Progress</u>

    **4.4.1**  <u>**Meeting Minutes**</u> - All meeting information including but not limited to agenda, minutes, attendees, and supporting information shall be captured within Proliance® in the Meeting's module.

    **4.4.2**  <u>**Project Documentation.**</u> If requested by Owner, the Construction Manger shall upload all Daily Reports, Schedules, Photos, Reports, and/or Tracking Logs to the corresponding folders in the Correspondence Module of Proliance®, as applicable.

**4.5** <u>**Drawing Files**</u>

    **4.5.1**  Contractors will be provided an approved set of drawings in addition to subsequent bulletins via Proliance®. It is the responsibility of the contractor to download the files from the site and produce printed copies as needed to timely deliver the Project.

Case 1:24-cv-04939-VMS   Document 1-1   Filed 07/16/24   Page 122 of 122 PageID #: 131

Staten Island Mall - Seed Money Macys
Contract # 019
Aurora Contractors, Inc.

4.6        **Project Close-out**

4.6.1   **As-Built Drawings.** In addition to supplying hard copy
documents to the Owner's site operations team; electronic
copies of as-built documents shall be uploaded to
Proliance® within two (2) weeks of the Substantial
Completion date of the Project.

4.6.2   **Warranties.** Warranty paperwork shall be supplied in hard
copy format to the Owner's site operations team and
uploaded to Proliance® in electronic format.

4.6.3   **Manuals.** All product manuals shall be uploaded to
Proliance® in addition to the hard copy that is supplied to
the Owner's mall operations team within two (2) weeks of
Substantial Completion.

## Section 5 Project Financials

5.1   **Contracts & Change Orders.** All contracts and change orders will be
signed electronically via Proliance® by both Owner and the Contractor.

5.2   **Invoices.** All Invoices will be created and submitted electronically via
Proliance® by the Contractor.  Invoices are to be submitted with all
applicable supporting documentation attached as set forth within the
Agreement.